## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIA DE ALIMENTOS ZENÚ S.A.S., | Civ. No. 16-6576 (KM)(MAH) |
| Plaintiff, | |
| v. | OPINION |
| LATINFOOD U.S. CORP. d/b/a ZENÚ PRODUCTS CO., and WILSON ZULUAGA, | |
| Defendants. | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Industria de Alimentos Zenú, S.A.S ("Industria") brings this sixteen-count action against the defendants, Latinfood U.S. Corp doing business as Zenú Products Co. ("Latinfood"), and Wilson Zuluaga.

This matter comes before the court on Latinfood and Mr. Zuluaga's motion to dismiss Counts 1-4 and 11-16 of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion is denied.

**TABLE OF CONTENTS**

I.      Background...................................................................................4

    A. The Parties................................................................................4

    B. The Zenú and Ranchera Marks.................................................4

        1. Zenú mark..........................................................................5

        2. Ranchera mark...................................................................6

        3. Industria's Trademark Registrations...................................6

    C. The Dispute...............................................................................7

        1. Mr. Zuluaga and Latinfood's Registration and Use of the Zenú mark....................................................................9

        2. Mr. Zuluaga and Latinfood's Application for Registration and Use of the Ranchera mark.................................................12

        3. Mr. Zuluaga and Latinfood's Implication of Affiliation with Industria ................................................................13

II.     Procedural History....................................................................14

III.    Legal Standard..........................................................................19

IV.     Analysis....................................................................................20

    A. Lanham Act and New Jersey Fair Trade Act claims (Counts 1-4, 11, and 15-16)..........................................................................20

        1. Use of the Zenú and Ranchera trademarks in United States Commerce (Counts 1-4, 11, and 15-16)..................................20

        2. Lanham Act Trade dress infringement (Count 4), and Source Misrepresentation (Count 11) claims.....................................26

        3. *Lexmark* elements (Counts 1, 2, 15, and 16)........................28

        4. Lanham Act false advertising (Count 3).................................30

    B. Inter-American Convention for Trademark and Commercial Protection claims (Counts 12-14)................................................................32

        1. Private Rights of Action........................................................32

2. Alternative Arguments............................................................38

    a.  Knowledge requirement.................................................38

    b.  Section 44 of the Lanham Act.........................................39

C. Dismissal of Mr. Zuluaga as an Individual Defendant.....................42

V.    Conclusion....................................................................................44

## I.    Background[1]

### A. The Parties[2]

The plaintiff, Industria, is a Colombian corporation[3] with its principal place of business in Medellin, Colombia. (AC ¶ 13) It is a wholly-owned subsidiary of Grupo Nutresa S.A., "the largest Colombian food corporation with annual global sales of approximately U.S. $3 billion." (*Id.*) Grupo Nutresa "conducts business and sells products in the United States through United States-based subsidiaries." (*Id.*)

Defendant Latinfood is a registered New York corporation with its principal place of business in New York. (*Id.* ¶ 14) Defendant Wilson Zuluaga is a New York resident who is the owner and principal of Latinfood, as well as a member of its board of directors. (*Id.* ¶ 15) According to Industria, both defendants transact business in New Jersey. Latinfood U.S. Corp "mak[es] significant sales within [New Jersey]" and also has a phone number with a New Jersey area code (*Id.* ¶ 14), while Mr. Zuluaga "transacts business in New Jersey by virtue of Latinfood's sales within the state and his promotion of Latinfood's products within the state." (*Id.* ¶ 15)

### B. The Zenú and Ranchera Marks

On December 27, 2002, Industria acquired the Zenú and Ranchera marks through an assignment from its sister company, Industrias Alimenticias

---

[1] For purposes of this Rule 12(b)(6) motion to dismiss, the allegations of the Complaint are taken as true. *See* Section III, *infra*.

[2] Certain key record items are abbreviated as follows:

| | |
|---|---|
| AC= | Amended Complaint, ECF no. 31 |
| Cplt. = | Complaint, ECF no. 1 |
| Def. Brf. = | Brief of defendant in support of motion to dismiss, ECF no. 37 |
| Def. Reply = | Reply Brief of defendant in further support of its motion to dismiss, ECF no. 45 |
| Pl. Brf. = | Brief of plaintiff in opposition to motion to dismiss, ECF no. 40 |

[3] The corporation was organized under the laws of Colombia. (AC ¶ 13) It was created by public deed No. 1953 and extended before a Notary Public in Colombia in August 2002. (*Id.* ¶ 1)

Noel S.A.[4] (*Id.* ¶¶ 1, 2) The Zenú mark "has been used for more than sixty years to identify meat, sausage, beans and other packaged food products in Colombia and elsewhere," while the Ranchera mark, "has been used extensively in Colombia and elsewhere for more than 25 years, and is among the most well-known trademarks for sausages and meat products." (*Id.*)

According to Industria, "[o]ver the many years of sales, [its] [Zenú and Ranchera trademarks have become famous in Colombia and across Latin America." (*Id.* ¶ 23) It alleges that "individuals residing in Colombia, individuals who have travelled to Colombia and individuals who have moved from Colombia to the United States are familiar with the [Zenú] and Ranchera trademarks and [Industria's] food products sold under the [Zenú] and Ranchera marks." (*Id.*)

**1. Zenú mark**

Industria's Zenú products include "the [Zenú] mark in a red stylized font underlined by a brush-stroke type line against a white background." (*Id.* ¶ 24) Words indicating the type of food contained in the packaging are "often written diagonally underneath the [Zenú] mark." (*Id.*) As for canned products with the [Zenú] mark, their label includes an additional "thick colorful band at the bottom of the label where additional information such as the weight or quantity of the product is conveyed in white type." (*Id.* ¶ 25)[5] *See* (ECF no. 31-1, Exh. A)

Industria registered four "title[s] of work" with the United States Copyright Office: (1) "Zenu Chorizo Mediano", (2) "Zenu Chorizo con Ternera", (3) Zenu Chorizo Pequeno", and (4) "Zenu Chile Con Carne de Res."[6] (*Id.* ¶ 27) *See* (Exs. B to E, ECF nos. 31-2 to 31-5). The Certificates of Registration for each copyright identify the "Effective Date of Registration" as December 2016. (Exs. B to E, ECF nos. 31-2 to 31-5).

---

[4] Industrias Alimenticias Noel S.A. later became Inveralimenticias S.A. and merged into Inversiones Nacional de Chocolates S.A., which on April 5, 2011, became Grupo Nutresa S.A. (*Id.*)
[5] The labels are written in Spanish.
[6] The "Title of Work" sections of the United States Copyright Office Certificate of Registrations use the word "Zenu" in lowercase and without an accent mark above the letter u.

Industria alleges that it "has advertised and promoted food products under the [Zenú] mark at trade shows around the world, including in the United States." (*Id.* ¶ 28) It also maintains a website "that is accessible by the public, including consumers in the United States, at www.zenu.com.co." (*Id.*)

**2. Ranchera mark**

Industria's Ranchera mark is "always displayed in a red 'western' or 'rancher-inspired' font which is then outlined first in white and then in black." (*Id.* ¶ 30) It "curves slightly upward in the middle of the word." (*Id.*) A "rancher theme" is used across the [Ranchera] packaging. (*Id.* ¶ 31) For example, this theme is used across a type of "Salchicha" which shows a family around a campfire. (*Id.*) "The family consists of a man, woman, boy and girl around a campfire in the foreground with a covered wagon in the background to the left. The family is always seated with the man on the left, followed by the boy, then the woman and the girl[.]" (*Id.*) *See also* (ECF no. 31-7, Exh. G).

Industria has registered the "Ranchera" title of work with the United States Copyright Office. (ECF no. 31-6, Exh. F). The effective date of registration is December 5, 2016. (*Id.*)

**3. Industria's Trademark Registrations**

Starting in 2001, Industria registered numerous trademarks in Colombia associated with Zenú, Ranchera, "and the line of products [Industria] offers under those names." (*Id.* ¶ 36) The Zenú mark also has an International Registration Number, dated March 12, 2014, and is registered with the World Intellectual Property Organization. (*Id.* ¶ 37) Industria also filed an application on March 12, 2014 to extend the International Registration at the United States Patent and Trademark Office ("USPTO"). (*Id.*)

In the past, Industria has owned numerous trademark registrations at the USPTO associated with the Zenú and Ranchera marks. (*Id.* ¶ 38) However, those registrations have lapsed. (*Id.*)

On November 20, 2014, Industria filed an application at the USPTO for "ZENÚ (Stylized)" for "meat, fish, poultry and game; meat extracts; canned,

frozen, dried and cooked fruits and vegetables; jellies, jams, compotes; eggs; milk and dairy products; edible oils and fats." (*Id.* ¶ 39) The application was filed based on Section 44(e) of the Lanham Act and has been blocked by the Zenú mark registered by Latinfood. (*Id.* ¶ 40)

Almost two years later, on November 14, 2016, Industria filed an application at the USPTO for "RANCHERA (stylized)" for "meat, fish, poultry and game; meat extracts; ham, namely, turkey ham, pork ham, beef ham; sausages and hot dogs made of beef or chicken; ribs, namely, beef ribs, pork ribs; beef hamburgers, chicken hamburgers, turkey hamburgers." (*Id.* ¶ 41) This application was filed based on Sections 1(b) and 44(e) of the Lanham Act. (*Id.*)

### C. The Dispute

The dispute arises out of Mr. Zuluaga and Latinfood's alleged scheme to profit from, and use, Industria's Zenú and Ranchera marks, trade dress[7], and packaging. (*Id.* ¶ 42) Starting in or about 2011, Mr. Zuluaga, through his company, Latinfood, allegedly began to "capitalize upon the goodwill generated over the course of decades for [Industria]'s widely-recognized quality products and its famous ZENÚ mark." (*Id.*) A year later, in or about 2012, Mr. Zuluaga incorporated Industria's Ranchera mark into his scheme. (*Id.*) According to Industria, at Mr. Zuluaga's direction, Latinfood began to 1) sell food products in the United States similar to those sold by Industria in Colombia and elsewhere, 2) use Industria's Zenú and Ranchera trademarks, the stylized logos, and 3) copy the trade dress and label designs employed by Industria. (*Id.*)

Specifically, according to Industria, Mr. Zuluaga "has caused Latinfood to mimic [Industria]'s [Zenú] packaging – including [its] stylized logo, copyrighted packaging and trade dress – to falsely suggest an affiliation with [Industria]'s

---

[7] *See* 1 McCarthy on Trademarks and Unfair Competition § 8:4 (5th ed.)(explaining "[w]hat constitutes trade dress").

business in Colombia." (*Id.* ¶ 67) Industria alleges "upon information and belief" that Mr. Zuluaga "launched Latinfood as the result of his observation that there was a demand for specialty products from Colombia in the tri-state area, which is home to a large population of Colombian-Americans." (*Id.* ¶ 43)(footnote omitted).[8] Industria alleges that "U.S. consumers travelling to and from Colombia and Americans of Colombian origin are familiar with the [Zenú] and [Ranchera] marks, and have brought [Zenú] and [Ranchera] products into the United States." (*Id.* ¶ 44) Therefore, Industria says, "recognizing th[at] demand, Mr. Zuluaga created Latinfood and has promoted it as an importer of Colombian products." (*Id.* ¶ 45)

According to Industria, "Mr. Zuluaga has remarked that the company's goal is to 'become the most reliable importer for food and specialty products from South and Central America.'" (*Id.*) "In this vein, [both Mr. Zuluaga and Latinfood] have touted that they possess 'an exclusive distribution and importing rights agreement for the tri-state area' with a major product manufacturer in Colombia." (*Id.*) Mr. Zuluaga, Industria says, has "misl[ed] the public into believing that [his and Latinfood's] products bear an affiliation to [Industria]'s famous products from Colombia." (*Id.* ¶ 46) Mr. Zuluaga and Latinfood "have targeted consumers in the tri-state region, including through at least fifteen stores in New Jersey. [Mr. Zuluaga and Latinfood]'s deceptive products can also be found for sale in New York and Connecticut." (*Id.* ¶ 47)

Regarding Zenú, Industria alleges that:

[p]rominently featured on each of [Mr. Zuluaga and Latinfood's] products is [Industria]'s [Zenú] mark in the identical stylized logo. Moreover, Mr. Zuluaga has caused Latinfood to misappropriate and use [Mr. Zuluaga and Latinfood]'s red and white [Zenú] trade dress in its packaging of its products, employing the exact same logo, diagonal labeling convention and colorful band at the base of its canned products.

---

[8] Footnote 1 of the Amended Complaint states that "[a]ccording to the 2010 Census, over 100,000 Colombian-Americans live in New Jersey and nearly 150,000 live in New York. The population of Latin Americans is even more sizeable." (AC ¶ 43 n.1)

(*Id.* ¶ 68)(citing ECF nos. 31-1, Exh. A and 31-9, Exh. I) The "same trade dress" can also be seen on Mr. Zuluaga and Latinfood's website, www.zenu.us.com, "which closely mimics both the domain name and trade dress presented on [Industria]'s website, www.zenu.com.co." (*Id.* ¶ 70) Moreover, according to Industria, "[Mr. Zuluaga and Latinfood]'s labels are also substantially similar to the Zenú labels which [Industria] ha[s] copyrighted." (*Id.* ¶ 69) *See* (ECF nos. 31-2 to 31-5, Exhs. B-E)

Industria alleges that "any suggestion of coincidence" regarding the level of similarity between Industria's products, and Mr. Zuluaga and Latinfood's products, "is belied by [Mr. Zuluaga and Latinfood's] attempt to procure 400,000 of [Industria]'s labels from [its] own [Zenú] label provider in Medellín, Colombia." (*Id.* ¶ 72) According to Industria, the provider informed Industria of "the suspicious order and brought [Mr. Zuluaga and Latinfood's] scheme to [Industria]'s attention." (*Id.*)

### 1. Mr. Zuluaga and Latinfood's Registration and Use of the Zenú mark

On January 25, 2013, Mr. Zuluaga, on behalf of Latinfood, submitted, and signed as director of the company, an application to the USPTO to register the Zenú mark. (*Id.* ¶ 48)(footnote omitted).[9] The application "was for the standard [Zenú] mark without any claim to a particular font style, size or color." (*Id.*) "In the application, Mr. Zuluaga asserted January 1, 2011 as a first use date and as the date of use in commerce." (*Id.* ¶ 49). On September 17, 2013, the USPTO issued Registration Number 4,402,942 for the mark ZENÚ "for Bologna; Canned cooked meat; Canned fish; Chorizo; Hot dogs; Preserved

---

[9] Footnote 2 of the Amended Complaint states: "[t]hough initially registered to Zenú Products Inc., another company controlled by Mr. Zuluaga, an alleged corrective *nunc pro tunc* assignment was filed with the USPTO, assigning the ZENÚ mark and registration therefor to Latinfood U.S. Corp. d/b/a ZENÚ Products, Co., effective August 21, 2013. At all times, Mr. Zuluaga controlled the application and the contents within it." (*Id.* ¶ 48 n.2)

meats and sausages; Processed meat; Sausages; Tuna fish" in Class 29." (*Id.* ¶ 50).[10]

Industria says that Mr. Zuluaga and Latinfood's "[Zenú] mark is identical to [its] [Zenú] mark, and the food products that [Mr. Zuluaga and Latinfood] sell under the [Zenú] mark are the same as or closely related to the [Zenú] - branded goods that [Industria] sells in Colombia and for which [Industria] has applied to register the [Zenú] mark in the U.S." (*Id.* ¶ 51). Industria alleges, "upon information and belief", that "Latinfood, at Mr. Zuluaga's direction, adopted the [Zenú] mark in order to co-opt the valuable goodwill associated with [Industria]'s mark and with the intent to deceive, mislead, and confuse the public into believing that there is a connection between [Mr. Zuluaga and Latinfood's] products and those of [Industria], and that [Mr. Zuluaga and Latinfood] products are of the same character, quality and function" as its products. (*Id.* ¶ 52). Therefore, Industria says, "[Mr. Zuluaga and Latinfood's] application to the USPTO was submitted in bad faith." (*Id.*)

Industria further alleges that Mr. Zuluaga secured the registration of the Zenú mark in the United States on behalf of his company "through false attestations in their trademark applications." (*Id.* ¶ 53). According to Industria, in connection with the application for the Zenú mark, Mr. Zuluaga "submitted specimens consisting of depictions of similar or identical packaging as that of [Industria]." (*Id.* ¶ 54). In particular, the specimens "feature similar or identical images, layouts, stylized lettering, logos, and coloring used by [Industria] on packaging for its goods." (*Id.*) "Upon information and belief", it says, "Mr. Zuluaga, acting on behalf of his company knew these specimens were in fact [Industria]'s products." (*Id.*) *See* (ECF no. 31-8, Exh. H). Included among the specimens were labels for RANCHERA Salchicha Premium, ZENÚ Chorizo Mediano, and ZENÚ Chorizo Pequeño, which, according to Industria are

---

[10] According to Industria, "Latinfood, by and through Mr. Zuluaga, recently applied for protection of the ZENÚ mark (Serial No. 87151048) for 'dairy-based beverages; white cheese' in Class 29." (*Id.* ¶ 66) At the time of the filing of the Amended Complaint, the application remained pending. (*Id.*)

indistinguishable, "markedly similar", or identical to its marks. (*Id.* ¶¶ 55-57) "Upon information and belief," Industria also alleges that "the specimens submitted by Mr. Zuluaga on behalf of Latinfood are not examples of those in use by [Mr. Zuluaga and Latinfood] in the United States." (*Id.* ¶ 58)

Moreover, Mr. Zuluaga, on behalf of Latinfood, allegedly made a "materially false statement" that was "made with intent to deceive the USPTO" when he swore that Latinfood "believed itself to be entitled to exclusive use of the [Zenú] mark in the United States." (*Id.* ¶¶ 59-60) "Upon information and belief," before the alleged date of first use in Latinfood's [Zenú] trademark application, Mr. Zuluaga and Latinfood knew that 1) Industria "had properly registered each of its [Zenú] trademarks in Colombia," and 2) Industria's [Zenú] mark had become well-known in the United States. (*Id.*) According to Industria, "upon information and belief, [Mr. Zuluaga and Latinfood] applied to register the [Zenú] mark in the United States only after, and solely because, they knew of [Industria]'s [Zenú] mark and its goodwill." (*Id.* ¶ 61)

Industria did not oppose Mr. Zuluaga and Latinfood's 2013 ZENÚ mark registration application until after the USPTO issued Registration Number 4,402,942 for the mark ZENÚ in September 2013 "because, as a foreign corporation, it was unaware of [Mr. Zuluaga and Latinfood's] pirating of the [Zenú] mark in the United States until in or around October 2013, when a supplier contacted [Industria] to alert it of [their] activity." (*Id.* ¶¶ 48-50, 64)

Since then, Industria has applied for registration for [Zenú] (Serial Nos. 79/147,515 and 86/459,824). (*Id.* ¶ 62) However, because of Mr. Zuluaga and Latinfood's registration of the Zenú mark under Registration No. 4,402,942, that mark and its registration number "ha[ve] been cited under Section 2(d) by the USPTO against each of [Industria]'s applications for [Zenú]. . . in Office Actions dated June 19, 2014 and March 13, 2015 respectively[.]" (*Id.*) As a result, Industria admittedly "cannot offer its goods for sale in the United States under its own ZENÚ mark." (*Id.* ¶ 63)

Thereafter, on September 9, 2014, Industria began a cancellation proceeding before the Trademark Trial and Appeal Board ("T.T.A.B.") seeking the cancellation of Latinfood's Zenú mark. (*Id.* ¶ 65) As of the date of the filing of the Amended Complaint, the proceeding was still pending. (*Id.*)[11]

### 2. Mr. Zuluaga and Latinfood's Application for Registration and Use of the Ranchera mark

On February 18, 2014, Mr. Zuluaga, on behalf of Latinfood, submitted, and signed as director of the company, an application to register the Ranchera mark. (*Id.* ¶ 73)(footnote omitted)[12] "The application was for the standard [Ranchera] mark without any claim to a particular font style, size or color for 'bologna; canned cooked meat; canned fish; chorizo; hot dogs; preserved meats and sausages; processed meat; sausages; tuna fish, not live.'" (*Id.*)

According to Industria, Latinfood's application was for a Ranchera mark "that is identical to [Industria's] [Ranchera] mark, and the food products that [Mr. Zuluaga and Latinfood] sought to sell under the [Ranchera] mark are the same as or closely related to the [Ranchera]-branded goods that [Industria] sells in Colombia and for which [Industria] has applied to register the [Ranchera] mark in the U.S." (*Id.* ¶ 74) "In the application, Mr. Zuluaga asserted January 15, 2012 as a first use date and as the date of use in commerce." (*Id.* ¶ 75).

Industria alleges that Mr. Zuluaga and Latinfood submitted a fraudulent Ranchera specimen in support of their application. (*Id.* ¶ 76). *See* (ECF no. 31-8, Exh. H).[13] Similar to the Zenú application, "Mr. Zuluaga swore, on behalf of

---

[11] Since 1958, the T.T.A.B. has been the administrative body hearing cancellation petitions. *See* 3 McCarthy on Trademarks and Unfair Competition §§ 20:1, 20:40 to 20:45, 20:99 (5th ed.) *See* Cancellation, http://ttabvue.uspto.gov/ttabvue/, *search* Registration Number 4402942. The appeal was suspended on December 8, 2017 pending the outcome of this action. *See id.*, <u>SUSP PEND DISP OF CIVIL ACTION</u>, December 8, 2017.

[12] Footnote 3 of the Amended Complaint states: "Like the [Zenú] application, the [Ranchera] application was filed in the name of the non-existing Zenú Products Inc." (AC ¶ 73 n.3)

[13] Industria alleges that the specimen was the same specimen that was submitted in connection with Mr. Zuluaga and Latinfood's ZENÚ application. (*Id.* ¶ 76)

his company in its trademark application, that it believed itself to be entitled to exclusive use of the [Ranchera] mark in the United States." (*Id.* ¶ 76) However, "upon information and belief", Mr. Zuluaga and Latinfood were aware that Industria had properly registered each of its [Ranchera] trademarks in Colombia prior to the February 2014 application date. (*Id.*) Therefore, according to Industria, "upon information and belief", Mr. Zuluaga's sworn statement in the application "was materially false and made with intent to deceive the USPTO." (*Id.* ¶ 77)

Mr. Zuluaga and Latinfood's Ranchera trademark application was ultimately denied by the USPTO because of a third-party registration for RANCHERO (Reg. No. 3294606). (*Id.* ¶ 79) However, Industria alleges "upon information and belief" that Mr. Zuluaga and Latinfood "still market and sell products bearing the [Ranchera] mark." *Id.* "The [Ranchera] products now advertised by [Mr. Zuluaga and Latinfood] feature the same [Ranchera] logo as [Industria]'s, and while not featuring the family around the campfire, their labels also adhere to a rancher theme." (*Id.* ¶ 80)

### 3. Mr. Zuluaga and Latinfood's Implication of Affiliation with Industria

In addition to the alleged aesthetic similarities between Industria's products, and Mr. Zuluaga and Latinfood's products, Industria alleges that the contents of the labels for Mr. Zuluaga and Latinfood's products "falsely suggest an affiliation with [its] business in Colombia." (*Id.* ¶ 81) For example, Mr. Zuluaga and Latinfood's labels "falsely identify the company as 'Zenu Products US Inc.'" rather than Latinfood, thereby suggesting, Industria Zenú says, that the company is a United States-based affiliate of Industria. (*Id.*) The labels also include a "'linea de exportacion'" designation, meaning "export line" in English, which further suggest "that Latinfood products are produced outside of the United States, much like [Industria]'s products from Colombia would be." (*Id.* ¶ 82) (footnote omitted)[14]

---

[14] Footnote 4 of the Amended Complaint provides: "[n]otably, Defendants' labels are predominantly in Spanish, again suggesting that the products are imported from a

According to Industria, Mr. Zuluaga and Latinfood's "products are often featured in the import/foreign sections of the groceries in which they are sold and are sold alongside products from other Latin American companies." (*Id.*) Industria alleges "upon information and belief" that "Latinfood sales representatives advise store owners that Latinfood has full rights to the distribution of ZENÚ- and RANCHERA-marked products." (*Id.* ¶ 83) Therefore, the individuals who engage with the Latinfood sales representatives are misled into believing that "they are buying products from the same source as [Industria]'s products from Colombia." (*Id.*)

Furthermore, Industria says that the suggestion that the products are imported is not only misleading, but is also false because "a majority of [Mr. Zuluaga and Latinfood]'s goods are manufactured and labeled in the United States." (*Id.* ¶ 84) It alleges that because "the origins and source of [Mr. Zuluaga and Latinfood]'s pirated products are not truthfully disclosed on [their] labels", Mr. Zuluaga and Latinfood are "potentially threatening the health and safety of consumers." (*Id.*)

Mr. Zuluaga and Latinfood also allegedly mislead consumers into thinking that they are associated with Industria through their website www.zenu.us.com, a domain name which is "confusingly similar" to Industria's domain name of www.zenu.com.co. (*Id.* ¶ 85)[15] Moreover, their website, which promotes Zenú and Ranchera marked products, describes their products as being part of "'una deliciosa tradición,'" meaning "delicious tradition" in English. (*Id.*) The use of that phrase, Industria says, "suggest[s] an affiliation with [its] sixty year old brand." (*Id.*)

## II.   Procedural History

On October 5, 2016, Industria filed its initial Complaint against Latinfood, doing business as "Zenú Products Co.", and Mr. Zuluaga. (Cplt.) It

---

Spanish-speaking country." (*Id.* ¶ 82 n.4)
[15] Industria alleges that Mr. Zuluaga and Latinfood "also operate a separate Latinfood site, www.latinfoodus.com, where they additionally promote the sale of both ZENÚ- and RANCHERA-marked products." (*Id.* ¶ 86)

asserted eight claims against Latinfood and Mr. Zuluaga. Counts 1-4 arise under Section 43 of the Lanham Act of 1946 (codified at 15 U.S.C. § 1114 and §1125). They are based on the Zenú mark and allege: (1) false association; (2) false advertising; (3) trade dress infringement; and (4) source misrepresentation. (Cplt. ¶¶ 67-100) Counts 5-7 arise under the Inter–American Convention for Trade Mark and Commercial Protection, Feb. 20, 1929, 46 Stat. 2907 [hereinafter IAC]. (*Id.* ¶¶ 101-22). They include claims of trademark cancellation and commercial name protection. (*Id.*) Count 8 alleges unfair competition in violation of the New Jersey Fair Trade Act, N.J. Stat. Ann. 56:4-1 *et seq.* (*Id.* ¶¶ 123-31).

On April 21, 2017, Industria filed an Amended Complaint asserting sixteen causes of action against Latinfood and Mr. Zuluaga.[16] (AC) Industria attached nine exhibits to the Amended Complaint. (ECF nos. 31-1 to 31-9).

The causes of action in Counts 1, 3, 4, 11, 12, 13, 14, and 15 were earlier asserted in the original Complaint. Counts 2, 5, 6, 7, 8, 9, 10, and 16, however, are new. Unlike the initial Complaint, which centered on the Zenú mark, the Amended Complaint addresses the Zenú mark and Ranchera mark. Counts 1-4 and 11 arise under the Lanham Act.

**Count 1:** false association of the Zenú mark (AC ¶¶ 91-99)

**Count 2:** false association of the Ranchera mark (*Id.* ¶¶ 100-08)

**Count 3:** false advertising (*Id.* ¶¶ 109-17)

**Count 4:** trade dress infringement (*Id.* ¶¶ 118-25)

**Count 11:** source misrepresentation (*Id.* ¶¶ 168-75)

Counts 5-10 allege copyright infringement of specific copyrights owned by Industria. (*Id.* ¶¶ 126-67)

---

[16] In light of the filing of the Amended Complaint, this Court administratively terminated (ECF no. 34) a motion (ECF no. 14) to dismiss the complaint. This Court filed a stipulation and Order allowing Industria to file the Amended Complaint. (ECF no. 33)

**Count 5:** copyright infringement of Industria's "Zenú chorizo mediano" label (*Id.* ¶¶ 126-32)

**Count 6:** copyright infringement of Industria's "Zenú chorizo pequeño" label (*Id.* ¶¶ 133-39)

**Count 7:** copyright infringement of Industria's "RANCHERA" label (*Id.* ¶¶ 140-46)

**Count 8:** copyright infringement of Industria's "Zenú chorizo con ternera" label (*Id.* ¶¶ 147-54)

**Count 9:** copyright infringement of Industria's "Zenú chile con carne de res" label. (*Id.* ¶¶ 155-62)

**Count 10:** copyright infringement for the "Zenú chorizo mediano" label, "Zenú chorizo pequeño" label, "Zenú chorizo con ternera" label, and "Zenú chile con carne de res."[17] (*Id.* ¶ 163-67)

Counts 12-14 allege violations of the IAC. (*Id.* ¶ 176-98)

**Count 12:** trademark cancellation under Articles 7 and 8 of the IAC (*Id.* ¶ 176-83)

**Count 13:** commercial name protection under Articles 16, 17, 18 and 31 of the IAC (*Id.* ¶ 184-93)

**Count 14:** trademark cancellation under Article 12 of the IAC (*Id.* ¶ 194-98).

Counts 15 and 16 allege unfair competition in violation of the New Jersey Fair Trade Act, N.J. Stat. Ann. 56:4-1 *et seq.* (*Id.* ¶ 199-216).

**Count 15:** unfair competition regarding the Zenú mark (*Id.* ¶ 199-207)

**Count 16:** unfair competition regarding the Ranchera mark (*Id.* ¶ 208-16).

As for Industria's Exhibits, Exhibit A includes images of Industria's products. (ECF no. 31-1) Exhibit B is the Certificate of Registration for

---

[17] Count 10 reiterates the allegations from Counts 5-6 and 8-9. Industria alleges that those "labels adhere[] to a theme which creates the same overall look for [Industria]'s ZENÚ-marked products" (AC ¶ 165), and defendants "have copied the overall appearance of [Industria's] labels, including those that have been copyrighted." (*Id.* ¶ 166)

Registration No. VA 2-023-767, "Zenu Chorizo Mediano", effective December 5, 2016. (ECF no. 31-2) Exhibit C is the Certificate of Registration for Registration No. VA 2-026-703, "Zenu Chorizo con Ternera," effective December 15, 2016. (ECF no. 31-3) Exhibit D is the Certificate of Registration for Registration No. VA 2-026-710, "Zenu Chorizo Pequeno," effective December 15, 2016. (ECF no. 31-4) Exhibit E is the Certificate of Registration for Registration No. VA 2-026-672, "Zenu Chile Con Carne de Res," effective December 15, 2016. (ECF no. 31-5) Exhibit F is the Certificate of Registration for Registration No. VA 2-023-741, "Ranchera," effective December 5, 2016. (ECF no. 31-6) Exhibit G includes photographs of Industria's "Ranchera" products. (ECF no. 31-7) Exhibit H includes photographs of specimens submitted by Mr. Zuluaga in connection with the application for Registration No. 4,402,942. (ECF no. 31-8) Exhibit I is an image of Latinfood's website including a photo of a Ranchera sausage product. (ECF no. 31-9)

On May 19, 2017, Latinfood and Mr. Zuluaga filed a Partial Answer to Industria's Amended Complaint, in addition to ten affirmative defenses to Counts 5-10. (ECF no. 36) On that same date, they also filed a motion to dismiss Counts 1-4 and 11-16 with prejudice for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF no. 37)

Attached to the brief are a declaration of Mr. Zuluaga with two Exhibits (ECF no. 37-3), and a declaration of Mark J. Ingber, Esq., counsel for Latinfood, with two Exhibits. (ECF no. 37-4) As for Mr. Zuluaga's Declaration, Exhibit A is a copy of the USPTO May 8, 2013 "PRIORITY ACTION" letter regarding the Zenú mark application, and Mr. Zuluaga's response filed on the same date with specimens. (Ex. A, ECF no. 37-3) Exhibit B is a copy of the N.Y.S. Department of State, Division of Corporations and State Records Filing Receipt, dated August 8, 2013, for Latinfood's assumed name of "Zenu products, Co." (Ex. B, ECF no. 37-3) Regarding Mr. Ingber's Declaration, Exhibit A is a copy of the USPTO Trademark Trial and Appeal Board's July 18, 2016 Order. (Ex. A, ECF no. 37-4). Exhibit B includes copies of the Trademark

Office history of Industria's pending and cancelled Zenú and Ranchera Marks and Application. (Ex. B, ECF no. 37-4)

One month later, on June 19, 2017, Industria filed a memorandum in opposition to Latinfood's motion to dismiss. (ECF no. 40)

On June 30, 2017, upon stipulation of the parties (ECF no. 43), Latinfood and Mr. Zuluaga filed their Amended Partial Answer, affirmative defenses, and Counterclaims. (ECF no. 44) The Counterclaims are against counterdefendants Industria and Cordialsa USA, Inc. ("Cordialsa"), the marketing arm and distribution company for Grupo Nutresa S.A.[18] (*Id.* at 22-25) Industria and Cordialsa are subsidiaries to Grupo Nutresa. (*Id.* ¶ 12)

On July 10, 2017, Latinfood and Mr. Zuluaga filed a reply brief and two exhibits in further support of its motion to dismiss Counts 1-4 and 11-16. (ECF no. 45) Exhibit A is a copy of the *General Inter-American Convention for Trade Mark and Commercial Protection,* 46 Stat. 2907; Treaty Series 833. (Ex. A, ECF no. 45-2) Exhibit B is a copy of Christine Haight Farley, *The Forgotten Pan-American Trademark Convention of 1929: A Bold Vision of Extraterritorial Meets Current Realities,* Digital Commons @ American University Washington College of Law (2013), https://papers.ssm.com/sol3/papers.cfm?abstract_id=2225970 (last visited Jul 6, 2017). (Ex. B, ECF no. 45-3)

Since that date, there have been additional filings by both parties, including a motion to dismiss Latinfood's counterclaim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF no. 69). This opinion solely addresses Latinfood and Mr. Zuluaga's motion to dismiss counts of the Amended Complaint (ECF no. 37).

---

[18] In the caption on the Amended Complaint and Counter-claims, only Latinfood is indicated as a Counterclaimant. However, in the body of the Counterclaim, it appears that the causes of action are asserted on behalf of Mr. Zuluaga as well.

### III.   Legal Standard

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

Fed. R. Civ. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

The Court in considering a Rule 12(b)(6) motion is confined to the allegations of the complaint, with certain exceptions:

> "Although phrased in relatively strict terms, we have declined to interpret this rule narrowly. In deciding motions under Rule 12(b)(6), courts may consider 'document[s] integral to or explicitly relied upon in the complaint,' *In re Burlington Coat Factory Sec.*

> *Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original), or
> any 'undisputedly authentic document that a defendant attaches
> as an exhibit to a motion to dismiss if the plaintiff's claims are
> based on the document,' *PBGC v. White Consol. Indus.*, 998 F.2d
> 1192, 1196 (3d Cir. 1993)."

*In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d
Cir. 2016). *See also Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir. 2014)
("However, an exception to the general rule is that a 'document integral to or
explicitly relied upon in the complaint' may be considered 'without converting
the motion to dismiss into one for summary judgment.' ") (quoting *In re
Burlington Coat Factory*, 114 F.3d at 1426); *Pension Ben. Guar. Corp. v. White
Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993). "The rationale
underlying this exception is that the primary problem raised by looking to
documents outside the complaint—lack of notice to the plaintiff—is dissipated
'[w]here plaintiff has actual notice … and has relied upon these documents in
framing the complaint.'" *In re Burlington*, 114 F.3d at 1426 (quoting *Watterson
v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993) (quoting *Cortec Indus., Inc. v. Sum
Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991)).

## IV.    Analysis

### A.  Lanham Act and New Jersey Fair Trade Act claims (Counts 1-4, 11, and 15-16)

#### 1.  Use of the Zenú and Ranchera trademarks in United States Commerce (Counts 1-4, 11, and 15-16)

Latinfood[19] first argues that Industria's Lanham Act claims, Counts 1-4,
and 11, as well as its New Jersey Fair Trade Act claims, Counts 15 and 16, fail
as a matter of law because Industria has not alleged use in commerce in the
United States of the Zenú and Ranchera marks. (Def. Brf. at 17-20).

---

[19] In Sections IV.A and IV.B, *infra*, of this opinion, the term "Latinfood" refers jointly to
defendants Latinfood and Mr. Zuluaga.

In *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1202 (2017)[20], the Fourth Circuit recently held that a plaintiff is not required to plead that it possesses or has used a trademark in United States commerce when alleging false association and false advertising. Application of *Belmora* would doom Latinfood's motion to dismiss on these grounds. The United States Court of Appeals for the Third Circuit has not yet spoken on the issue.

Section 43(a) of the Lanham Act provides as follows:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Subsection (A) describes the cause of action known as false association, while Subsection (B) describes the cause of action known as false advertising. *Id.*

In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the United States Supreme Court considered whether a plaintiff had a cause of action for false advertising under the Lanham Act, and held that "[t]o invoke the Lanham Act's cause of action for false advertising, a plaintiff must

---

[20] Both Industria and Latinfood's submissions refer to this case as *Flanax*, presumably because the trademark at issue was "FLANAX." However, I will be referring to the case as *Belmora*.

plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." 134 S. Ct. at 1395. Specifically, the *Lexmark* Court held that "to come within the zone of interests in a suit for false advertising under § [43(a) of the Lanham Act], a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. It further explained that, under proximate causation principles, "a plaintiff suing under [the Lanham Act] must [also] show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.

About two years later, in *Belmora*, the Fourth Circuit considered "whether the Lanham Act permits the owner of a foreign trademark and its sister company to pursue false association, false advertising, and trademark cancellation claims against the owner of the same mark in the United States." 819 F.3d at 701. It first noted that the text of Section 43(a) "does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action." *Id.* The *Belmora* Court then distinguished the language of Sections 43(a) and 32, describing them as "stand[ing] in sharp contrast" to each other.[21] *Id.* (citing 15 U.S.C. § 1114). It emphasized that

---

[21] Under Section 32, which addresses trademark infringement,

> [a]ny person who shall, without the consent of the registrant—

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a *registered mark* in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

> (b) reproduce, counterfeit, copy, or colorably imitate a *registered mark* and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising

Section 32 requires liability for "'use in commerce' of 'any reproduction, counterfeit, copy, or colorable imitation *of a registered mark*'[.]", while under Section 43(a), on the other hand, "it is the *defendant*'s use in commerce— whether of an offending 'word, term, name, symbol, or device' or of a 'false or misleading description [or representation] of fact'—that creates the injury under the terms of the statute." *Id.* (quoting 15 U.S.C. § 1114) (emphasis added).

Quoting from *Lexmark, Belmora* stated: "[t]o determine whether a plaintiff, 'falls within the class of plaintiffs whom Congress has authorized to sue,' we 'apply traditional principles of statutory interpretation.'. . . The outcome will rise and fall on the 'meaning of the congressionally enacted provision creating a cause of action.'" *Id.* (internal citations omitted).

Applying those principles, the Fourth Circuit concluded that the plaintiff's use of the mark in the United States is not a "condition precedent" to a Section 43(a) claim: "As noted earlier, such a requirement is absent from § 43(a)'s plain language and its application in *Lexmark.* Under the statute, the *defendant* must have 'use[d] in commerce' the offending 'word, term, name, [or] symbol,' but the *plaintiff* need only 'believe[ ] that he or she is or is likely to be damaged by such act.'" *Id.* (emphasis in original)(quoting 15 U.S.C. § 1125(a)). It then emphasized that the case at hand was an unfair competition case, not a trademark infringement case, and ultimately concluded:

> [g]iven that *Lexmark* advises courts to adhere to the statutory language, 'apply[ing] traditional principles of statutory interpretation,'... we lack authority to introduce a requirement into § 43(a) that Congress plainly omitted. Nothing in *Lexmark* can be read to suggest that § 43(a) claims have an unstated requirement that the plaintiff have first used its own mark (word, term, name,

---

of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action *by the registrant* for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(emphasis added).

symbol, or device) in U.S. commerce before a cause of action will lie against a defendant who is breaching the statute.

*Id.* (internal citation omitted).

*Belmora* found structural support for its holding in other cases that extended the scope of § 43(a) to encompass unfair competition without regard to other preconditions. It cited protection against misuse of a generic name:

> As the Supreme Court has pointed out, § 43(a) 'goes beyond trademark protection.'. . .For example, a plaintiff whose mark has become generic—and therefore not protectable—may plead an unfair competition claim against a competitor that uses that generic name and 'fail[s] adequately to identify itself as distinct from the first organization' such that the name causes 'confusion or a likelihood of confusion.'

*Id.* at 709 (internal citations omitted)(quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1043 (D.C. Cir. 1989)). *See also id.* at 709-10 (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118–19 (1938) for the proposition that the defendant is required to "'use reasonable care to inform the public of the source of its product' even though the plaintiff's 'shredded wheat' mark was generic and therefore unprotectable."). Likewise, it cited "a 'reverse passing off'[22] case, [in which] the plaintiff need not have used a mark in commerce to bring a § 43(a) action," but need only proved that the work " 'originated with' him." *Id.* (citing *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010)). If use in United States

---

[22] The Supreme Court has defined "reverse passing off" (also known as "reverse palming off") as "misrepresent[ing] someone else's goods or services as his own" and has held that it is actionable under § 1125(a) of the Lanham Act. *Dastar*, 539 U.S. at 28 n.1. The Second Circuit has outlined four elements a plaintiff must show:

> (1) that the work at issue originated with the plaintiff;
>
> (2) that origin of the work was falsely designated by the defendant;
>
> (3) that the false designation of origin was likely to cause consumer confusion; and
>
> (4) that the plaintiff was harmed by the defendant's false designation of origin.

*Upton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir.1995).

commerce were a precondition to a § 43(a) action, reasoned the Fourth Circuit, the generic mark and reverse passing off cases could not have been sustained at all. *Id.*

> In sum, the Lanham Act's plain language contains no unstated requirement that a § 43(a) plaintiff have used a U.S. trademark in U.S. commerce to bring a Lanham Act unfair competition claim. The Supreme Court's guidance in *Lexmark* does not allude to one, and our prior cases either only assumed or articulated as dicta that such a requirement existed. Thus, the district court erred in imposing such a condition precedent upon [plaintiff]'s claims.

*Id.* at 710. *See also* 6 Callmann on Unfair Comp. § 23:2 (4th ed.); 5 McCarthy on Trademarks and Unfair Competition §§ 27:13, 27:30 (5th ed.).

There is no Third Circuit holding on this issue. Moreover, at least one court has questioned the reasoning of *Belmora,* even as it held, after trial, that accepting the *Belmora* holding would not have affected the result. *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 110 & n.66 (D.D.C. 2016). Nevertheless, I find the Fourth Circuit's analysis persuasive, at least for purposes of a motion to dismiss. A plaintiff who has not sold the product within the United States may face some formidable obstacles in proving its claim.[23] At this preliminary stage, however, I cannot find that the

---

[23]   *Belmora* implied as much:

> A plaintiff who relies only on foreign commercial activity may face difficulty proving a cognizable false association injury under § 43(a). A few isolated consumers who confuse a mark with one seen abroad, based only on the presence of the mark on a product in this country and not other misleading conduct by the mark holder, would rarely seem to have a viable § 43(a) claim.

> The story is different when a defendant, as alleged here, has—as a cornerstone of its business—intentionally passed off its goods in the United States as the same product commercially available in foreign markets in order to influence purchases by American consumers. *See M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1986) ("[E]vidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."). Such an intentional deception can go a long way toward establishing likelihood of confusion. *See Blinded Veterans,* 872 F.2d at 1045 ("Intent to deceive ... retains potency; when present, it is probative evidence of a likelihood of confusion.").

false advertising and false association claims are ruled out as a matter of law because plaintiff has not pled use of the Zenú and Ranchera marks in the United States.

### 2. Lanham Act Trade dress infringement (Count 4), and Source Misrepresentation (Count 11) claims

Latinfood argues in addition that, even if this Court were to find U.S. sales unnecessary as to the other counts, *see* section IV.A.1, *supra*, it should nevertheless dismiss the "remaining likelihood of confusion and misrepresentation of source claim." (Def. Brf. at 24) The reference is evidently to Counts 4 and 11.

As to Count 4, the likelihood of confusion/trade dress infringement claim, Latinfood maintains that neither *Lexmark* nor *Belmora* applies.

Section 43(a) of the Lanham Act "protects from deceptive imitation not only a business's trademarks, but also its 'trade dress.'" *Fair Wind Sailing, Inc. v. Dempster,* 764 F.3d 303, 308 (3d Cir. 2014)(quoting 15 U.S.C. § 1125(a)(3)). "Trade dress has been defined as the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." *Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 171 (3d Cir.2000).

"To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 357 (3d Cir. 2007). A plaintiff must also "articulat[e] the specific elements which comprise its distinct dress." *Fair Wind,* 764 F.3d at 309 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d Cir.1997)). *See also* 1 McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed.)

---

819 F.3d at 710 n.8.

Although there is no case which addresses whether use of the mark in United States commerce is required for trade dress infringement claims, I find *Belmora*'s rationale to be persuasive here. It is not specific to the claims discussed above, but rests more generally on the scope of section 43(a). So viewed, it would apply to Count 4 as well. I therefore will deny the motion to dismiss the claim for trade dress infringement, Count 4, for failure to plead that the plaintiff used the Zenú mark in United States commerce.[24] (*See* AC ¶¶118-166.)

As to Count 11, source misrepresentation, Latinfood makes a similar argument.

"The Lanham Act provides that a third party may petition for cancellation of a registered trademark if the registration was procured by fraud." *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 174–75 (3d Cir. 2017)(citing 15 U.S.C. §§ 1064(3), 1120). For such a claim to succeed, "a showing. . . must be made by clear and convincing evidence that the 'applicant or registrant knowingly ma[de] a false, material representation with the intent to deceive the PTO.'" *Id.* (quoting *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); citing *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001)).

Section 14(3) of the Lanham Act provides, in pertinent part:

> [a] petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows *by any person who believes that he is or will be damaged*, including as a result of dilution under section 1125(c), by the registration of a mark on the principal register established by this Act, or under the Act of March 3, 1881, or the Act of February 20, 1905:
> (3) ... [if] its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter, or contrary to similar prohibitory provisions of such prior Acts for a registration under such Acts, or if the registered mark is being used by, or with the permission of, the registrant so as to

---

[24] As to whether the *Lexmark* factors apply to trade dress infringement claims, no answer appears in the case law. Assuming they do apply, I find that Industria's allegations in its Amended Complaint satisfy the elements. *See* (AC ¶¶118-25).

> misrepresent the source of the goods or services on or in
> connection with which the mark is used.

15 U.S.C. § 1064(3)(emphasis added). Industria asserts that the provision "is to be interpreted broadly, and if a plaintiff can show a 'real interest' or 'real commercial interest' in the registration, his claim should be heard." (Pl. Brf. at 17-18)(citing *Muhlenberg College v. Sportswear, Inc.*, Civ. Action No. 13-7197, 2015 WL 713842, at *4 (E.D. Pa. Feb. 19, 2015)). *See also Kelly v. Estate of Arnone ex rel. Ahern*, No. CIV A 08-6046(SDW), 2009 WL 2392108, at *5 (D.N.J. Aug. 3, 2009)(quoting *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 735 F.2d 346, 349 (9th Cir.1984))("A petitioner seeking to cancel a registration under Section 14 of the Lanham Act needs to 'plead and prove facts showing a real interest in the proceeding in order to establish standing.'")

I agree with Industria and find that at this preliminary stage, it has sufficiently alleged a "real commercial interest" and therefore may assert a claim for source misrepresentation. *See* (AC ¶¶168-73) There is no case law indicating that use of the product in commerce is required for such a claim. Latinfood's motion to dismiss Count 11 is therefore denied.

### 3. *Lexmark* elements (Counts 1, 2, 15, and 16)

Latinfood further argues that Industria's Lanham Act false association claims and New Jersey unfair competition claims, as pled, do not satisfy the *Lexmark* elements. (Def. Br. at 23). Latinfood focuses on paragraph 88 of the Amended Complaint which states as follows:

> Moreover, [Latinfood's] sale of what [Industria] believes to be sub-par and noninspected products under their pirated trademark harms [Industria] by altering consumers' estimation of ZENÚ- and RANCHERA-marked products in addition to potentially threateningthe health and safety of consumers.

(AC ¶ 88) Latinfood maintains that Industria's allegation that Latinfood's products are "sub-par and noninspected" is unsupported, and Industria does not provide any facts as to how its reputation or sales will be harmed. (Def. Br. at 23-24)

I begin by noting that "[t]he elements of unfair competition under the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4, are the same as those under Section 43(a) of the Lanham Act, saving the jurisdictional interstate commerce element." *Endo Pharm., Inc. v. Actavis, Inc.*, No. 12-CV-7591 (KM), 2016 WL 1090356, at *5 (D.N.J. Mar. 21, 2016)(citing *SK & F Co. v. Premo Pharm. Laboratories, Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980)). Accordingly, my ruling as to the Lanham Act claims equally applies to the claims of unfair competition under the New Jersey Fair Trade Act.

As stated previously, *Lexmark* held that "to come within the zone of interests. . . , a plaintiff must allege an injury to a commercial interest in reputation or sales." 134 S. Ct. at 1390. It further explained that, under proximate causation principles, "a plaintiff suing under [the Lanham Act] must [also] show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising. . ." *Id.* at 1391.

Here, in its false association claims for the Ranchera and Zenú marks, Industria's Amended Complaint satisfies the *Lexmark* zone of interest element by alleging that "[Latinfood's] inferior products harm the goodwill [Industria] has worked hard to generate and, in turn, impact [Industria]'s sales in Colombia and any future sales [Industria] may seek to have in this District and in the United States." (AC ¶¶ 98, 107). It also claims that Latinfood's allegedly inferior products have damaged its reputation. (*Id.* ¶ 90)

Industria has also sufficiently alleged the *Lexmark* proximate cause element through its allegations that Latinfood has targeted Colombians and other consumers familiar with Industria's mark (*see id.* ¶¶ 43, 96, 124, 204), damaged [Industria]'s goodwill through their sale of mislabeled products that are subpar or different than those sold by Industria (*see id.* ¶¶ 9, 52, 88-90, 98, 116), and have further harmed Industria economically by foreclosing its registration and use of the Zenú mark in the United States. (*see id.* ¶¶ 10, 11, 40, 62, 63, 90, 98, 116). Whether that can be established remains to be seen. At this stage, however, it is sufficiently alleged as to Counts 1, 2, 15, and 16.

### 4. Lanham Act false advertising (Count 3)

Next, Latinfood seeks dismissal of Count 3, the Lanham Act false-advertising claim, because according to Latinfood, Industria fails to satisfy the Third Circuit's requirement of "a higher degree of specificity then mere 'notice' pleading" for such claims. (Def. Brf. at 20)(citing *Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1556 (E.D. Pa. 1985)). I do not perceive that the Third Circuit has established a special pleading standard for false advertising claims. *See N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 304 (D.N.J. 2015). I also seriously question whether the 1985 *Daetwyler* holding remains good law in light of the pleading standards subsequently set forth by the Supreme Court in *Iqbal* and *Twombly*. *See id.* (citing *Mycone Dental Supply Co. v. Creative Nail Design, Inc.*, No. CIV.A. 11-4380 JBS, 2012 WL 3599368, at *5 (D.N.J. Aug. 17, 2012)[25] and *N.J. Physicians*, 141 F. Supp. 3d at 304 n.8); *U.S. ex rel. Knisely v. Cintas Corp.*, 298 F.R.D. 229, 238–39 (E.D. Pa. 2014). In this case, however, the selection of a standard is not critical.

To establish a false advertising claim, a plaintiff must allege: "(1) that the defendant has made false or misleading statements as to his own product or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material

---

[25] To be sure, cases have cited *Daetwyler* even post-*Twombly* and *Iqbal*. *Mycone* notes, however, that "[m]ost of the cases describing heightened pleading requirements for Lanham Act claims predate the changes in pleading standards that arose with the Supreme Court's *Twombly* and *Iqbal* jurisprudence."*Id.* at *5. *See also Ferring Pharm. Inc. v. Watson Pharm., Inc.*, No. 2:12-CV-05824 (WJM), 2014 WL 12634303, at *3 (D.N.J. Aug. 4, 2014)(rejecting argument that the Court should apply an intermediate pleading standard, and instead applying the *Iqbal* pleading standard to Lanham Act false advertising claims); *Edison Motor Sales, LLC v. Dibre Auto Grp., LLC*, No. 2:12-CV-239 DMC MF, 2012 WL 5199764, at *5-7 (D.N.J. Oct. 19, 2012)(describing the intermediate pleading standard as being "not binding" and "simply persuasive", and instead applying the *Iqbal* pleading standard to a Lanham Act false advertising claim); *H.H. Fluorescent Parts, Inc. v. DM Tech. & Energy, Inc.*, No. 04-CV-1997, 2005 WL 2972986, at *5 (E.D. Pa. Nov. 3, 2005)(recognizing the "unsettled state of the law as to whether Rule 9(b) was intended to incorporate claims brought under the Lanham Act" and therefore declining to apply the intermediate pleading standard).

in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000).

In support of its false advertising claim, Industria alleges that 1) Latinfood identifies itself as "Zenu Products US Inc." on its products, thereby suggesting to consumers that Latinfood is a United States-based affiliate of a foreign company; 2) Latinfood obtained www.zenu.us.com as its web address, leading consumers to presume that the website is associated with Industria, whose web address is www.zenu.com.co; 3) Mr. Zuluaga "has caused Latinfood to label its products as imported and has promoted the company as holding an exclusive distribution and importing rights agreement with a major product manufacturer from Colombia", thereby misleading consumers into believing that Latinfood's products are Industria's products, or affiliated with Industria; 4) Latinfood's importation labels are false because they have used manufacturers in the United States; 5) the falsely labeled goods travel in interstate commerce; 6) Latinfood's "misleading labels" are likely to influence consumers' purchase choices because consumers choose Latinfood products based on their belief that the products are affiliated with Industria's products; and 7) Latinfood's "inferior products and false labeling harm the goodwill [Industria] has . . . generate[d] and, in turn, impact [Industria]'s sales in Colombia and any future sales [Industria] may seek to have in this District and in the United States." (AC ¶¶110-16; *see also id.* ¶¶ 81-85).

Under *Lexmark*, to support a claim for false advertising, a plaintiff "must allege an injury to a commercial interest in reputation or sales", and "must [also] show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." 134 S. Ct. at 1390-91.

Industria argues persuasively that its claim satisfies the *Lexmark* zone-of-interest element because the Amended Complaint identifies specific misleading statements made by Latinfood which "[w]hen coupled with the allegations that [Latinfood] ha[s] misappropriated [Industria]'s trademark, logo, trade dress and packaging design" show that Latinfood "regularly suggest[s] that [it] has an affiliation with [Industria]", an affiliation which is "false and misleading because no such affiliation exists." (*See* AC ¶¶ 4-5, 7-9, 46, 52, 54, 67-68, 82-85, 87, 89, 95-96, 112, 115, 123). The complaint also adequately addresses the *Lexmark* proximate-cause element by pleading injury to [Industria]'s reputation and potential sales. (*See id.* ¶¶ 3, 9, 13, 27, 40, 52, 63, 88-90, 98, 116).

I find that the Amended Complaint adequately states a false advertising claim. Whether Latinfood's deception "caused [consumers] to withhold trade from [Industria]" is an issue that must await factual development. Accordingly, I deny Latinfood's motion to dismiss Count 3.

## B. Inter-American Convention for Trademark and Commercial Protection claims (Counts 12-14)

### 1. Private Rights of Action

Latinfood maintains that Counts 12-14 of the Amended Complaint,[26] which assert claims under the IAC, should be dismissed because the United States Supreme Court and the Third Circuit have recognized that international agreements generally do not create private rights. (Def. Brf. at 26-28) (emphasis added). Industria, however, urges this Court to reject Latinfood's argument because the IAC explicitly creates private rights of action. (Pl. Brf. at 19-20)(emphasis added).

There is a presumption that treaties, even those labeled as "self-executing," do not create private rights:

> Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational

---

[26] Latinfood erroneously describes Industria's IAC claims as being counts 12-17. (Def. Brf. at 26).

> agreements, even those directly benefiting private persons, *generally* do not create private rights or provide for a private cause of action in domestic courts. Accordingly, a number of the Courts of Appeals have presumed that treaties do not create privately enforceable rights in the absence of express language to the contrary.

*Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (emphasis added; citations omitted)(quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907, Comment a, p. 395 (1986)). The Third Circuit has followed the same approach and has held that "[b]y itself, the status of 'self-executing' does not answer the question of whether a document creates a private right of enforcement." *Gross v. German Found. Indus. Initiative,* 549 F.3d 605, 616 (3d Cir. 2008)(citing Restatement (Third) of Foreign Relations Law of the United States § 111, Comment h (1986)). Accordingly, in addressing a self-executing treaty which does not explicitly provide a private cause of action, "'. . . courts look to the treaty as a whole to determine whether it evidences an intent to provide a private right of action.'" *Id.* (quoting *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring)).

To answer the question of whether a private right exists, a court must consider the particular treaty at issue. Here, Industria brings claims for trademark cancellation under Articles 7 and 8 of the IAC (Count 12), commercial name protection under Articles 16, 17, 18, and 31 of the IAC (Count 13), and trademark cancellation under Article 12 of the IAC (Count 14). (AC ¶¶176-98).

"The United States is a party to [the IAC], a multilateral regional treaty with several Latin-American nations," including Colombia. 5 McCarthy on Trademarks and Unfair Competition § 29:26 (5th ed.) The Convention "was the culmination of the efforts of many years to secure the cooperation of the American States in uniform trade mark protection." *Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 157–58 (1940). It "pertains to trademarks, trade names, unfair competition, and false indications of geographical origin or source. The beneficiaries under the Convention are defined as (1) nationals of

contracting states, and (2) domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the contracting states." *Mario Diaz v. Servicios de Franquicia Pardo's S.A.C.*, 83 U.S.P.Q.2d 1320, 2007 WL 549241 (T.T.A.B. Feb. 16, 2007).

In *Bacardi*, the United States Supreme Court held that the IAC is self-executing and that its implementation therefore requires no Act of Congress. 311 U.S. at 160. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) (recognizing that with a self-executing treaty, "no domestic legislation is required to give [it] the force of law in the United States.") *See also British-American Tobacco Co. Limited and Tabacalera Ist mens, S.A. V. Philip Morris Inc.*, 55 U.S.P.Q.2d 1585, 2000 WL 1005433 (T.T.A.B. June 14, 2000)(holding that the IAC is self-executing, independent of the Lanham Act and giving the Trademark Board the jurisdiction to cancel a registration for being in violation of the Convention).

The Supreme Court recognized in *Bacardi* that "the clear purpose of the [IAC] is to protect the foreign trademarks which fall within the treaty's purview. ... The intent of the treaty is to *confer a substantive right* to the protection of the foreign mark ..." 311 U.S. at 163 (emphasis added). The Preamble to the IAC reflects this purpose:

> Animated by the desire to reconcile the different juridical systems which prevail in the several American Republics; and
>
> Convinced of the necessity of undertaking this work in its broadest scope, with due regard for the respective national legislations,
>
> Have resolved to negotiate the present Convention for the protection of trade marks, trade names and for the repression of unfair competition and false indications of geographical origin, and for this purpose have appointed as their respective delegates ...

IAC, preamble.

Now, in accordance with that purpose, Industria asserts that the IAC explicitly creates private causes of action in numerous Articles, including Articles 1, 7, 8, 12, 17, 18, 30, and 31. (Pl. Brf. at 20). Surveying those IAC

Articles, I find that their language strongly supports a finding of intent to create a private cause of action.

I quote them in full:

> The Contracting States bind themselves to grant to the nationals of the other Contracting States and to domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the States which have ratified or adhered to the present Convention *the same rights and remedies which their laws extend to their own nationals or domiciled persons* with respect to trade marks, trade names, and the repression of unfair competition and false indications of geographical origin or source.

IAC, ch. I, art. 1 (emphasis added).

> Any owner of a mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, *shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought*, and upon proof that the person who is using such mark or applying to register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class, *the opposer may claim for himself the preferential right to use such mark in the country* where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements established by the domestic legislation in such country and by this Convention.

IAC, ch. II, art. 7 (emphasis added).

> When the owner of a mark seeks the registration or deposit of the mark in a Contracting State other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, *he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark* upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and those of either Paragraph (b) or (c) below:

(a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and

(b) that the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled; or

(c) that the owner of the mark who seeks cancellation based on a prior right to the ownership and use of such mark, has traded or trades with or in the country in which cancellation is sought, and that goods designated by his mark have circulated and circulate in said country from a date prior to the filing of the application for registration or deposit for the mark, the cancellation which is claimed, or prior to the adoption and use of the same.

IAC, ch. II, art. 8 (emphasis added).

Any registration or deposit which has been effected in one of the Contracting States, or any pending application for registration or deposit, made by an agent, representative or customer of the owner of a mark in which a right has been acquired in another Contracting State through its registration, prior application or use, *shall give to the original owner the right to demand its cancellation or refusal in accordance with the provisions of this Convention and to request and obtain the protection for himself,* it being considered that such protection shall revert to the date of the application of the mark so denied or cancelled.

IAC, ch. II, art. 12 (emphasis added).

*Any* manufacturer, industrialist, merchant or agriculturist domiciled or established in any of the Contracting States, *may, in accordance with the law and the legal procedure of such countries, oppose* the adoption, use, registration or deposit of a trade mark for products or merchandise of the same class as those sold under his commercial name, when he believes that such trade mark or the inclusion in it of the trade or commercial name or a simulation thereof may lead to error or confusion in the mind of the consumer with respect to such commercial name legally adopted and previously in use.

IAC, ch. III, art. 17 (emphasis added).

36

> *Any* manufacturer, industrialist, merchant or agriculturist domiciled or established in any of the Contracting States *may, in accordance with the law and procedure of the country where the proceeding is brought, apply for and obtain an injunction* against the use of any commercial name or the cancellation of the registration or deposit of any trade mark, when such name or mark is intended for use in the manufacture, sale or production of articles or merchandise of the same class, by proving:
>
> (a) that the commercial name or trade mark, the enjoining or cancellation of which is desired, is identical with or deceptively similar to his commercial name already legally adopted and previously used in any of the Contracting States, in the manufacture, sale or production of articles of the same class, and
>
> (b) that prior to the adoption and use of the commercial name, or to the adoption and use or application for registration or deposit of the trade mark, the cancellation of which is sought, or the use of which is sought to be enjoined, he used and continues to use for the manufacture, sale or production of the same products or merchandise his commercial name adopted and previously used in any of the Contracting States or in the State in which cancellation or injunction is sought.

IAC, ch. III, art. 18 (emphasis added)

Chapter VI, entitled "Remedies", includes Articles 29 through 31. Industria maintains that Articles 30 and 31 are the "broadest" provisions which grant "interested parties the ability to seek redress from the courts of signatory states *for any conduct in violation of the treaty*." (Pl. Brf. at 20) (emphasis in original).

> *Any act prohibited by this Convention* will be repressed by the competent administrative or judicial authorities of the government of the state in which the offense was committed, by the legal methods and procedure existing in said country, either by official action, or at the request of interested parties, who may avail themselves of the rights and remedies afforded by the laws to secure indemnification for the damage and loss suffered; the articles, products or merchandise or their marks, which are the instrumentality of the acts of unfair competition, shall be liable to seizure or destruction, or the offending markings obliterated, as the case may be.

37

IAC, ch. VI, art. 30 (emphasis added).

> Any manufacturer, industrialist, merchant or agriculturist, interested in the production, manufacture, or trade in the merchandise or articles affected *by any prohibited act or deed*, as well as his agents or representatives in any of the Contracting States and the consular officers of the state to which the locality or region falsely indicated as the place to which belongs the geographical origin or source, *shall have sufficient legal authority to take and prosecute the necessary actions and proceedings before the administrative authorities and the courts of the Contracting States.*

> The same authority shall be enjoyed by official commissions or institutions and by syndicates or associations which represent the interests of industry, agriculture or commerce and which have been legally established for the defense of honest and fair trade methods.

IAC, ch. VI, art. 31 (emphasis added).

The language is sufficiently clear to overcome the general presumption stated in, *e.g., Medellin, supra.* Beyond the general principle that it is "self-executing," the IAC manifests a specific intent to confer a private right of action on individuals. Certainly, at the motion to dismiss stage, such a claim cannot be ruled out as a matter of law.

### 2. Alternative Arguments

#### a. Knowledge requirement

In the alternative, Latinfood first argues that even if the IAC creates a private right of action, Counts 12-14 should be dismissed because Industria "fails to allege that [Latinfood] had prior knowledge of [Industria]'s existence." (Def. Brf. at 28). Without citing to any legal authority, it maintains that an allegation of a defendant's knowledge is a "condition precedent to the Pan-American Convention." (*Id.*)

Industria responds that it had indeed repeatedly made such an allegation throughout its Amended Complaint, and maintains that its allegation must be taken as true for purposes of this motion to dismiss. (Pl. Brf. at 26)(citing AC ¶¶54, 59, 61, 71, and 180) It further points out that "even if these allegations

were not made, only Articles 7 and 8 of the IAC contain any reference to a defendant's knowledge of the use of the mark and thus, [Industria]'s other IAC claims are not affected by [Latinfood's] knowledge (or lack thereof) of [Industria]'s mark." (*Id.*) It concludes that Latinfood's claim that it did not know of Industria's mark "strains credulity." (*Id.*)

Industria's claims adequately allege that Latinfood knew of and copied Industria's Zenú and Ranchera marks. Indeed, a side-by-side comparison argues against the possibility of coincidence. Accordingly, I deny Latinfood's request to dismiss the IAC claims on that basis.

### b. Section 44 of the Lanham Act

Latinfood makes a number of interrelated contentions involving the interplay between the IAC and Sections 44(b), (d), and (h) of the Lanham Act.

The last clause in Article 7 of the IAC refers to domestic law:

> . . . the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country, *upon compliance with the requirements established by the domestic legislation in such country and by this Convention.*

IAC, ch. II, art. 7 (emphasis added). Relying on that emphasized language, Latinfood claims that Industria cannot maintain an Article 7 claim because it did not comply with the requirements of U.S. trademark law, particularly sections 44(b) and 44(d) of the Lanham Act.[27] Latinfood argues, for example,

---

27    Section 44(b) of the Lanham Act, "Benefits of section to persons whose country of origin is party to convention or treaty," provides as follows:

> Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits *of this section under the conditions expressed herein* to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.

15 U.S.C. § 1126(b)(emphasis added).

that Industria failed to establish its "right of priority" under Section 44(d) of the Lanham Act and/or failed to file its United States Zenú and Ranchera applications within six months of its foreign trademark application. (Def. Brf. at 29-31).

Section 44(d) of the Lanham Act, "Right of priority," provides as follows:

An application for registration of a mark under section 1051, 1053, 1054, or 1091 of this title or under subsection (e) of this section, filed by a person described in subsection (b) who has previously duly filed an application for registration of the same mark in one of the countries described in subsection (b) of this section shall be accorded the same force and effect as would be accorded to the same application if filed in the United States on the same date on which the application was first filed in such foreign country: *Provided,* That—

(1) *the application in the United States is filed within six months from the date on which the application was first filed in the foreign country;*

(2) the application conforms as nearly as practicable to the requirements of this chapter, including a statement that the applicant has a bona fide intention to use the mark in commerce;

(3) the rights acquired by third parties before the date of the filing of the first application in the foreign country shall in no way be affected by a registration obtained on an application filed under this subsection;

*(4) nothing in this subsection shall entitle the owner of a registration granted under this section to sue for acts committed prior to the date on which his mark was registered in this country unless the registration is based on use in commerce.*

In like manner and subject to the same conditions and requirements, the right provided in this section may be based upon a subsequent regularly filed application in the same foreign country, instead of the first filed foreign application: *Provided,* That any foreign application filed prior to such subsequent application has been withdrawn, abandoned, or otherwise disposed of, without having been laid open to public inspection and without leaving any rights outstanding, and has not served, nor thereafter shall serve, as a basis for claiming a right of priority.

15 U.S.C. § 1126(d)(emphasis added).

40

Industria has a number of responses, involving retroactivity and the supremacy of the treaty, which I largely pass over here. *See Diaz*, 2007 WL 549241, at *6. For present purposes I consider that international treaties, and Article 7 in particular, may grant rights broader than those granted by domestic law, including the Lanham Act. Contrariwise, Section 44(d) is not the only potentially applicable section of the Lanham Act.

Latinfood additionally argues that Section 44(h) of the Lanham Act, 15 U.S.C. § 1126,[28] forecloses Industria's IAC claims. (Def. Br. at 31-33). Latinfood focuses on the emphasized language (*see* n.28) limiting remedies to those "appropriate in repressing acts of unfair competition." Claims under Articles 7, 8, 12, 16, 17, 18 and 31 of the IAC, it says, do not fit that description, because they do not fall within Chapter IV of the IAC- "Repression of Unfair Competition." (*Id.* at 32-33, Def. Reply at 11) (citing *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir.), *cert. denied*, 531 U.S. 918 (2000); *Empresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247 (S.D.N.Y. 2002)). Industria responds that these out-of-Circuit cases do not bind this court; that they were decided in the peculiar context of statutory provisions and regulations implementing the U.S. embargo which prohibited ownership or transfer of any ownership of any property in the United States by any Cuban person or entity; and that the TTAB has declined to adopt their holdings

---

[28]    Section 44(h) of the Act, "Protection of foreign nationals against unfair competition," cross-references subsection (b) (quoted in n.27, above) and provides as follows:

> Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available *so far as they may be appropriate in repressing acts of unfair competition.*

15 U.S.C. § 1126(h) (emphasis added).

41

outside of that context. (Pl. Brf. at 23)(citing *Diaz*, 2007 WL 549241 at *6).

The resolution of these Section 44 issues will depend on the development of the facts and the precise contours of the overlapping (or not overlapping) claims under U.S. law and the treaty. This case is going forward in any event. These may turn out to be redundant claims, alternative claims, or supplementary claims; it simply is not clear at present. The motion to dismiss on these grounds is denied without prejudice to renewal in the context of summary judgment.

### C. Dismissal of Mr. Zuluaga as an Individual Defendant

All 16 Counts of the Amended Complaint assert claims not only against Latinfood but against Mr. Zuluaga as an individual. (AC ¶¶ 91-216). Mr. Zuluaga is identified as the "owner and principal of Latinfood, as well as a member of its board of directors." (*Id.* ¶ 15). *See also* (ECF no. 27-3, Decl. of Zuluaga, ¶ 1)(identifying himself as "President and 100% sole owner" of Latinfood). In particular, Counts 1-4 and 11 allege that Latinfood and Mr. Zuluaga violated the Lanham Act, Counts 5-10 allege that Latinfood and Mr. Zuluaga engaged in copyright infringement, Counts 12-14 allege that Latinfood and Mr. Zuluaga violated the IAC, and Counts 15-16 allege that Latinfood and Mr. Zuluaga violated the New Jersey Fair Trade Act.

Latinfood argues that Mr. Zuluaga should be dismissed as a defendant because the Amended Complaint does not allege facts that satisfy the New Jersey standard for piercing the corporate veil.[29] (Def. Brf. at 34-35). Industria responds that the argument is beside the point, because it seeks to hold Mr. Zuluaga liable, not on a corporate veil theory, but because he "personally controlled and/or directed Latinfood's wrongful acts." (*Id.*)

---

[29] Under New Jersey law, to pierce the veil, a plaintiff must demonstrate "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and (2) that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *North American Steel Connection, Inc. v. Watson Metal Products Corp.*, 515 Fed. App'x 176, 179 (3d Cir. 2013).

The Third Circuit has recognized that "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort.... The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978). The *Donsco* Court explained the distinction between individual tort liability and liability resulting from piercing the corporate veil in the following manner:

> [Individual tort] liability is distinct from the liability resulting from the 'piercing of the corporate veil' as that term is commonly used. The effect of piercing a corporate veil is to hold the owner liable. The rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity. [Individual defendant] is liable here as an actor rather than as an owner. His liability is in no way dependent on a finding that [the corporation] is inadequately capitalized, that the corporation is a mere alter ego of [the individual defendant], that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been properly complied with.

*Id.*

In that case, the Third Circuit concluded that a corporate president's knowledge and approval of the corporation's acts of unfair competition were "sufficient actual participation in the wrongful acts" to render him personally liable under section 43(a). *Id.* That the corporate president acted as an agent of the corporation rather than on his own behalf, the Court stated, "does not affect [the individual defendant]'s liability." *Id.*

Here, Industria alleges that Mr. Zuluaga 1) created Latinfood, 2) personally promoted Latinfood as an importer of goods from Colombia, 3) claimed that Latinfood had an "'exclusive distribution agreement'" with a major Colombian manufacturer, and 4) encouraged Latinfood's sales representatives to promote their products with the same misleading marketing strategy. (AC ¶¶6, 8, 45). According to Industria, it was at Mr. Zuluaga's direction that Latinfood "began to sell food products in the United States similar to those sold by [Industria] in Colombia and elsewhere, to use [Industria]'s ZENÚ and

RANCHERA trademarks, the stylized logos, and to copy the trade dress and label designs employed by [Industria]" with the "intent to deceive, mislead, and confuse the public into believing that there is a connection between [Latinfood's] products and those of [Industria], and that [Latinfood's] products are of the same character, quality and function as those of [Industria]." (*Id.* ¶¶42, 52, 89) *See also* (Pl. Brf. at 28). Mr. Zuluaga also allegedly "controlled the fraudulent registration process" for the Zenú mark. (*Id.*)  Specifically, Industria alleges that Mr. Zuluaga filed the application to register the Zenú mark, and knowingly submitted allegedly false attestations in the application. (AC ¶¶ 48-62)

Latinfood asserts that Industria's fraud-related allegations are "incredulous" [*sic*] and "baseless" (Def. Reply at 13), but such denials must await a later stage of the proceedings. For purposes of this motion, the allegations against Mr. Zuluaga must be taken as true, and they are sufficient to state a claim that he is personally liable.

Accordingly, I will deny Latinfood's motion to dismiss all counts filed against Mr. Zuluaga as an individual.

**V.     Conclusion**

For the reasons set forth above, Latinfood and Mr. Zuluaga's motion (ECF no. 37) to dismiss Counts 1-4 and 11-16 of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is DENIED. An appropriate order will issue.

**KEVIN MCNULTY, U.S.D.J.**

Date:  December 29, 2017