```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY


INDUSTRIA DE ALIMENTOS ZENU     .
SAS,                            .
                                .
            Plaintiff,          .
                                . Case No. 16-cv-06576
VS.                             .
                                . Newark, New Jersey
LATINFOOD U.S. CORP.,           . March 21, 2019
et al.,                         .
                                .
            Defendants.         .



            TRANSCRIPT OF TELEPHONIC CONFERENCE
         BEFORE THE HONORABLE MICHAEL A. HAMMER
             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:
For the Plaintiff       PETER D. RAYMOND, ESQ.
Industria:              Reed Smith LLP
                        599 Lexington Avenue
                        22nd Floor
                        New York, NY, 10022
                        (212) 549-0364
                        praymond@reedsmith.com

                        SAMUEL KADOSH, ESQ.
                        Reed Smith LLP
                        599 Lexington Avenue
                        22nd Floor
                        New York, NY, 10022
                        (212) 549-0451
                        skadosh@reedsmith.com

                        JEREMY A. BERMAN, ESQ.
                        Reed Smith LLP
                        599 Lexington Avenue
                        22nd Floor
                        New York, NY, 10022
                        (212) 549-4241
                        jberman@reedsmith.com
```

```
For the Defendant        MARK J. INGBER, ESQ.
Zuluaga & Cordialsa      Ingber Law Firm
                         Suite 159
                         51 John F Kennedy Parkway
                         Short Hills, NJ 07078-2704
                         (973) 921-0080
                         ingber.lawfirm@gmail.com


Audio Operator:

Transcription Company:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive,
                          Suite 203
                          Riverdale, N.J.  07457
                          (973) 237-6080



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

3

1          (Commencement of proceedings at 12:16:07 P.M.)

2

3          THE COURT:  All right this is Judge Hammer.

4    I'm on the -- we're on the record in this case it's

5    Industria De Alimentos v. Latinfood, Civil number

6    16-6576 because the apparently the parties could not

7    agree on -- in discussion with my law clerk whether we

8    needed to proceed on the record.  So, in an abundance

9    of caution I decided best to proceed on the record

10   rather than have to do it twice.  So, I can I have

11   appearances please beginning with plaintiff's counsel?

12         MR. KADOSH:  Yes, Your Honor this is -- this

13   is Sam Kadosh from Reed Smith, I have my colleagues

14   Peter Raymond and Jeremy Berman on the line as well.

15         THE COURT:  Okay, for the defense?

16         MR. INGBER:  And Your Honor this is Mark

17   Ingber the attorney for defendant Latinfood U.S. Corp

18   and Wilson Zuluaga.

19         THE COURT:  All right.  So, I'm operating off

20   of -- I know that there was some recent discovery

21   disputes that I resolved.  There was the one that was

22   resolved by way of the Court's February 7th order.

23   There was the deposition dispute, I think it was last

24   week that I resolved.  Where are we with remaining

25   fact discovery, are we done at this point?

4

1          MR. KADOSH:  Your Honor, so this is again Sam

2     Kadosh from Reed Smith.  What has happened since we

3     last spoke is, we resolved the disputes related to the

4     document production between the parties.  We conducted

5     two non-party depositions, one this week, one last

6     week.  We also were able to obtain the dates for our

7     -- the 30(b)(6) deposition for our client Industria

8     and that somebody will -- from Columbia.  And that is

9     for the week of April 8th.  We provide that

10    information to Mr. Ingber this morning and he's going

11    to check with his client to see if that indeed works

12    for a deposition.

13          There are, I think, will be a deposition with

14    Mr. Zuluaga you know the defendant, -- of Latinfoods

15    and there may be one or two additional depositions.  I

16    think we'll only know that after the 30(b)(6)

17    depositions are --

18          There's also just some follow up that we need

19    to do as a result of -- some follow up discovery that

20    we really need to do as a result of these depositions.

21    In the first deposition of a non-party we had

22    discovered through the deposition that that individual

23    had not searched many of  -- individual did a lot of

24    business with Latinfoods for -- really some 60

25    documents.

1          THE COURT:  I'm sorry, I didn't get that last

2   -- I didn't get the last part.  What -- from the

3   deposition of the non-party -- can you repeat the

4   rest?

5          MR. KADOSH:  Sure.  We took the deposition of

6   non-party Sudat (phonetic) C-I-D-A-O, last week.

7          THE COURT:  Okay.

8          MR. KADOSH:  And this was a key non-party.

9   But that this non-party does business to this day with

10  Latinfood and was the counter party to some very

11  important emails, that were then shared with the Court

12  previously.  And we had subpoenaed this non-party in

13  order to get the communications because Mr. Zuluaga

14  had allegedly deleted them.  And we had received a few

15  of the emails, but not all of the emails.

16         THE COURT:  Okay.

17         MR. KADOSH:  And in the deposition of the

18  non-party last week it came out that the non-party had

19  not searched their email server, other computer, --

20         THE COURT:  I got you.

21         MR. KADOSH:  -- or backup hard drives, those.

22  We made the follow up request, we're hoping that that

23  would be able to be resolved, you know, --

24         THE COURT:  Right.

25         MR. KADOSH:  -- without any Court

1   intervention but that is something -- you know that is

2   something that may require the Court's help.

3           We had also sent out a subpoena to Network

4   Solution, which is an email provider.  That was the

5   email provider for Latinfoods, and we did that after

6   the deposition.  While we were waiting for the Court

7   on the call today, the defendants had -- the

8   defendants' counsel had indicated that he had some

9   problems with the subpoena.  But this is the first

10  that we've heard about it.  So, I'm not sure that

11  dispute is ripe for the court yet, because you know

12  we're really only hearing about the concerns about the

13  subpoena for the first time today.

14          THE COURT:  Okay.

15          MR. INGBER:  Your Honor --

16          THE COURT:  Yeah.

17          MR. INGBER:  This is Mark Ingber --

18          THE COURT:  Wait, at risk before we run into

19  getting into -- whether I'm even going to consider any

20  dispute over the subpoena to the network provider, I'm

21  just trying to still first get my arms around where I

22  started, which was what other fact discovery is left

23  out there.  Because at least -- unless I'm misreading

24  the docket, the most current scheduling order that we

25  had was the one that was entered in October of 2018

1   which had a fact discovery end date of December 24,

2   2018.  Was it amended since then?  And I'm not -- I'm

3   not asking that --

4           MR. KADOSH:  Well Your Honor what's --

5           THE COURT:  Understand that I'm not asking to

6   trip the parties up, it's just one of the things we

7   may need to accomplish today is another amended

8   scheduling order to account for what -- what's going

9   on in the case and the need for the additional

10  discovery, and a time frame that marries up to, you

11  know, the needs of the case.

12          MR. KADOSH:  Your Honor so this is Sam --

13  what has happened at the last time that you set the

14  deadlines is there were extensive disputes between the

15  parties --

16          THE COURT:  Right.

17          MR. KADOSH:  -- about the scope of documents,

18  discovery and interrogatories.  And you had said that

19  you first wanted the parties to resolve those disputes

20  before you --

21          THE COURT:  And then we would revisit the

22  schedule, is that right?

23          MR. KADOSH:  Exactly, that's correct Your

24  Honor.

25          THE COURT:  That make sense.

1          MR. KADOSH:  And so, one of the purposes of

2     the call today, I thought would be to revisit the

3     schedule and set some new deadlines.

4          THE COURT:  Yes.  All right, that's fine.  I

5     just wanted to make sure.  Is there other -- any other

6     outstanding fact discovery that we have not discussed

7     that still has to get done?  No?  Okay.

8          MR. KADOSH:  -- Your Honor, there may be --

9     again this is Sam again.  There was a deposition that

10    took place on Monday that related to defendants'

11    counterclaims.  And his counterclaims are, you know,

12    one sentence that one of our subsidiary's employees in

13    2015 went around supermarkets in New Jersey and told

14    them to stop selling these products because they were

15    "fake."  And so, we took the deposition of the

16    supermarket owner that was identified in the cross

17    complaints on Monday.  He had identified maybe one or

18    two other supermarkets that were spoken to or alleged

19    spoken to, you know communicated the same message that

20    the products were fake.

21         So, we're just going to send out additional

22    requests to defendants to ask for the sale data for

23    those supermarkets because they weren't previously

24    identified as being an issue.  And we'll also subpoena

25    the supermarkets for the sales data for -- you know,

9

1  just to see -- defendants' contention is that as a

2  result of these conversations the sales of those

3  stores stopped.  So, we just want to ask that.  So,

4  that's one other piece of information that we're going

5  to need to track down as a result of Monday's

6  deposition.

7          THE COURT:  Well, are these other

8  supermarkets for which the defendant in the

9  counterclaim alleging damages?

10          MR. KADOSH:  -- identify.

11          MR. INGBER:  Your Honor we have alleged that

12  -- we have alleged one -- entity that we had alleged

13  that plaintiffs had -- employee interfered with -- at

14  the deposition this week we -- we believe we uncovered

15  additional one, that we -- two -- so we certainly --

16          THE COURT:  Okay.

17          MR. INGBER:  You know, we're trying to get a

18  handle on that and explore how many other parties.  We

19  need -- obviously we need to depose individuals that,

20  from the plaintiff so that we should -- get this

21  information.

22          THE COURT:  So, there's -- is -- I want to

23  make sure, just so I understand correctly.  There's no

24  dispute between the parties about the relevance of

25  these other two supermarkets that the initial

10

1   supermarket owner who -- who was -- who testified the

2   other day identified.

3        MR. KADOSH:  I think -- I think they're

4   clearly relevant.

5        THE COURT:  Okay, well and the defense

6   apparently thinks so too since they're seeking the

7   deps.

8        MR. RAYMOND:  And Your Honor this is Peter

9   Raymond and if I could just say to that, we -- we

10  don't know, this is sort of hearsay this guy said in

11  his deposition that he had heard that things have been

12  said to these other supermarkets, so we don't know

13  whether it's true or not.  But we -- we both -- I

14  think both sides agree that if in fact it happened it

15  may be relevant.  So, that's -- we're just exploring

16  that now.

17       THE COURT:  Okay.  All right.  I see what

18  you're saying.

19       MR. INGBER:  Your --

20       THE COURT:  Yes?

21       MR. INGBER:  -- this is Mark Ingber.  So,

22  last year, Your Honor we had subpoenaed this witness

23  who was employed by defendants -- excuse me by --

24  defendants who -- as an individual by the name of

25  Alexandre Yepis (phonetic).  And we gave -- the

1   manager for Cordialsa and we had heard through the

2   grapevine that he -- of the employees by -- by the

3   counter claimant -- counter defendant Cordialsa.

4           So, in any event we spoke to the dep -- this

5   -- this individual is very important because he's the

6   individual that was identified by the supermarket's

7   manager this week during his deposition as the person

8   -- into on behalf of Cordialsa on behalf of the --

9   defendants, that our client -- unauthorized and fake

10  and to remove them from the shelves.  And he --

11  according to the witness Mr. Yepis was acting under

12  the order of Louis Harango (phonetic) who Cordialsa's

13  30(b)(6) witness and he has -- has identified two

14  additional -- at least two additional supermarkets

15  that Mr. Yepis mentioned.

16          So, we find out this morning that Mr. Yepis

17  is no longer with Cordialsa and we're hoping --

18  conversation with  plaintiff's counsel which is going

19  to get the contact information, which will be very

20  helpful since he's a major witness in support of -- of

21  defendants' counterclaim for tortious interference.

22          So, if they produce -- if we can get his

23  contact info and depose him, you know, that will be

24  very -- somehow -- vanishing and nobody can find him,

25  that would -- obviously that would be a problem.  You

12

1  know, because we believe that the plaintiffs had an

2  obligation to keep track of the whereabouts of the

3  note -- of the noted deponents.

4         THE COURT:  Okay.

5         MR. RAYMOND:  Your Honor, this is Peter

6  Raymond, just to comment on that.  We -- we were asked

7  by Mr. Ingber if Mr. Yepis was still employed by us.

8  We found out just last night or this morning that he

9  was not.  You know, it takes a little bit of time

10 because our client's in Columbia.  They don't speak

11 English.  We actually deal through their Columbian

12 counsel.  And this is actually not them, this is a US

13 subsidiary.  So, we put in the request.  It took about

14 a week to get the response back, but we did just get

15 the response, he's no longer employed.

16        As we told Mr. Ingber this morning we

17 followed up with the client to ask if there -- what

18 their last contact information is for him, if they

19 know where he is.  And as soon as we get that

20 information, we will pass that along to Mr. Ingber.

21 But at this point there's no indication of any, you

22 know, mis-deeds here.  We just confirmed, you know,

23 that he's not employed by the subsidiary anymore and

24 will do our best to find out where he is and cooperate

25 in trying to depose him.

1          THE COURT:  All right.  All right.

2          MR. INGBER:  And that -- that -- Your Honor,

3   you know if -- if we can -- if they -- if they can

4   give us the information and we can depose him well

5   then, it's not an issue.

6          THE COURT:  Right.

7          MR. INGBER:  I -- Your Honor's attention.

8          Secondly, Your Honor, the plaintiffs on March

9   15 emailed that they subpoena the production of

10  documents that they were currently serving on Network

11  Solutions, the documents to be produced by March 29,

12  2019 regarding Latinfoods domain name and my client's

13  corporate and individual client's emails associated

14  with it.

15          You know it's taken a -- to review this,

16  because we've never seen something like this.  But we

17  believe the subpoena is -- as to request all account

18  statement or the data that any and all emails between

19  Latinfoods and Zuluaga we believe is in violation of

20  the Stored Communications Act, to request all metadata

21  of any and all email.  We believe it's in violation

22  of the Electronic Communications Act by asking that

23  all metadata and email backups which could include --

24  personal and privilege communications.  We also

25  believe that it could violate the attorney/client

1  privilege of the email metadata could include content

2  protected by the attorney/client privilege -- backups

3  of any emails can include attorney/client privilege.

4           So, we want to know -- and I discussed this

5  with -- I have discussed with opposing counsel right

6  beforehand -- we wanted to know whether Network

7  Solutions has responded or otherwise contacted

8  plaintiff's counsel in response to the subpoena.  We

9  also want plaintiff's counsel to provide us with a

10  copy -- with the -- the -- information for the

11  pertinent network solutions.  Or we can determine

12  whether -- whether Network  Solutions will be

13  notifying -- and our client before and if they decide

14  to comply with the subpoena.

15           So, we want to also have a -- we want things

16  to be considered -- request a meet-and-confer to

17  discuss the foregoing.

18           MR. KADOSH:  Your Honor this is Sam Kadosh

19  again, as I mentioned previously --

20           THE COURT:  Yes.

21           MR. KADOSH:  -- the subpoena was served a

22  week ago.  This is literally when we got on the call

23  to call the Court, while we were waiting for the

24  Court, I asked Mr. Ingber so are there any -- you know

25  I think this is a pretty quick call -- to discuss.

15

1   And he raised the issue of the subpoena.

2           So, I don't think the dispute is ripe yet.  I

3   would -- appropriate -- particularly because so much

4   of this case is about document destruction and alleged

5   document destruction.  And part of what the subpoena

6   seeks from Network Solutions is their record as to,

7   you know, when emails were deleted, when there were

8   changes to the auto deletion policy.  But you know --

9   you know we don't think this dispute is ripe.  If and

10  when it is, we're happy to brief it or -- anything

11  that the Court wants.

12          THE COURT:  Well, I do think though Mr.

13  Ingber's concern is that given that the deadline for

14  compliance with the subpoena is only eight days away,

15  how does he have any assurances as he stands here now

16  that in the interim while you folks are meeting-and-

17  conferring and if necessary the Court resolves a

18  motion to quash, because that's not been filed with

19  me, the documents aren't turned -- the responsive

20  documents aren't turned over in the interim?

21          MR. KADOSH:  Your Honor the -- you know

22  again, this is the first time that we're hearing about

23  it.

24          THE COURT:  I understand.

25          MR. KADOSH:  We could have a meet-and-confer

1   --

2          THE COURT:  I Also think there's an easy

3   cure.

4          MR. KADOSH:  -- today or tomorrow, you know

5   if he feels -- if he feels like there's an urgency

6   here, let's meet-and-confer tomorrow and we can bring

7   it to the Court's attention next week.

8          THE COURT:  Well, let me make clear -- hold

9   on let me make clear.

10          MR. KADOSH:  Yeah.

11          THE COURT:  As much as I would like for this

12   to be my only case so that I can be on standby for any

13   discovery dispute that may pop up and provide 24-hour

14   relief I'm not going to likely be in a position to do

15   that.  Here's what I suggest.

16          One, let me make clear I'm aware of, because

17   it's been brewing on for going on now, at least a year

18   and a half.  If my records are correct, they show that

19   I became of this spoliation issue back in or around

20   October of 2017.  And to the extent that the subpoena

21   request seeks information relevant to the spoliation

22   issue, that may be discoverable material under Rule

23   26.

24          I know Mr. Ingber raise, among other things,

25   the Stored Communications Act.  My understanding, and

1  I've written on the Stored Communications Act before,

2  is that that may restrict the government.  I don't

3  know though the extent to which that restricts

4  discovery of metadata in private civil litigation

5  where the Court is to determine that the data is

6  relevant and discoverable under Rule 26.

7         On the other hand, I do see point that

8  depending on the fruits of that subpoena response and

9  depending on the scope of the subpoena -- obviously I

10 have not seen the subpoena, it could raise issues of

11 privilege communications.  If, for example, the fruits

12 of that subpoena response included communications or

13 even metadata about communications between Mr. Ingber

14 and his client.

15        I would strongly suggest that we -- you folks

16 do the following.  When we get off the phone work out

17 a schedule for the parties to meet-and-confer.  And as

18 well a deadline by which the parties will agree that

19 if they haven't resolved it through the meet-and-

20 confer process then Mr. Ingber may make a motion to

21 quash the subpoena with the Court.  The defense --

22 Industria would have obviously the opportunity to

23 respond.

24        In the interim Network Solutions be advised

25 not to produce the fruits of the subpoena response

18

1  until either you folks through the meet-and-confer

2  process have resolved the issue, or if necessary, the

3  Court has resolved this issue.

4        That gives --

5        MR. KADOSH:  Yeah, that's acceptable to

6  plaintiff.

7        MR. INGBER:  That's acceptable to defendants

8  Your Honor.  Thank you for that suggestion.

9        THE COURT:  All right.  So, why don't we do

10  this on that front.  When you folks get off the phone

11  -- or when I get off the phone you folks continue to

12  discuss at least the time frame.  And again, that time

13  frame should include two things: One, enough time for

14  the parties to meet-and-confer; Two, if necessary, a

15  briefing schedule.

16        Honestly, it seems to me that putting aside

17  potential privilege -- and the -- even the risk of

18  privilege could be carved out of this.

19        MR. KADOSH:  Right.

20        THE COURT:  Such that Network Solutions is

21  not obligated to produce any information or concerning

22  any communications that would include Mr. Ingber or

23  his law firm or any agents of the law firm in

24  conjunction with the litigation.  But that the parties

25  meet-and-confer on what's reasonably necessary under

19

1   the subpoena given the spoliation issue.

2          Honestly, I'm not sure that I understand --

3   well, you know what I'm not going to go into that area

4   because I haven't seen the subpoena.  But recognizing

5   that vis-a-vis the spoliation -- some of this

6   information very well may be relevant and discoverable

7   under Rule 26.  And keep in mind too that some of this

8   may actually help thwart -- not thwart, obviate the

9   need for complicated and expensive spoliation motion

10  practice later, which would probably portend a very

11  uncertain result from both sides under Rule 37.

12          So, what I would suggest is that by --

13  today's a Thursday?  So, by Monday you folks give me a

14  joint proposed order that includes the deadlines for

15  the meet-and-confer, includes the deadlines for any

16  necessary motion practice and that includes

17  confirmation that counsel has alerted Network

18  Solutions to hold off on complying with the subpoena

19  pending further order of the Court.  How's that?

20          That gives us a rational approach.  That

21  gives you folks the -- the space and probably, I

22  guess, to some extent Mr. Ingber the comfort level of

23  having a meaningful meet-and-confer that may very well

24  obviate a lot of these issues, without worrying about

25  an inadvertent interim production where Network

1  Solutions is just trying not to run afoul of this

2  subpoena.  But also gives the plaintiff the comfort of

3  knowing that it's going to have recourse if the

4  parties can't resolve this in the meet-and-confer.

5         And then include in there the proposed -- the

6  proposed order the proposed briefing schedule.  And I

7  would also include -- because some of this may turn on

8  that, a proposed end -- or proposed amended deadlines

9  for fact discovery, expert reports and the completion

10  of expert discovery.  Because clearly in light of the

11  depositions that are going on, not really including

12  the spoliation issue, our current structure, as we

13  discussed earlier, needs to be amended.

14         MR. INGBER:  Your Honor?

15         THE COURT:  Yes.

16         MR. INGBER:  This is Mark Ingber, a couple of

17  things.  In connection with getting back to you by

18  Monday, I'm going to be in -- in a -- attending a

19  conference in Washington DC  on Monday and Tuesday.

20         THE COURT:  Okay.

21         MR. INGBER:  So, I will not be --

22         THE COURT:  How about the end of the week?

23         MR. INGBER:  -- in the --

24         THE COURT:  How about -- how about a week

25  from tomorrow?

1          MR. INGBER:  By the end of the week --

2          THE COURT:  In other words --

3          MR. INGBER:  That would be better.

4          THE COURT:  All right, fine.

5          MR. INGBER:  And -- go -- just so you're

6  aware, but we -- we had initially noticed multiple

7  witnesses for focus based on the -- that we had

8  received.  But we did agree, Your Honor, that we -- we

9  would be begin with the 30(b)(6) for the each of

10 Industria and Cordialsa and at that point we would

11 determine -- the defendants would -- would determine

12 what we needed additional witnesses.  So, we -- we

13 think that to go through with that in good faith that

14 there's a -- there's a reasonable likelihood that

15 further depositions of the plaintiff will be needed

16 besides their 30(b)(6) initial witness.

17         THE COURT:  Okay.  Is everybody onboard for

18 the proposed schedule that I just laid out?

19         MR. KADOSH:  Yes, Your Honor this is Sam

20 Kadosh and we're onboard with all -- all of it.  With

21 just one caveat, which is at the prior conference we

22 had contemplated that we would complete fact discovery

23 when -- the -- the spoliation motion and then only

24 then after that engage in expert discovery.  With the

25 idea being that the -- the outcome of the spoliation

1  motion would really, you know, give the party insight

2  into the scope of the case going forward, before we

3  engage in like another very costly step in the

4  process, you know, of retaining the experts and doing

5  surveys and deposing the experts.  That we would

6  first, you know, see the outcome of the spoliation

7  motion.

8          MR. INGBER:  Well, Your Honor, this is Mark

9  Ingber.  I do recall a discussion about resolving the

10 issue of -- of the -- if it still was necessary of any

11 issue regarding the potential or -- spoliation before

12 moving forward with expert witness.  But, you know,

13 other than that there was nothing about a particular

14 schedule of trying to bring a spoliation motion was to

15 be considered after the close of discovery.

16         MR. RAYMOND:  Your Honor -- Your Honor this

17 is Peter Raymond.  If I could just comment on that.

18 What actually happened here, and maybe people aren't

19 remembering.  But we -- we made a motion before -- for

20 permission to make this spoliation motion now.  And

21 Your Honor ruled in response to that that we could not

22 make it then, but that we could make a motion at the

23 end of fact discovery, but before expert discovery.

24         So, that is in the record and that is a

25 ruling that Your Honor made.  So, it wasn't --

1          THE COURT:  Hold on.

2          MR. RAYMOND:  -- a discussion.

3          THE COURT:  Hold on, let me pull up --

4          MR. INGBER:  Well the other -- Your Honor --

5  made a ruling -- that ruling -- plaintiff's -- bring a

6  second frivolous motion for reconsideration of -- of

7  spoliation.

8          MR. RAYMOND:  No, it was on that second

9  motion that Your Honor made that ruling, so it was in

10 response to that second motion.  So, it's in the

11 record.  I don't have it in front of me right now, but

12 Your Honor did make that ruling.  So, we'll -- we can

13 work that into the schedule that we're going to

14 propose to you.

15         MR. INGBER:  Well, I -- I don't believe it

16 belongs in a -- in a -- in a discovery schedule,

17 frankly.

18         MR. RAYMOND:  Well --

19         THE COURT:  Hold on.  Before --

20         MR. RAYMOND:  -- it was a rule of the Court.

21         THE COURT:  Let's allow the Court the

22 opportunity to pull up the actual order.

23                (Pause in proceedings)

24         THE COURT:  Sorry, just give me a moment

25 because there's  a lot of docket here.

1          MR. INGBER:  This is -- this is in the -- the

2     docket number 131, Your Honor.

3          THE COURT:  Actually it's 103, because 131

4     incorporates 103, the May 7, 2018 order, I think.  I

5     think.

6          MR. INGBER:  Right.  That's correct Your

7     Honor.

8          THE COURT:  All right.  What the order held

9     was that plaintiff's application to stay remaining

10    discovery pending adjudication of the sanctions motion

11    is denied.  Plaintiff could file any such motion at

12    the close of discovery, in conjunction with

13    dispositive motions.  The Court never held -- this why

14    it struck me as unlikely when I first heard it.  The

15    Court never held that expert discovery was going to be

16    stayed.  That's not in either the May 8, 2018 Order,

17    nor the -- oh, and I just had it.  What was the -- Mr.

18    Ingber what was the order you just cited?

19         MR. INGBER:  August 31, Your Honor, December

20    4.

21         THE COURT:  Yeah.  Yeah.  Which essentially

22    incorporated --

23         MR. INGBER:  12-18.

24         THE COURT:  -- re-incorporated the May 7,

25    2018 Order.  In other words --

1          MR. RAYMOND:  Well, Your Honor can we check

2    the transcript then, because I know Your Honor said

3    that.  I just don't want to -- I don't have those in

4    front of me right here.  But Your Honor said that in

5    our discussion about motion.

6          THE COURT:  Well, you're certainly free to

7    check the transcript --

8          MR. INGBER:  -- are not in the final order

9    unless they're there.

10          THE COURT:  Exactly.  It's -- it's what's

11   reduced to the order, for which no party ever sought

12   reconsideration or appeal that actually matters.

13          Look, here's -- here's my core concern, okay.

14   Particularly because I ordered that the sanctions

15   motion would be part and parcel of the dispositive

16   motion.  It's going to probably take -- in this case

17   it is already approaching the three-year mark.  It's

18   already going to take probably three months or so for

19   full briefing on those motions.  It very well may take

20   another five to six months for adjudication of those

21   motions.  In a case that's rapidly approaching the

22   three-year mark and given all of the things that

23   counsel still has to do just to get fact discovery

24   done, I am loath to, just essentially give a blank

25   check on when exactly expert discovery begins.

1          I -- I also am not sure that I understand,

2    given that the spoliation motion is going to be part

3    and parcel of the dispositive motion, I'm not sure why

4    it would make sense to hold off on expert discovery

5    pending adjudication of the -- the dispositive motions

6    any spoliation motion.

7          Now, you could argue that, well if we the

8    defendants win, for example, on summary judgment that

9    would have the effect of mooting expert discovery.

10   And to some extent there's an irrefutable logic to

11   that.  But that is -- there's nothing about that

12   that's unusual or extraordinary.  That's always a risk

13   when there's a dispositive motion pending.  And this

14   court, when faced with applications to stay discovery

15   has routinely required more of a showing than that.

16   That's my concern in a nutshell.

17         MR. RAYMOND:  All right, Your Honor we will

18   present a -- a schedule as you -- as you have asked us

19   to do.  I mean I know we didn't discuss this before

20   and I guess it's in the transcript, maybe it didn't

21   make it into the order.  But, you know, we were trying

22   to -- permission to make that motion sooner rather

23   than later.  And Your Honor, I thought, sort of

24   compromised and said, yeah you can make it at the end

25   of fact discovery, but before expert discovery.

1          So, I know there was a discussion about it

2    and it should be in the transcript.  Obviously, it's

3    up to Your Honor to decide how you want to proceed.

4    But, you know, the spoliation motion is -- you know,

5    it's a very serious motion in this case.

6          THE COURT:  Uh huh.

7          MR. RAYMOND:  You know a spoliation has

8    caused us to not -- to not be able to get much

9    discovery.  In fact --

10         THE COURT:  Right, but Peter remember --

11   remember too -- because this part I do remember.

12   Remember --

13         MR. RAYMOND:  Your Honor, I have the

14   transcript --

15         THE COURT:  Hold on.

16         MR. RAYMOND:  I'm sorry.

17         THE COURT:  As we've just established, the

18   transcript while I guess providing some insight is

19   certainly not dispositive of the docketed order.

20         The -- the idea behind holding off on the

21   spoliation motion until dispositive motions was this.

22   It was that there was a real -- at least a possibility

23   that other discovery that the parties could educe

24   would possibly obviate the need for the spoliation

25   motion by finding that there were alternative sources

1   of the same or substantially similar information.  And

2   at that point we just didn't know.

3          So, at least -- if I recall correctly, my

4   thinking was, that let's get the rest of discovery

5   done.  When we have a much clearer pictures of what

6   prejudice the plaintiff could argue as a result of the

7   spoliated information.  But none of that necessarily

8   portends one way or the other for -- favorably for

9   holding off on expert discovery.

10         MR. RAYMOND:  Your Honor, I just pulled the

11  transcript, for what it's worth at page seven you --

12  you stated, "What I will offer is this.  I will stay

13  any expert discovery on damages to let you make that

14  motion and get a ruling on that motion before the

15  parties have to go through the time and expense of any

16  expert damages.  But beyond that discovery will

17  continue and the Courts May -- Order stands."

18         So, it's correct we didn't then try to

19  cooperate that specifically into the order that you

20  issued, but we thought Your Honor's ruling was quite

21  clear that -- that we could avoid the expense of

22  expert discovery at least until --

23         THE COURT:  And that was when?

24         MR. RAYMOND:  -- the decision.

25         THE COURT:  Which transcript --

1           MR. RAYMOND:  That was December 4, 2018,

2   teleconference Your Honor.

3           MR. INGBER:  They -- hearing this issue.

4   This is the same -- plaintiff's counsel -- first order

5   said they they're not to bring up spoliation at this

6   time and wasted everybody else's time on this.

7           So, it -- whatever the order said -- as Your

8   Honor indicated -- dispositive -- move to reconsider

9   it.  So, you know as far as the defendants are

10  concerned there's -- there's a lot more to do.

11          MR. RAYMOND:  Well, Your Honor --

12  inconsistent with what you said in the transcript.  It

13  doesn't --

14          THE COURT:  Yes, making it -- counsel making

15  it incumbent upon you then to seek reconsideration or

16  appeal.

17          Look, let's take a practical view of this.

18  This case is, as I said, is two plus years old.  I

19  still haven't heard a reason why the expert discovery

20  should await result of the dispositive motions and the

21  spoliation motion.

22          MR. RAYMOND:  Your Honor, again Peter

23  Raymond.  The answer to that is that expert discovery

24  in this, as in other trademark cases, will likely

25  including doing consumer perception surveys, which you

1    know can cost up to $100,000 to do.  That's not

2    including the depositions that each side may want to

3    take of the experts.  So, there's a very substantial

4    expense in that -- in that piece of expert -- of

5    expert work and discovery.

6          So, I think the thinking was at the December

7    8th conference was that we could hold off on the

8    parties taking on that very substantial expense

9    until there was ruling on the -- on the spoliation

10   motion.

11         MR. INGBER:  Your Honor, this is plaintiff --

12   excuse me defendant counsel.  If -- time Your Honor

13   the parties are entered into a stipulation whereby

14   Industria has -- has stipulated that they never used

15   the mark Zenu -- of any goods imported by Industria in

16   to the U.S.  That they've never sold any goods in the

17   U.S.  They never sold any goods bearing the mark Zenu

18   -- in the US.

19         THE COURT:  Uh huh.

20         MR. INGBER:  So, I can't imagine what the

21   consumer study is going to find.  The witness this

22   week, Mr. Rodriguez from -- said he never heard of

23   Industria.

24         THE COURT:  Uh huh.

25         MR. INGBER:  So, this is the subsequent

1  factors which -- which would further indicate that if

2  any expert discovery on -- on a survey -- on -- on the

3  plaintiff's recognition in the US would be frivolous.

4         THE COURT:  Uh huh.  All right, look --

5         MR. RAYMOND:  Your Honor -- the not -- what

6  the -- what the survey would hopefully show is that

7  Columbian American ex patriots in the United States

8  who are, you know, many of the customers of Latinfoods

9  believed that they are buying products imported by my

10 client from Columbia.

11        And in fact, in the non-party deposition of

12 the Cidao Meats, which was taken in the last two

13 weeks, Cidao's principal said that she was

14 specifically asked by Mr. Zuluaga of Latinfoods to

15 copy our trademark and our design for my client's

16 website in -- that one was the woman who created the

17 packaging for Latinfoods.  So, --

18        MR. INGBER:  -- that -- Your Honor --

19        MR. RAYMOND:  -- finish --

20        MR. INGBER:  -- wasn't there for the entire

21 deposition.

22        THE COURT:  All right, look counsel --

23 counsel, let's do this.  Because I want to be fair.

24 And also -- practical -- look cases -- the other

25 things is cases change over time.  I certainly don't

1   know -- and that -- that transcript actually goes on

2   for like another, I don't know, nearly 20 pages.  So,

3   -- and it resulted in the order that it resulted in.

4          I also did not know then when I know now,

5   which is that not only are we not going to meet the

6   December 24, discovery deadline that we are going

7   probably to go for at least another three months.  So,

8   at least into mid-June, before we can safely say that

9   discovery is wrapped up.  And it very well may go

10  longer if the parties don't resolve this subpoena

11  issue.

12         What I will say is this.  If the defense

13  wants to renew an application to stay discovery

14  pending the spoliation motion and the dispositive

15  motions, you can send me a letter that lays out the

16  basis why and then Mr. Ingber can respond.  Based on

17  everything we know, including now.

18         But keep in mind that if the best the

19  defendants have is, essentially off-the-cuff comment

20  during a long and rather contentious hearing that did

21  not, at the end of the -- certainly in the order

22  didn't embody it, where nobody sought reconsideration

23  or appeal, and really even as I go through the rest of

24  the transcript -- now I'm doing this on the fly

25  because we're in the middle of the phone conference.

1  You know, frankly, you're going to be fighting an

2  uphill battle, unless you've got a better -- more

3  substantive argument as to why now, knowing what we

4  know about the length of discovery and the remaining

5  discovery to be done it make sense to hold off on

6  experts depending adjudication of the summary judgment

7  and dispositive motions.  You can make that -- that --

8  that argument.  And I'll certainly hear in response

9  from Mr. Ingber.

10         MR.  INGBER:  Your Honor I think you mean --

11         THE COURT:  All right.

12         MR.  INGBER:  -- the -- the plaintiff's

13  counsel, not defendants' counsel in your -- in your --

14         THE COURT:  Sorry if I misspoke, I meant --

15  it's obviously the plaintiffs who are -- who are

16  raising this issue.  Right.  And Mr. Ingber can

17  respond.

18         All right.

19         MR.  INGBER:  Thank you Your Honor.

20         THE COURT:  So, you folks are going to get me

21  that schedule.  And I'm still going to want, at least

22  in that schedule, proposed deadlines.  And then if the

23  defendants want to renew that application, I'll leave

24  that to you, and we'll deal with that at the

25  appropriate time.  All right.

34

1          MR. INGBER:  Thank Your Honor.

2          MR. RAYMOND:  Thank Your Honor.

3          THE COURT:  All right, thank you counsel,

4    we're adjourned.

5

6       (Conclusion of proceedings at 12:58:40 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2      I, JESSICA ROBINSON, Transcriptionist, do hereby

3   certify that the pages contained herein constitute a

4   full, true, and accurate transcript from the official

5   electronic recording of the proceedings had in the

6   above-entitled matter; that research was performed on

7   the spelling of proper names and utilizing the

8   information provided, but that in

9   many cases the spellings were educated guesses; that

10   the transcript was prepared by me or under my

11   direction and was done to the best of my skill and

12   ability.

13      I further certify that I am in no way related to

14   any of the parties hereto nor am I in any way

15   interested in the outcome hereof.

16
17   /S/ JessicaRobinson                03/23/19
18   Signature of Approved Transcriber          Date
19   Jessica Robinson, AOC #581
20
21   King Transcription Services
22   901 Route 23 South,
23   Center Suite 3
24   Pompton Plains, N.J.  07444
25   (973) 237-6080
26
27
28
29
30
31
32
33
34