```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

INDUSTRIA DE ALIMENTOS ZENU       .
S.A.S.,                           .
                                  .
        Plaintiff,                .  Case No. 16-cv-06576
                                  .
vs.                               .  Newark, New Jersey
                                  .  October 25, 2019
LATINFOOD U.S. CORP., et al.,     .
                                  .
        Defendants.               .
```

```
                     TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE MICHAEL A. HAMMER
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

 For the Plaintiff:      PETER D. RAYMOND, ESQ.
                         Reed Smith LLP
                         599 Lexington Avenue
                         New York, NY 10022
                         (212) 549-0364
                         Praymond@reedsmith.com

                         SAMUEL KADOSH, ESQ.
                         Reed Smith LLP
                         599 Lexington Avenue
                         New York, NY 10022
                         (212) 549-0451
                         skadosh@reedsmith.com




 Audio Operator:

 Transcription Service:     KING TRANSCRIPTION SERVICES
                            3 South Corporate Drive, Suite 203
                            Riverdale, NJ  07457
                            (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2
     For the Defendants:     MARK J. INGBER, ESQ.
 3                           The Ingber Law Firm
                             Schoolhouse Plaza
 4                           374 Millburn Avenue, Suite 301 East
                             Millburn, NJ 07041
 5                           (973) 921-0080
                             ingber.law@verizon.net
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Commencement of proceedings at 10:08 A.M.)

 2

 3              THE COURT:  All right.  We are on the record in

 4    Industria de Alimentos versus Latinfood U.S., Civil

 5    No. 16-6576, for a hearing and conference on a number of

 6    discovery disputes that the parties have presented to the

 7    Court by way of their July 26th joint letter, Docket

 8    Entry 157.

 9              So can I have appearances, please, beginning with

10    plaintiff's counsel.

11              MR. KADOSH:  Your Honor, Sam Kadosh and Peter

12    Raymond from Reed Smith for plaintiff Industria.

13              THE COURT:  All right.  And for the defendants.

14              MR. INGBER:  Your Honor, Mark Ingber and my

15    paralegal Barry Chen for the defendants.

16              THE COURT:  All right.  Good morning, Counsel.

17              We have a lot to cover, so let's just dive right

18    in.

19              The first issue is the plaintiff essentially wants

20    to depose Wilson -- and if I mispronounce this, please let me

21    know -- Zuluaga.  I don't get a sense that there's a dispute

22    about Zuluaga as a Rule 30(b)(1) fact witness, but the

23    concern that the defendant has raised is that whether

24    Mr. Zuluaga can be redeposed by the plaintiff regarding the

25    spoliation issue.  The defendant argues that Mr. Zuluaga has
```

```
 1   already been deposed on the spoliation issue and that, in

 2   fact, the plaintiff was allowed a full day of deposition on

 3   the spoliation issue.  And so, essentially, why are we

 4   covering old ground?

 5            The plaintiff argues that there are certain issues

 6   that the -- that were not previously covered.

 7            So I guess what I'm really doing is addressing both

 8   discovery disputes 1 and 2.  Let me see if we can nail this

 9   down.

10            Is the defendant arguing that plaintiff -- putting

11   aside the spoliation issue, the defendant shouldn't be

12   allowed -- I'm sorry -- the plaintiff shouldn't be allowed to

13   depose Mr. Zuluaga at all?

14            MR. INGBER:  No.  No, Your Honor.  We're just --

15   this is Mark Ingber.

16            We're just trying to -- a couple of issues.  We're

17   trying to -- we're trying to avoid having him being deposed

18   on the spoliation issue.

19            THE COURT:  Right.

20            MR. INGBER:  And they're -- and the plaintiff's

21   deposition topics, on the deposition topics, they repeat the

22   same issues about covering spoliation.

23            THE COURT:  All right.  So your issue is about the

24   spoliation and not the fact --

25            MR. INGBER:  That's --
```

1            THE COURT:  -- of taking a Rule 30(b)(1) deposition

2    of him.

3            MR. INGBER:  Secondly, Your Honor, they -- they --

4    my client is a -- is a named defendant individually.  And the

5    defendant -- the plaintiff's counsel seems to be trying to,

6    you know, do an end-around and try to depose him multiple

7    times based on his 30(b)(6) capacity and in -- as an

8    individual defendant so that they could ask whatever they

9    want.  It's -- we've --

10            THE COURT:  Well, they can ask whatever they want,

11   as long as it's relevant.  Again, putting aside the

12   spoliation issue -- and I'm going to -- we're going to

13   address that separately -- it's not uncommon, particularly in

14   a smaller business, which you've asserted Latinfood is -- for

15   a 30(b)(1) witness to also be a 30(b)(6) witness.

16            MR. INGBER:  Right, but they want to have -- we

17   want that deposition to be deposed simultaneously,

18   Your Honor.

19            We agree that our witness Mr. Zuluaga, when he's

20   testifying, would be testifying both in his corporate and

21   individual policy.  And the defendant -- the plaintiff's

22   counsel cited a case that's saying is -- versus Electronic

23   Data, which we -- allowing a witness to be deposed

24   simultaneously, and we agree with that.  But, again, it just

25   seems plaintiff has left the door open by saying that, oh,

1    they could depose him separately and call him again.

2              MR. KADOSH:  No, that is incorrect.  Your Honor.

3    We're not --

4              THE COURT:  Well, number one, don't ever interrupt

5    counsel.

6              MR. KADOSH:  I'm sorry.

7              THE COURT:  I just want to make that clear at the

8    outset, because I know this case has been plagued by fights

9    between the counsel -- believe me, I read the deposition

10   expert [*sic*] -- excerpts from the -- that counsel gave me,

11   and, frankly, I was little disturbed to see the level of --

12   or the interaction.  I want to make clear, because we have a

13   number of issues to cover, each side will certainly get a

14   full and fair opportunity to be heard.  But please do not

15   interrupt each other.

16             Mr. Ingber, what were you saying?

17             MR. INGBER:  Your Honor, I was saying, again, that

18   all witnesses, Mr. Zuluaga, once we confirm that he's not

19   going to be redeposed hopefully on the spoliation issues,

20   when he's testifying, he's going to be testifying one time in

21   his individual and corporate capacity.  And his responses be

22   bind the defendants in all situations.  And we cite, again,

23   to the very case cited by the plaintiff on page 1 of the

24   July 26th letter, the Zang v. Electronic Data Systems Corp.

25   case [phonetic].  If you want, I could give you the cite.

1          THE COURT:  No.  I have it right here.  And I

2   understand that.

3          All -- all Zang basically said was you could be

4   deposed as both a 30(b)(1) and a 30(b)(6).  I have a hard

5   time believing that the Court essentially micromanaged the

6   order of questioning.

7          Is that what the parties are asking me to do?

8          MR. INGBER:  Well, Your Honor, if you don't think

9   that that case is sufficient, then we refer to the -- the

10  State Farm Mutuals Funds case cited on page 4, which says

11  that the district court rejected the defendant's attempt to

12  depose a witness in his individual capacity after that

13  witness has already been deposed as his organization's

14  Rule 30(b)(6) designee.

15         THE COURT:  No.  I'm familiar, and I read that

16  case.

17         Upon finding, essentially, that the questioning as

18  to one provided all of the relevant discovery that counsel

19  could reasonably expect to get as to the second category.

20         Look, if -- if what -- if the issue is do the

21  defendants -- or plaintiffs, rather, get to question

22  Mr. Zuluaga as both a 30(b)(1) witness and a 30(b)(6), the

23  answer to that is plainly yes.  In terms of the ordering of

24  the questions, I'm not sure -- and there may be areas --

25  because I don't know the full scope of Mr. Zuluaga's

1    anticipated testimony.  There may be areas where his 30(b)(6)

2    testimony overlaps with the 30(b)(1) testimony.  Right?

3              MR. INGBER:  Correct.

4              THE COURT:  Which would largely render a lot of

5    this moot.  It would have the effect of him testifying

6    simultaneously.  But it would render a lot of this moot.

7              So let's deal with the larger issue first of -- so

8    there's no objection to -- if I understand correctly, there's

9    no objection to -- and I'm not sure there's even a dispute

10   between the parties, then, as to plaintiff deposing

11   Mr. Zuluaga both under Rule 30(b)(1) and Rule 30(b)(6).

12   Right?

13             MR. INGBER:  Correct, Your Honor.

14             THE COURT:  Okay.  And I assume that's what the

15   plaintiffs are looking to do?

16             MR. KADOSH:  That's right, Your Honor.  On the same

17   date.  We noticed the depositions for the very same date.

18   We're not looking to take two separate depositions of him.

19   But it's just there are certain restrictions on 30(b)(6)

20   depositions that you have to notice the topics in advance --

21             THE COURT:  There are certain topics.  Right.

22             MR. KADOSH:  Right.  So we just want, you know, a

23   date with him where he'll both be there as a 30(b)(6) and a

24   30(b)(1).  So I don't -- I don't think there's a --

25             THE COURT:  I'm still not sure I see the dispute.

1          So here -- but here's how we'll handle it.

2          MR. KADOSH:  I don't think there is a dispute.  I

3    think -- you know, I think maybe perhaps Mr. Ingber is

4    misunderstanding that we want to take him on two separate

5    days in his 30(b)(6) and 30(b)(1) capacity, which is the

6    situation that the State Farm case envisioned --

7          THE COURT:  Right.

8          MR. KADOSH:  -- but we're not.

9          THE COURT:  Right.

10          MR. KADOSH:  We noticed them for the same date.

11   And, you know, we want him for one day both as a 30(b)(6) and

12   as a 30(b)(1).  That's all.  I don't think there's a dispute

13   here, Your Honor.

14          THE COURT:  So to move this along, I'm going to

15   allow the plaintiff to depose -- by the way, at the outset, I

16   should say, I'm entrusting counsel to take good notes on

17   this, because you folks are going to jointly prepare and

18   submit the form of order embodying the Court's rulings at the

19   conclusion of today's hearing.  Okay?

20          I'm going to allow the plaintiff to depose

21   Mr. Zuluaga, both as a fact witness under Rule 30(b)(1) and

22   Rule 30(b)(6).  I am not -- for one day, I am not going to

23   micromanage the order of questions.  I think that would be,

24   frankly, an exercise in futility.  But if in the course of

25   the deposition, Mr. Ingber believes that the questioning has

1    somehow become redundant or repetitive, not merely in and of

2    itself, because that's a basis for an objection, but not to

3    terminate or limit a deposition, but to the point where it

4    borders on harassment or there's some issue that arises, the

5    parties will be able to call me to adjudicate the dispute.

6    Same as any other deposition.

7                MR. INGBER:  Thank you, Your Honor.

8                THE COURT:  All right.  So we've resolved that.

9                Let's turn to the issue of the spoliation question.

10   Now, I'm going to direct my first questions to plaintiff's

11   counsel.

12               I have to say, frankly, from what I see in the

13   joint letter, the explanation about this uncovered evidence

14   from third parties is so vague that I am not sure that I

15   understand what that is, much less how that warrants a new

16   opportunity to question about spoliation.  And I -- perhaps,

17   actually, before we even get to that.  If the plaintiff did

18   get this third-party discovery, did plaintiff produce it to

19   the defense under Rule 5(a)(1)(C)?

20               MR. KADOSH:  Yes, Your Honor, we've produced

21   everything.

22               THE COURT:  Okay.  Second question, I saw --

23   because occasionally magistrate judges do peek behind the

24   curtain -- I saw the exchange between the parties --

25   actually, I think it was also brought up in the joint

1    letter -- and I understand it was probably the result of a

2    lot of communications between the parties.

3              But why is it that when defense counsel asks you

4    for more information as to the additional spoliation

5    questioning, plaintiff didn't -- you didn't provide it.

6    Instead you basically said, we're not going to provide you

7    with an outline of our deposition of Mr. Zuluaga, so we

8    decline your request that we provide you with the additional

9    facts necessitating additional questions on the spoliation

10   topics.

11             I've got to tell you, I didn't read anything in

12   asking for additional facts as asking for an outline of your

13   deposition questions.  And I have some real concerns as to

14   whether the parties really met and conferred under Rule 37 in

15   that issue.

16             MR. KADOSH:  Your Honor, my view was that we had

17   provided all of the new discovery material to Mr. Ingber.

18   Right?  So he received the production from Network Solutions.

19   He received the production from Jamal Meeks [phonetic].  And

20   I don't want to necessarily give him my game plan for the

21   questions that I'm going to ask.  He knows what -- what new

22   material is out there.  I don't want to give him my game plan

23   to prepare his witness, you know, to know exactly what

24   questions we're going to ask.

25             THE COURT:  Well, if he has the documents and if

1    you're going to be asking him about the documents, how much

2    of a game plan are you really giving up?  Maybe it's easy for

3    me to ask that because I haven't seen the documents.  But --

4    so let's do this.  Let's fast-forward.

5            What are these documents that we're talking about?

6    How did they give rise to these new revelations?

7            MR. KADOSH:  After the February 2018 deposition, we

8    learned that Mr. Ingber [*sic*] had a different email account

9    that we used for business -- used for business

10   communications.  We learned this from productions from a

11   third party.  Right?  That's something that is obviously --

12   that was -- that was -- at his deposition, he said he didn't

13   have any other business email addresses.

14           THE COURT:  Wait, wait, wait, wait.  I'm sorry.

15   Because you started out by saying "Mr. Ingber" had a

16   different email account?

17           MR. KADOSH:  I'm sorry.  I'm sorry.

18           Mr. Zuluaga.

19           THE COURT:  Okay.  So --

20           MR. KADOSH:  I apologize.

21           THE COURT:  -- so -- that's all right.  So

22   Mr. Zuluaga has a different email -- a different email

23   account.

24           Okay.  Go ahead.  I'm sorry.

25           MR. KADOSH:  And it was asked about at this

1  spoliation deposition, and he identified only one email

2  account.  He didn't identify this other email account that we

3  learned about afterwards.  And that's his Gmail account.

4          The second issue --

5          THE COURT:  Well, wait -- I'm sorry.  I'm just -- I

6  want to hear what you have to say.  I'm just trying to keep

7  up.

8          Which one was the Gmail?  Was the one he disclosed

9  at the deposition or the one you subsequently found?

10         MR. KADOSH:  That's the one that we subsequently

11 found.

12         THE COURT:  Okay.

13         MR. KADOSH:  That he used for business purposes.

14         THE COURT:  Right.

15         MR. KADOSH:  He identified it at his deposition, at

16 the spoliation deposition, but he did not identify it as one

17 that was being used for business purposes.

18         THE COURT:  I follow.  Okay.

19         MR. KADOSH:  The second issue, Your Honor, is we

20 received metadata from Network Solutions.

21         THE COURT:  Wait, before we get to the second

22 issue.  So -- how do we know -- I think I know -- I think I

23 know what you're going to tell me.  But how do we know that

24 this other Gmail account that he disclosed at the deposition

25 but did not disclose as being used that he used it for

1   business purposes, how do you know he used it for business

2   purposes?  Have you got emails from third parties for --

3              MR. KADOSH:  Exactly.

4              THE COURT:  Okay.

5              MR. KADOSH:  Exactly, Your Honor.  From the

6   third-party Cibao Meats.

7              THE COURT:  Okay.

8              Did he specifically deny using the Gmail email

9   account for business at the deposition?

10             MR. KADOSH:  He was asked, what are -- you know, in

11  a few different ways, are these the only emails that you use

12  for business purposes?  And he confirmed the limited set,

13  which did not include the Gmail.

14             THE COURT:  Okay.

15             MR. RAYMOND:  Your Honor, could I just add one fact

16  here.

17             THE COURT:  Yeah.

18             MR. RAYMOND:  Just to put this in context, because

19  I took the initial deposition of Mr. Zuluaga.

20             What happened was we served a document demand, and

21  we were told that Mr. Zuluaga and his company had no

22  documents because his hard drive had somehow been destroyed.

23  So there were no documents that related to our claims in the

24  lawsuit.

25             And that's when we asked the Court to let us take

1   this spoliation deposition to find out what happened.

2            THE COURT:  Right.

3            MR. RAYMOND:  So I took that deposition.  And

4   Mr. Zuluaga told his story about how his hard drive was hurt,

5   and he went into Best Buy, and he decided to buy a new one,

6   and he took the old one, and rather than search it and

7   download it, he threw it away, because it was less expensive

8   to do that.

9            So at that point, we were just told he -- and he

10  said everything that was relevant to communications about

11  this case was on that hard drive and on that email account,

12  and so we weren't going to get anything.

13           And Your Honor actually suggested to us at a

14  subsequent conference that we go to third parties, we

15  subpoena third parties --

16           THE COURT:  Right.

17           MR. RAYMOND:  -- to see if we can get the other

18  side.

19           We did that.  And we got this -- this plethora of

20  emails that showed that Mr. Zuluaga had specifically asked

21  Cibao Meats, who was designing his website, to copy our email

22  from -- to copy our trademark off of my client's website and

23  do all this stuff.  These were obviously incredibly

24  significant documents to our case.  So once we found all

25  that --

1          THE COURT:  I'm sorry.  Counsel, can I interrupt?

2     I got a note from my deputy clerk.

3          Can I interrupt you just to state your name for the

4     record, again, because obviously, I think you guys know this,

5     what will happen, is you'll order the transcript and the --

6     the transcription service, it makes a lot easier for them to

7     identify the speaker.

8          MR. RAYMOND:  Right.  I'm Peter Raymond, also from

9     Reed Smith.

10         THE COURT:  All right.  Thank you.

11         So I'm sorry.  I didn't mean to interrupt.

12         MR. RAYMOND:  So that was the context.

13         And then we discovered -- we found through the

14    third parties, we got all this very significant discovery,

15    and that's what we want to now follow up with Mr. Zuluaga on

16    spoil- -- we don't want to go back to his testimony in the

17    last deposition.  We didn't know at the last deposition -- we

18    had no documents.  We were just trying to find out why there

19    were no documents.

20         Now we've found out there were these very

21    significant documents, which, you know, maybe were

22    purposefully destroyed, maybe not.  I don't know.  But -- but

23    that's what we want to now explore with Mr. Zuluaga.  That's

24    all we want to do.  And under the spoliation issue, we just

25    want to be able to take it the next step, because now we know

1   and he knows -- because we produced them to him and we have

2   this exchange of emails that he -- were destroyed in his hard

3   drive, but were not -- actually some of them were destroyed

4   in the third party's hard drive.

5            THE COURT:  Right.

6            MR. RAYMOND:  But enough of them were produced that

7   showed what actually happened here, and it's very significant

8   for our case up to -- on the merits and on the spoliation

9   issue.  So I just wanted to put that in context as to why we

10  need to continue the spoliation deposition, but not to redo

11  what we already covered.

12           THE COURT:  Right.  You don't want to cover old

13  ground.  You want to talk about the documents you've gotten

14  since then.

15           But let me ask this --

16           MR. RAYMOND:  And new email address that we found

17  out that had some additional documents --

18           THE COURT:  Different than the Gmail account?  --

19      (Simultaneous conversation)

20           THE COURT:  Different than the Gmail account?  Or

21  the Gmail account --

22      (Simultaneous conversation)

23           MR. RAYMOND:  No.  No.  I mean the Gmail.

24           THE COURT:  Okay.  Hold on.  I'll certainly let you

25  speak, Mr. Ingber.

1              I am not looking for your litigation strategy, and

2    we don't have time anyway for you to give me your deposition

3    outline.

4              But can you give me a sense of what it is overall

5    that you're trying to understand or would be trying to

6    understand in the subsequent deposition on spoliation?  You

7    have what you have from the third parties.  Makes sense.  It

8    shows that Mr. -- from what you're telling me -- that

9    Mr. Zuluaga was using this Gmail account to conduct business

10   and that he did with Cibao Meats?

11             MR. RAYMOND:  Cibao Meats.

12             THE COURT:  Cibao Meats.  I get all of that.

13             But what is left to discover on the spoliation

14   front?  It's not a -- hardly a surprise that you got

15   documents or correspondence email from him based on what we

16   know -- or what's been represented so far from third parties

17   and not from him.

18             So what -- where are we still going on the

19   spoliation issue that we don't already know?

20             MR. RAYMOND:  Well, there's an issue of intent in

21   spoliation.  And certainly that's something we need to

22   explore with him, which we didn't know -- I mean, we -- we

23   got his intent to destroy the hard drive, but we didn't know

24   what was on that hard drive.  He obviously knew what was on

25   that hard drive, and it was, you know, directly relevant to

 1   our claims here.  So we want to explore that with him,

 2   certainly.  And we want to explore some of these documents.

 3   That really goes to the merits more than -- so it's not

 4   really so much spoliation.  I mean, obviously -- want to

 5   explore those documents with him that we didn't have before.

 6               THE COURT:  All right.

 7               MR. RAYMOND:  But to the extent that that also

 8   relates to spoliation, we don't want to be precluded from

 9   asking questions, just because we took a deposition a year

10   and a half ago before we had any of the documents just about

11   the destruction of his hard drive.  That's really all we

12   asked him about in the first deposition.  So....

13               THE COURT:  All right.

14               MR. KADOSH:  Your Honor, if I could add one more

15   thing, and this is Sam Kadosh from Reed Smith.

16               We also received the production of metadata from

17   Network Solutions.

18               THE COURT:  Oh.  Right.  You were starting to

19   talking about that.

20               Go ahead.

21               MR. KADOSH:  And that metadata --

22               THE COURT:  Wait.  Who's Network Solutions?

23               MR. KADOSH:  Network Solutions is Latinfood's email

24   provider.

25               THE COURT:  Okay.

1          MR. KADOSH:  Okay?  And so we received metadata

2    which both had -- you know, it showed that certain emails

3    exist on the Network Solutions server and also showed that

4    certain emails don't exist, which we know of their existence

5    and they should exist based on the story that Mr. Zuluaga

6    told --

7          THE COURT:  Wait.  I'm sorry.  Tell me that again.

8          MR. KADOSH:  Okay.

9          THE COURT:  We know about -- what you're saying is

10   the response you got, the metadata you got from Network

11   Solutions says that certain emails exist on the server.

12         MR. KADOSH:  Right.  And they're also --

13         THE COURT:  Okay.  And then presume- -- which

14   presumably means they're recoverable?  If -- off of the

15   server?  Or not.

16         MR. KADOSH:  I don't know.

17         THE COURT:  Okay.  What's the second?

18         MR. KADOSH:  I don't know, but it shows that --

19   possibly, but the second -- and I think this is perhaps the

20   more interesting point is Mr. Zuluaga told a certain story at

21   his first spoliation deposition about his hard drive crashes,

22   which explains how all of his email -- I'm sorry -- all of

23   the documents that he had saved on his computer were gone.

24         But then he also said that he had failed to change

25   an autodeletion policy.  Right?

1              THE COURT:  I guess prior to the hard drive

2    crashing.

3              MR. KADOSH:  Correct.

4              THE COURT:  Right.

5              MR. KADOSH:  He had failed to change an

6    autodeletion policy.

7              Now, subsequent to that point, we know there were

8    certain communications between Mr. Zuluaga and Cibao

9    Meats -- okay? -- because we received those communications

10   from Cibao Meats.  Right?  And certainly we would have

11   expected those to have been produced by Latinfoods.  They

12   were not produced by Latinfoods, and the -- and there was

13   also no metadata produced in Network Solutions, which means

14   even after the spoliation deposition, there were certain

15   emails that were intentionally deleted -- or -- yeah, that we

16   believe were intentionally deleted.  And we want to be able

17   at the -- at the deposition to use this Network Solutions

18   metadata to test and to examine Latinfood's narrative about

19   how it came to be that all of their documents were gone.

20             THE COURT:  Okay.  All right.

21             Mr. Ingber, I have to say they give me a pretty

22   good argument as to why there is good cause to at least, in a

23   limited fashion, revisit the spoliation issue.

24             MR. INGBER:  Your Honor, Mark Ingber speaking.

25             This is -- it's nice to hear, Your Honor.  If they

 1  had responded to my question when I asked for what they were

 2  going to say, you know, we probably could have resolved this

 3  issue.  You know, but, again, because -- because of, you

 4  know, discourse and, you know, we didn't get -- we got the

 5  response you had referenced.

 6          By the way, Your Honor, my client had mentioned at

 7  his spoliation deposition, that he did have -- there might be

 8  other email accounts that he had that he didn't recall.  And

 9  we found out about it, and it was a very limited number, and

10  we provided an explanation to that.

11          Anything that wasn't provided to them and wasn't

12  covered, certainly -- or anything new that they found, let me

13  ask away.  There's really not an issue about that.  We just

14  don't want to go into the same questions about how your hard

15  drive got destroyed and what steps you took to do this.

16  Again, everything -- nearly everything has been a

17  re-produced.  My client voluntarily reached out to all his

18  vendors, got all the -- got most of the documents.  There

19  were subpoenas that were sent out to Cibao and other vendors.

20  All of the documents that were, if it appears and my client's

21  testify- -- all the documents or the vast bulk of them have

22  been re-produced, live documents that are damaging to my

23  client that were produced.  So we're not trying to hide

24  anything.  And there's clearly no intent.

25          But let me ask away, Your Honor.

1           THE COURT:  Fair enough.

2           So, look, I'm going to allow question --

3  questioning Mr. Zuluaga regarding spoliation, limited to the

4  new information.

5           To be clear, though.  If, for example, plaintiff's

6  counsel were to ask at the deposition, "do you recall

7  testifying as to X," I don't regard that as violating my

8  limitation on staying with new information, as much as it is

9  place in context for the witness to answer.

10          If there is any issue about that, counsel can call

11 me from the deposition.

12          Okay.

13          Discovery Dispute Number 3, the plaintiff's demand

14 for defendant's financial records.  The -- plaintiff wants

15 documents regarding Latinfood's sales, costs, and profits

16 specifically for the years 2014 to 2018; specifically

17 Latinfood's bank statements, QuickBook files and invoices,

18 arguing it's relevant, which is one of the remedies that

19 Industria seeks is disgorgement of Latinfood's products [*sic*]

20 from selling products with the Zenu and Ranchera trademarks.

21          To date, the defendants have produced some of the

22 documents of Latinfood's sales and profits and essentially

23 argue that the plaintiffs should rely on them.

24          Now, one area of concern -- I don't know who will

25 be addressing this as on the plaintiff's side, Mr. Ingber

 1  tells me that he provided the summaries to you folks in

 2  August 2017, and this was not raised again and specifically

 3  plaintiffs didn't raise this again until May 28th of this

 4  year, which is, obviously, almost two years later.

 5              What's the -- is that true?

 6              MR. RAYMOND:  Your Honor, this is Peter Raymond.

 7  Let me respond to that, because Mr. Kadosh came into the case

 8  during that period.  I've been involved since the beginning.

 9  We -- associate worked on the case.  Left the firm, so

10  Mr. Kadosh took over.

11              It is true.  But discovery was still ongoing, and

12  to be frank about it, I looked at the discovery at some point

13  as we were getting closer to the end about what we had, and I

14  saw that all we had were these few pages with summaries of

15  what the alleged cost and expenses were, and I turned to

16  Mr. Kadosh and said we need to make sure we get the

17  underlying documents.  We have the right to -- you know, to

18  see the underlying documents.  It's not a -- you know,

19  Mr. Ingber argues that it's some -- it's a big problem for

20  them.  All they've got to do is put all the documents in a

21  room.  They don't have to do anything.  We'll go look at

22  them.  But I think we clearly have the right to look at the

23  actual documents and not just accept their summary so that we

24  can challenge their alleged costs.  You know, the way -- as

25  you well know, the way this works is we as plaintiff in a

1  trademark case have to put in the revenue figures.  They then

2  have to put in the costs they claim go against those revenues

3  to determine profits.  But we get to cross-examine that and

4  challenge those costs and whether they're relevant and

5  whether they're -- and whether they're necessary.  But if we

6  can't see the underlying documents, we have no way of doing

7  our job.  We can't -- we can't challenge their costs to

8  determine what the actual profits were.  We'd just be

9  accepting Mr. Ingber's summaries.  I'm not suggesting they're

10  wrong, but I don't know.  It seems to me it's our job to look

11  at the underlying documents so that we can have the ability

12  to challenge whether the cost numbers they put in really

13  related to these products or to something else.

14          And every trademark case I've ever had, we've

15  always gotten all those -- on both sides.  I've given them,

16  and I've looked at them.  I mean, that's how -- you have to

17  be able to do that to be able to do that process of putting

18  in revenues and challenging costs and expenses against them

19  to determine profits.

20          THE COURT:  No, I --

21          MR. RAYMOND:  That's all we're asking to do.  And

22  we are not asking them to produce them or Bates-number them.

23  They can tell us what room they're in, and we'll send someone

24  to there to look at them.  We don't want to create any big

25  problem here.

1          But the delay was -- was my fault, but discovery

2    was ongoing and --

3          THE COURT:  Yeah, but there were deadlines for

4    getting discovery responses and then raising disputes

5    regarding written discovery that, frankly, I think, by any

6    measure, this is long past.  Is it not?

7          MR. RAYMOND:  Well --

8          THE COURT:  If you're -- your argument essentially

9    is what we got was from the defendants was insufficient, and

10   we're entitled to a better production.

11         That's why the scheduling order had deadlines to

12   raise disputes about written discovery.  By any measure, that

13   deadline came and went without plaintiffs raising this.  I

14   don't necessarily disagree that the information, which very

15   well may constitute evidence, is important, given the

16   plaintiff does -- I checked the complaint -- is pleading a

17   disgorgement remedy.  But the fact is it's after almost two

18   years.  Right.

19         MR. RAYMOND:  Well, everything -- there were a lot

20   of reasons why things sat, Your Honor.  But both sides served

21   new discovery requests throughout this process.  And we

22   served a new discovery request to get these specific

23   documents as well.  Those summary documents were served in

24   response to initial and general discovery requests.  But both

25   sides served several more sets of discovery requests.  And

 1   these were in response -- we specifically asked for these

 2   specific documents so that we could challenge their --

 3              THE COURT:  I'm get back to you, Mr. Ingber.  Don't

 4   worry.

 5              MR. INGBER:  All right.

 6              THE COURT:  So... all right.  Let me move to a

 7   separate question.

 8              Am I right that what the plaintiffs want are the

 9   bank statements, QuickBook files, and invoices for 2014 to

10   2018?  Is that -- I'm trying to get an understanding

11   because -- look, I understand you want documents regarding

12   sales, costs and profits.  Those are very broad terms.  In --

13   in more concrete terms what is that the plaintiffs are

14   looking for.

15              MR. RAYMOND:  We really want to be able to

16   challenge whatever costs, expenses they claim go against the

17   revenues to determine the profits.  We can accept their

18   revenue figures, but it's the costs and expenses that we'd

19   like to see the underlying documents.

20              THE COURT:  Why did you need bank statements?

21              MR. RAYMOND:  Bank statements just -- well, bank

22   statements really go to the revenue side more than the cost

23   side, but --

24              THE COURT:  Yeah, it's going to be redundant with

25   their QuickBook files, isn't it?

1          MR. RAYMOND:  Assuming the QuickBook files are

2    accurate, then they should just be redundant.  The costs and

3    expenses, we have no detail on at all other than gross

4    numbers that they claim are the costs and expenses on these

5    product sales.  They have no backup for that whatsoever.

6          THE COURT:  All right.  Is there anything else

7    plaintiff wanted to tell me on this?

8          MR. RAYMOND:  No.  That it, Your Honor.  Thank you.

9          THE COURT:  No?  All right.

10         So, Mr. Ingber, I'm happy to hear you.  I know you

11   argue undue burden, which, frankly, I thought was

12   unpersuasive, because there's not a whole lot of burden in

13   producing electronic records.  But even if there were,

14   plaintiffs have offered that they'll send somebody to come

15   and review so that you don't actually have to produce

16   anything.

17         And, I mean, I think -- I think we can agree, but

18   maybe you'll disagree -- that the -- at least some -- some

19   subset of the discovery the plaintiffs seek is relevant, is

20   it not?

21         MR. INGBER:  Not necessarily, Your Honor.

22         By the way, understanding the initial request was

23   over two years ago, Your Honor, notwithstanding that, in the

24   letter, they asked us to update these figures in May of this

25   year, Your Honor.  We updated the figures for them to provide

1    them whatever they -- what they had wanted updated figure- --

2              THE COURT:  On your summaries.

3              MR. INGBER:  Yes, Your Honor.

4              It was only after that, Your Honor, that they came

5    that with, well, we need all this other information, bank

6    statements, invoices, QuickBooks files.  You know, it just --

7    it was like right on the deadline of the discovery end date.

8    And all of a sudden, you know, we were -- we were dealing

9    with a situation that should have been asked, you know, years

10   ago and, frankly, wasn't even replicated.

11             THE COURT:  Let me tell both sides, though.  The

12   argument about that -- I can't remember -- it was July 25th

13   deadline for discovery or whatever it was in July -- I

14   understand, but that is unpersuasive to me for three

15   reasons -- or, I guess, really two reasons.  One, of course,

16   the Court has the power to extend the deadline, but, two,

17   both sides are still looking for such extensive discovery

18   that it's hard to take your reliance on -- or argument that

19   the denial deadline -- this is going to factor into one of

20   the later discovery disputes -- that the discovery deadline

21   is so compelling when both sides are looking for additional

22   discovery.

23             So -- go ahead.  I'm sorry.

24             MR. INGBER:  Your Honor, we had -- we had --

25   between counsel, we had come to a compromise where --

1            THE COURT:  This is the one-month QuickBooks

2  summary?

3            MR. INGBER:  Exactly.  For each year, Your Honor,

4  so that they can see, you know, what was going on.

5            By the way, Your Honor, the quick -- the QuickBook

6  entries, the client only entered the sales data contained in

7  the invoices and entered it into QuickBook, not the invoices

8  themselves, Your Honor.

9            THE COURT:  Right.

10           MR. INGBER:  So, again, this was something that was

11  suggested by plaintiff's counsel.  We agreed.  And then it

12  was removed.  So --

13           THE COURT:  Here's -- look, I certainly appreciate

14  the efforts in a case that has had no shortage of discovery

15  disputes, the efforts to try and reach a compromise on one.

16           My strongest sense, though -- and I don't -- don't

17  know for sure is that the plaintiffs never waived the right

18  to get the underlying data.  This was going to be an interim

19  stopgap to try and resolve this discovery dispute.  Right?

20  My point being the underlying documents probably were always

21  going to be critical here.

22           MR. INGBER:  We had also, Your Honor -- the -- by

23  the way, Your Honor, I'm -- if -- I'm sure you've seen the

24  stipulation on the facts.  The defendants -- the plaintiffs

25  have no sales in the U.S. of any -- of any type, not just the

1   Zenu and Ranchera ones that are in dispute.  They have never

2   had any physical presence in the U.S., Your Honor, for sales.

3   Their damages, Your Honor, are so beyond speculative that it

4   doesn't merit doing this.

5          We have also offered to bifurcate the case,

6   Your Honor, so that they could ask, you know, intrusive

7   damage questions, you know, later on.

8          But, again, based on their stipulation of facts

9   alone, Your Honor, that are attached as Exhibit N, there's no

10  basis for them to get this -- this intrusive --

11         THE COURT:  But isn't part -- I hear you.

12         But isn't part of their claim that they can't enter

13  the U.S. market because your client has the 942 registration

14  for Zenu?

15         MR. INGBER:  Actually, Your Honor, there's been

16  testimony to the effect -- and we've seen documentation,

17  Your Honor, that they couldn't get their products in well

18  before my client was even registered in the U.S., that they

19  were having problems with getting it past the FDA,

20  Your Honor.  That they were -- that there were issues with --

21  other issues, Your Honor, about the product not being

22  satisfactory.

23         THE COURT:  Okay.  That may very well be, and it'll

24  play out perhaps at trial as to whether the -- whether that

25  would have rendered their entry into the market impossible.

 1          But I certainly don't know how that's going to play

 2    out, my point being, I have a hard time understanding the

 3    argument that because they weren't in the U.S. market during

 4    the 2014 and 2018 time period, they can't possibly seek

 5    disgorgement profits from the -- alleged improper use of the

 6    Zenu mark.  Right?

 7          MR. INGBER:  Well, Your Honor, under the <u>Lexmar</u>

 8    case, they need to -- they need to have shown an economic

 9    zone of interest here.  And based on all the cases that are

10    subsequent to it, Your Honor.  They're so far beyond that,

11    they're so -- they're so far speculative, Your Honor, that

12    it's -- while it might have been sufficient during the motion

13    to dismiss stage, Your Honor, the discovery and the

14    stipulation of the facts show exactly otherwise.  It's far

15    beyond speculation to say that they couldn't enter the U.S.

16    market, Your Honor, because of a registration that our client

17    had.

18          THE COURT:  I understand that.  And it sounds like

19    you've got a -- you know, an argument that you can make at

20    summary judgment.

21          But, obviously, at the discovery stage, it's hard

22    for me to conclude, is it not, that these records aren't at

23    least relevant, given the scope of Rule 26?

24          MR. INGBER:  They're -- they're relevant in the

25    sense, Your Honor, but that the -- the cost -- the cost

1    information, everything was entered into the -- the

2    QuickBooks and the summaries, Your Honor.  The document --

3    the info that they're going to want is not going to be

4    anything other than the summaries, which is why we had

5    offered to provide them with a -- with a one-month annual

6    presentation, Your Honor, which is what they had offered.

7              Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.

9              All right.  The first issue is the fact that paper

10   discovery was exchanged in this case going back to 2017.  And

11   at that point, the defendants produced their own summaries of

12   the invoices and revenue, and it was not until May 28, 2019,

13   that plaintiffs complained that the summaries were

14   insufficient.

15             The Court would be within its right to conclude

16   that plaintiffs, having failed to raise this issue in a

17   timely fashion and given the deadline in the scheduling order

18   for raising written discovery disputes, that they should not

19   be permitted to seek relief at this time.

20             But I do find not only is the discovery that

21   they're looking for relevant, but that it is particularly

22   important -- and I understand the defendant's argument that

23   the relief that the plaintiff is seeking is speculative,

24   perhaps because of FDA issues and the -- what the defendants

25   argue would be plaintiff's inability to establish an economic

1    zone of interest.

2         But while those are arguments that may go to the

3    merit of the parties' claims, that certainly is not the

4    standard for discovery.  And not only does the Court regard

5    these records as relevant, but it regards them as actually

6    quite significant on the issue of damages.

7         Certainly, the law supports the production of

8    financial records for costs, expenses, overhead, and profit.

9    For example, in the W.L. Gore v. Tetratec Corporation case,

10   which the plaintiffs cite, 1989 WL 144178 at pages 4 to 5,

11   (E.D. Pa. 1989), and that was a patent infringement case, but

12   that distinction is not particularly significant.  But there

13   the court awarded plaintiff discovery of all documents

14   evidencing the defendant's costs, expenses, overhead and

15   profits.  The court found the discovery was plainly relevant,

16   given the broad interpretation of Rule 26 and the trial

17   court's substantial discretion in fashioning appropriate

18   damages.

19        Here, we're dealing with the Lanham Act.  And as I

20   said, the patent infringement issues in Gore are not

21   particularly important because under § 11.7 of the Lanham

22   Act, the party may provide for and the court may award a

23   number of different types of damages, including recovering

24   defendant's profits and compensation for the plaintiff's

25   damages, among other remedies.

1          In this case, Industria seeks, among other things,

2    disgorgement of defendant's profits, and so much of the

3    records that it seeks would be necessary to calculate

4    Latinfood's profits.  <u>See</u>, for example, Complaint Docket

5    Entry 1 at page 9, ¶ 3, in the prayer for relief section

6    where the plaintiffs seek disgorgement.

7          Accordingly, the Court is satisfied that this

8    information is not only relevant but is critical to the

9    plaintiff's ability to establish damages.

10         Under Federal Rule of 26 A 2 (B), of course --

11   strike that --

12         Under Rule -- Fed. R. Civ. P. 26(a)(2)(C) -- I'm

13   sorry -- strike that.  I'm looking at it wrong.

14         Under Rule 26 and 16, this Court has substantial

15   discretion to order the production of discovery and set a

16   schedule of proceedings.  The issue here really is whether

17   the plaintiffs have established good cause to seek this

18   information at this time.  And the Court finds, particularly,

19   given the number of disputes in this case and the fact that

20   the parties did serve additional written discovery requests

21   on each other, that good cause has been satisfied and so, in

22   the exercise of its discretion, will nonetheless consider

23   this issue.

24         Moreover, I would note that the Third Circuit in

25   the matter of <u>Meyers v. Pennypack Woods Homeownership</u>, 559

```
 1   F.2d 894 (3d Cir. 1977) ruled that the exclusion of important

 2   evidence, which certainly some of this discovery may very

 3   well be, is "an extreme sanction not normally to be imposed

 4   absent a showing of willful deception or flagrant disregard

 5   of a court order."  See Pennypack, 559 F.2d at 904 to 905.

 6             Accordingly, I find that at least certain of this

 7   discovery that the plaintiffs seek is relevant and that they

 8   have established good cause for seeking it, notwithstanding

 9   the fact that they waited almost two years to circle back to

10   it.

11             Now, defendants have argued, one, that the

12   summaries themselves should be sufficient, particularly given

13   that the defendants entered the sales data on the invoices

14   into the QuickBooks; not the invoices them, so stated, hard

15   copies.  So, essentially, the plaintiffs already have what

16   they need.

17             Respectfully, I disagree.  I do believe that the

18   QuickBook files and the invoices themselves are significant

19   to the plaintiff's ability to properly establish, if they

20   ultimately do prevail, recovery of the defendant's profits or

21   disgorgement.

22             Defendants also argue undue burden.  The problem --

23   or the shortcoming there is that a showing of undue burden

24   requires a very specific and particularized showing.  It's

25   not enough, essentially, to say that it would be burdensome,
```

1   because the reality is most discovery and certainly discovery

2   in larger-scale commercial disputes is at least some degree

3   of burdensome -- or burden.  The standard for undue burden is

4   actually quite high.

5          Moreover, what we're talking about here presumably

6   with both the -- at least as to regards to QuickBook files,

7   those are electronic records and should not be particularly

8   difficult, even though the invoices aren't hard-copy, we're

9   talking about there a discrete category of documents for

10   which the plaintiff has actually offered to send somebody to

11   review and copy themselves.  So I cannot agree with the

12   plaintiffs -- or defendants, rather -- respectfully, that

13   undue burden is a serious consideration here.

14          I'm not satisfied, though, that the plaintiffs have

15   adequately articulated a basis to get the defendant's bank

16   statements themselves.  There's been no particularized

17   showing that the bank statements are going to show them

18   anything that the QuickBook files and invoices themselves in

19   terms of revenue won't -- or overhead or expenses.

20          Moreover, I would be concerned because there's no

21   particular plan that's been put in front of me that would

22   actually limit what exactly would be reviewed in terms of

23   Latinfood's bank account records.

24          So I'm going to grant the plaintiff's request for

25   relief and limit it to the QuickBook files and the invoices.

1          The parties will meet and confer to determine the

2    most efficient way for the production of those materials.

3          With that, we turn to Discovery Issue 4, which is

4    extending the discovery deadline, which also really bleeds

5    into Discovery Issue 5, which itself, actually, as I regard

6    it, is in two parts, because there is -- so the fourth

7    discovery issue is about extending the discovery deadline.

8    As I see it, Issue 5 (A) is the defendants want to get more

9    depositions because they argue that the 30(b)(6) witness was

10   not competent to testify.  And then Issue 5 (B) is the

11   defendants want additional Industria 30(b)(1) witnesses,

12   including but not limited to Industria's CEO Diego Medina.

13         So let's see if we can figure out the most

14   practical of working through this.

15         Why don't we take -- we're going to set the issue

16   of additional discovery aside.  I think that's probably going

17   to be largely moot or otherwise taken care of in resolving

18   these additional issues.

19         So the defendants, Mr. Ingber, you want additional

20   depositions because you argue that Mr. Salazar, the

21   plaintiff's marketing and sales director, was incompetent and

22   essentially -- I don't like to use that word -- not a

23   competent witness on a number of the topics.  Right?

24         But here's the question -- actually, I'm going to

25   start off with both sides.  Defense counsel, Mr. Ingber, you

```
 1   tell me that there was a proposed -- that the plaintiff
 2   proposed a stipulation of facts to resolve not only the
 3   Salazar issue, but the additional 30(b)(1) witnesses that you
 4   sought over the defendant -- or plaintiff's objection.
 5   Right?
 6            MR. INGBER:  Your Honor, Mark Ingber.
 7            We had proposed something that we thought could
 8   resolve these issues.  It was rejected by the defendants --
 9   by the plaintiff's counsel.
10            THE COURT:  Well, from the joint letter, all I
11   could glean -- because, frankly, I don't think the plaintiffs
12   mentioned at all in the letter, you did, was that they raised
13   the concept.  You volunteered to do the proposed stipulation
14   of facts.  You showed it to them.  They protested that.  But
15   the time you got it to them, which was, I think, July 25th or
16   somewhere around there, there wasn't enough time to review it
17   before the close of fact discovery.
18            Is that about how it went?
19            MR. INGBER:  No.  This was presented to them well
20   in advance of that.
21            THE COURT:  I am not worried about that.  Here's
22   what I'm trying to figure out.
23            MR. INGBER:  I think that's moot, Your Honor, by
24   the way.  Frankly.
25            THE COURT:  Why?  Tell me why.
```

```
 1                 MR. INGBER:  Why?

 2                 THE COURT:  Yeah.

 3                 MR. INGBER:  Because it was -- it's become very

 4    clear to me that what we were looking for was very far from

 5    what they were going to accept, Your Honor.

 6                 THE COURT:  Okay.

 7                 MR. INGBER:  It was -- and that's why, you know --

 8    that's why the -- it hasn't really been brought up --

 9                 THE COURT:  All right.  So it's not simply that

10    after the plaintiffs complained -- and, again, I don't even

11    know what I read in the joint letter.

12                 But the way the joint letter read, it sure sounded

13    like after the plaintiffs complained that they didn't have

14    enough time to review it with the looming fact discovery

15    deadline approaching, it read like the issue was dropped and

16    nobody revisited it.  If that was all the case, then I was

17    going to make you folks revisit it.  But if it's moot and

18    you're both confident that it's moot, then we'll dive into

19    these issues, because what I want to do today is I want to

20    resolve all of these disputes, and then from where I stand,

21    certainly as to written discovery, there -- had -- should not

22    be another discovery dispute.  And I will scrutinize very

23    closely why I would possibly have another discovery --

24    written discovery dispute this late in the game and after all

25    of these issues that we're resolving today, that has not been
```

 1   previously raised.

 2           And, frankly, from where I stand, this should

 3   resolve even the question of who's getting deposed, meaning

 4   in terms of fact discovery, the only possible dispute that

 5   should come my way, if one at all, would be a dispute at a

 6   deposition.

 7           So let's go into, then, the issue of the 30(b)(6)

 8   and Mr. Salazar's performance as a 30(b)(6) witness.

 9           Are you arguing that the additional witnesses are

10   necessary because Mr. Salazar was a -- basically a not --

11   unprepared -- or not qualified 30(b)(6) witness?  Or are you

12   seeking to depose Mr. Medina and -- I have the whole list

13   here somewhere -- Jiménez, Ospina, Martha Ochoa, and Moreno

14   regardless of the 30(b)(6) issue?

15           MR. INGBER:  Your Honor, pursuant to Exhibit N,

16   Your Honor, we had an agreement --

17           THE COURT:  Wait.  N as in Nancy?

18           MR. INGBER:  N, like in Nancy.  This is Mark Ingber

19   speaking, Your Honor.

20           We had an agreement in writing that we would start

21   off with the 30(b)(6) witness, and then we unilaterally would

22   have the right to depose further witnesses as we saw fit,

23   Your Honor.

24           THE COURT:  Okay.

25           MR. INGBER:  We have the Salazar deposition,

 1   Your Honor, where he testified to no knowledge essentially

 2   about anything, Your Honor.  Whatever we asked him --

 3            THE COURT:  There's a very big dispute about that

 4   that we're going to get into.

 5            But --

 6            MR. INGBER:  But we asked him about Marquillas,

 7   Your Honor.  He said that Marquillas -- I'm looking at his --

 8   Exhibit F, Your Honor, page 56.  He says Marquillas --

 9            THE COURT:  Wait.  What page?

10            MR. INGBER:  It's page 54, Your Honor.  Marquillas

11   is a supplier of Industria.  I do not work with the

12   suppliers.

13            No, he answered.

14            I asked him who works with the suppliers?

15            Santiago Jiménez, he responded.

16            Do you know -- I asked him, "Do you know if

17   Mr. Jiménez was alerted to Marquillas's complaint?"

18            He said, "I don't know if he was alerted directly."

19            I asked him, "Have you ever spoken to Mr. Jiménez

20   about what happened with Marquillas?"

21            He says, "We have talked directly to our

22   attorneys."

23            I asked him, "Did you speak with Mr. Jiménez about

24   this personally?"

25            He said no.

 1              Marquillas is important, Your Honor, because this

 2     is -- this is who the plaintiff has identified as having

 3     notified them in October of 2013 about the defendant's

 4     alleged infringing activities.  We have been completely

 5     stonewalled, Your Honor, in trying to get information about

 6     this.  We couldn't get it from Salazar.

 7              THE COURT:  When you say "on this," you mean

 8     Marquillas?

 9              MR. INGBER:  Exactly.  We -- we even asked later on

10     in that deposition, I asked plaintiff -- I asked defendant --

11     plaintiff -- on page 108, Your Honor, of that same exhibit,

12     "Do you know the name of a person that Marquillas that

13     communicated this to Industria?"

14              He responded, "I don't know."

15              He -- I asked him, "Who would know?"

16              And, again, he said, "I don't know."

17              "Can you find out?

18              "I don't know:

19              And then Mr. Raymond said, "We'll provide you with

20     a name if we have it.  Thank you."

21              They have a name, Your Honor.  We have a protective

22     order in place.  We're trying to get this information on

23     discoverable facts.  Okay?  And we've been completely

24     stonewalled.  You've -- if you've read the deposition,

25     Your Honor, of Salazar, you saw about the improper speaking

1    objections, the coaching --

2               THE COURT:  Well, look, here's what I'm going to

3    say on that:  If there's a dispute, as the scheduling order

4    made clear, you call me -- the parties -- the aggrieved party

5    calls me from the deposition.

6               But that's a far cry from whether Mr. Salazar was a

7    prepared witness or not.

8               MR. INGBER:  So after that deposition, Your Honor,

9    that's when we came about -- hey, we're not going to -- you

10   know, we had a fundamental difference about whether he was --

11   he was an acceptable 30(b)(6) witness.  That's when we came

12   up with this proposed stipulation of facts.  But that

13   essentially went nowhere.

14              We -- the Arango deposition, Your Honor, that was

15   on -- and he's the Cordialsa, the defendant -- another

16   third-party defendant in this case.  Luis Arango.  His

17   deposition was on July 11.  He identified that he had gone to

18   Diego, that he had gone to --

19              THE COURT:  Medina.

20              MR. INGBER:  To Colombia, met with the plaintiffs,

21   and that Diego Medina had given instructions.  We see his

22   name here --

23              THE COURT:  Well, he basically kicked it over to

24   Moreno.

25              MR. INGBER:  Exactly.  He kicked over to Moreno.

 1   And we want to -- we want to depose him too.  We said, let's

 2   start with Moreno.

 3                THE COURT:  "Him" being Medina or Moreno or both?

 4                MR. INGBER:  Pardon?

 5                THE COURT:  You mean -- when you say we want to

 6   depose him too, who's "him"?

 7                MR. INGBER:  We want to depose -- we said, okay.

 8   He's a busy executive.  You know, there's -- the plaintiff is

 9   trying to put a protective blanket, Your Honor, on all these

10   witnesses that -- that have been named in the initial

11   disclosures and as witnesses, Your Honor.

12                These people -- Your Honor, if we get to trial,

13   these witnesses are potentially just going to pop up, and

14   we're not going to have any opportunity to have deposed them,

15   even though I sent deposition notices out to all these

16   individuals over a year ago.

17                So -- but we're willing to start, Your Honor,

18   with -- with this Moreno fellow.  Okay.  But we need to have

19   him here, Your Honor.  All of their witnesses speak Spanish,

20   Your Honor.  You've seen the problems that we've had taking

21   depositions here with speaking objections and everything

22   else.  We need to have this person in front of us.

23                Now, all of a sudden, notwithstanding that we have

24   translation issues.  We have -- my client has to pay for the

25   translation.  So we want this person here, but now we're

|Hearing
|16-cv-06576, October 25, 2019                                                    46

```
 1   seeing, oh, we'll agree, but he has to be the last, and we'll

 2   only do it via video.

 3            THE COURT:  Wait.  Let me stop you right there,

 4   Mr. Ingber.

 5            I'm not -- if we get into sort of the back and

 6   forth of the attorneys' failed negotiations, we're never

 7   going to get out of here.

 8            What I want to know quite simply is on substance,

 9   you argue, one, Salazar was a poor Rule 30(b)(6) witness, and

10   even when he did testify, he identified specific individuals

11   who would know in the form of, for example, Jiménez.  Right?

12            MR. INGBER:  Correct, Your Honor.

13            THE COURT:  Now, I've got to be honest with you,

14   though.  I reviewed the Salazar deposition excerpts, at least

15   what I had.  And you're right, at least as to Marquillas, he

16   kicks the issue over to Jiménez, but I'm certainly not

17   prepared to conclude, based on everything that's been put in

18   front of me, that he was a completely unprepared witness.

19            Moreover, the plaintiffs tell me that you

20   essentially terminated the deposition early so whereas the

21   parties had negotiated two full days, 14 hours, you only

22   proceeded for about eight hours and left uncovered a number

23   of subjects.

24            And, for example, even in your side of the joint

25   letter, all you argued was that he did not know the pleadings
```

1   in the case, which made me wonder why does that even matter.

2            So I need some more specificity as to what Salazar

3   specifically was unprepared to testify to in terms of

4   30(b)(6) deposition.

5            MR. INGBER:  Well, I just gave you one example,

6   Your Honor, about Marquillas.  I tried to get examples of --

7            THE COURT:  So Marquillas is a good argument for

8   getting Jiménez.  I get it.

9            MR. INGBER:  Okay.  So that's a good argument for

10  getting him.

11           We have the Arango deposition mentioning all these

12  meetings that took place in Colombia, Your Honor, about the

13  facts involved here, about what they did when they found out

14  about my client, the plaintiffs -- plaintiffs' counsel is

15  trying to say, well, you don't know him.  You don't need

16  anybody else because Luis Arango from Cordialsa testified,

17  and anything else is cumulative.

18           We are allowed to --

19           THE COURT:  Well, hold on, hold on, hold on.  Let's

20  put this in context.

21           What they argue -- they argue that in response to

22  your demand to depose Diego Medina, they essentially argue

23  that at Arango's deposition, he testified about Medina's

24  involvement and that by virtue of, one, that Medina's

25  involvement was limited to -- I think it was an email -- or a

1   communication, essentially, where he basically hands it off

2   to Mr. Moreno.  That's how they raised that issue -- or in

3   the context in which they raised that issue.

4          MR. INGBER:  Well, Mr. Arango also testified that

5   he met with -- with Mr. Medina.

6          THE COURT:  Yeah, who told him basically go talk to

7   Moreno.

8          MR. INGBER:  Okay.  So exactly.  We want to start

9   with Moreno.  Let's start with Moreno.  Let's start with

10  Moreno.  Let's see what he has.  If he's going to stonewall

11  us, Your Honor, and says I don't know or I don't -- I don't

12  remember, you know, then we have to move on from there.  If

13  Moreno gives us what we want, Your Honor, which is all that

14  we want, we might be finished with these people, except, of

15  course, again, we want -- we want this Jiménez guy, because

16  we need somebody to testify about Marquillas.

17         THE COURT:  Actually, you know what?  Let's do

18  this.  I want to take a -- I've got to take a two-minute

19  break, because I have to respond to a -- call that I have to.

20         But we're going to take -- it should only be

21  ability two minutes.

22         I want you to -- when we resume, I want you to be

23  able to be prepared come back and tell me exactly what it is

24  plaintiff want.

25         Are you looking for another Rule 30(b)(6)

1    deposition?  Or are you looking simply for these witnesses,

2    Medina, Jiménez, Ospina, Ochoa, and Moreno.

3              MR. INGBER:  Okay, Your Honor.

4              THE COURT:  All right.  And then we'll pick it up

5    from there, because I think that'll help sort of narrow

6    down --

7         (Recess:  11:13 A.M. to 11:24 A.M.)

8              THE COURT:  All right.  So, Mr. Ingber, I'm going

9    to throw this right back into your hands.

10             What exactly is it at this point that the defendant

11   is looking to do in terms of these depositions?

12             MR. INGBER:  Your Honor, firstly, you referenced

13   that you had read the transcript of the Salazar.

14             THE COURT:  Yeah, at least what was given to me,

15   yeah.

16             MR. INGBER:  Yeah, exactly, Your Honor.

17             Yeah, we didn't provide you with the entire

18   transcript, Your Honor.  We just provided you with excerpts.

19   If I went through the entire transcript, Your Honor, there

20   would be too many references.

21             Your Honor, there were certain allegations made

22   that we tried to question Mr. Salazar about, about alleged --

23   the defendant -- excuse me -- the plaintiff says defendant

24   attempted to prepare 400,000 of the plaintiffs' labels.

25             THE COURT:  Wait, wait, wait.  Sorry.

1                I understand that's advocacy.

2                What is it exactly that the defendant wants?  And

3    then we'll work from there.

4                MR. INGBER:  Our first preference, Your Honor, is

5    to begin with a substitute 30(b)(6) deposition, somebody that

6    was prepared and can respond to the topics and without being

7    improperly coached, instructed, and without improper speaking

8    objections.

9                THE COURT:  I'll make clear, I am not making any

10   finding about the proper or improper nature of that.

11               I will simply remind counsel of two things.  One,

12   if there is a dispute, you've got to call me from the

13   deposition.  Two, any objections have to be in a short,

14   nonspeaking, nonargumentative manner.

15               I will -- I did not review it enough -- I did

16   review it enough to draw some concerns about -- or have some

17   concerns about the interplay coupled with a bunch of the

18   discovery dispute letters between counsel, but certainly not

19   nearly enough to make any conclusions about that.

20               So -- all right.  So you want a substitute 30(b)(6)

21   deposition.  Is that -- is that a essentially it?

22               MR. INGBER:  Well, that's essentially -- that's our

23   first preference, Your Honor.

24               THE COURT:  Okay.

25               MR. INGBER:  And, again, I understand that you're

1   not -- I mean, could we at least agree, Your Honor, that

2   the -- that the plaintiffs' counsel is telling him -- telling

3   on the record that he can talk to his client in the middle of

4   the deposition, notwithstanding that he --

5            THE COURT:  Not while there's a question pending,

6   no, you cannot.

7            MR. INGBER:  Okay.  So, Your Honor.

8            THE COURT:  That's universally true, by the way.

9   That's not limited to that deposition.

10            MR. INGBER:  Right.

11            Your Honor, our first preference is to begin with

12   the 30(b)(6).  If we get -- if we have a proper witness,

13   Your Honor, that may obviate everything.

14            Certainly, Your Honor -- and we put it on the

15   record, even at -- during our last hearing, Your Honor, where

16   we -- where we said on March 21st, just so you're aware, we

17   initially noticed multiple witnesses for focus, but we did

18   agree, Your Honor, that we would begin with the 30(b)(6) for

19   the -- for each of the Industria and Cordialsa witnesses, and

20   at that point, we could determine -- the defendants would

21   determine what we needed additional witnesses.

22            So we've been saying this all along, Your Honor.

23   We wanted to start with the proper 30(b)(6) deposition.  If

24   we -- if that's not going to be granted, then we want to

25   pursue the other -- the other deponents, beginning, again,

```
 1   we'll pick -- we'll start with Mr. Hernando Moreno.  We'd
 2   like this Santiago Jiménez.  Hopefully that will end it,
 3   Your Honor.
 4           But I'm -- I'm not going -- we don't want to be in
 5   a situation where we're told, hey -- which is what the
 6   plaintiffs' counsel said, we'll give you Moreno, but he's the
 7   last one, and you have to just stop.
 8           Your Honor, this is -- we want a complete record,
 9   Your Honor.  We're allowed to take deposition testimony
10   that's not cumulative, Your Honor.  If we're going to be
11   precluded from taking the deposition testimony of witnesses,
12   Your Honor, then these witnesses that have been cited in
13   their initial disclosures as witnesses should be precluded
14   from testifying at trial.
15           Thank you, Your Honor.
16           THE COURT:  I understand completely.
17           One follow-up question or clarification.  Am I
18   correct that what you're arguing is your first preference is
19   to depose -- to take another 30(b)(6) deposition.  And that
20   the defense will seek additional witnesses, specifically
21   Jiménez, Ospino, Ochoa, Moreno, those identified in the
22   plaintiffs' initial disclosures, only if the 30(b)(6) witness
23   is not competent to testify on a subject or more subjects.
24           Is that right?  Because I don't want to go through
25   this whole exercise only to have you come back and go, well,
```

1   we still need to depose Mr. Moreno, or we still need to

2   depose Mr. Jiménez, regardless of whether the 30(b)(6)

3   witness was competent or not.

4           MR. INGBER:  Your Honor, I think that's correct, if

5   they provide -- if this witness testifies competently and

6   provides knowledge, if, for example, if, Your Honor, the

7   30(b)(6) witness has spoken to Santiago --

8           THE COURT:  Jiménez.

9           MR. INGBER:  -- Jiménez about what had happened

10  during their conversation.  Apparently, Marquillas, fine.

11  But if a 30(b)(6) witness comes and shows up and says, I

12  don't know, you have to ask the other guy, you know, then I

13  have to get -- I have to ask the other guy.

14          THE COURT:  Right.  Except by virtue of them

15  testifying in a 30(b)(6) capacity, that could be a witness

16  who was never a party to a particular conversation.  You

17  understand that.  Right?

18          MR. INGBER:  But --

19          THE COURT:  That would be a 30(b)(1) witness.

20          MR. INGBER:  But he still has to testify --

21          THE COURT:  He's done his due -- he or she's done

22  their due diligence --

23          MR. INGBER:  Exactly --

24          THE COURT:  -- they've spoken to the appropriate

25  people.

1             MR. INGBER:  Exactly.

2             THE COURT:  To deal with -- look, I don't know

3     about the Marquillas subject itself, but to deal with those

4     subjects that were noticed or topics that were noticed in the

5     deposition notice.  Right?

6             MR. INGBER:  Right.

7             THE COURT:  Okay.

8             MR. INGBER:  So that's where we are, Your Honor.

9             THE COURT:  All right.

10            MR. INGBER:  Again, if we can't get him -- again,

11    even if we get him, if we don't get the information from a

12    substitute 30(b)(6), you know, we want to do what we said all

13    along, go to the next witness until we get the answer.

14            THE COURT:  And then presumably, if there were a

15    dispute about the competence or not of that 30(b)(6) witness,

16    you folks would raise that with me.  Right?

17            MR. INGBER:  I'm sorry.  I didn't hear the --

18            THE COURT:  If there were a dispute -- if you later

19    came back and claimed the 30(b)(6) witness was not competent

20    to testify or was not prepared to testify about a particular

21    subject, you would come back to me and the -- obviously, if

22    the plaintiffs disagreed, you folks would come back for me to

23    decide that.

24            MR. INGBER:  In the same way that we've been

25    writing ever since we took the Salazar witness --

```
 1   testimony --

 2             THE COURT:  I'm aware.

 3             Okay.

 4             MR. INGBER:  Thank you, Your Honor.

 5             THE COURT:  Counsel.

 6             MR. KADOSH:  Your Honor, you've asked Mr. Ingber, I

 7   would say four or five times -- maybe more -- about what

 8   issues he specifically needs additional testimony on.  He

 9   still hasn't answer that question.  Right?  We hear these

10   broad conclusory statements Mr. -- you know, that Mr. Salazar

11   was an insufficient witness, inadequately prepared.  But I

12   don't think that's been borne out at all.

13             And so, really, the question is what are the

14   issues?  What does he need testimony on?

15             The only really particular issue that he's

16   identified, Your Honor, is this issue of identity of this

17   person at Marquillas.

18             And just to take a step back and provide the

19   background on that, our complaint alleged that at a certain

20   point, Marquillas, who is a label producer, produced food

21   labels for Industria, contacted us, contacted Industria and

22   informed us that somebody -- who was trying to order exact

23   copies of our labels.

24             Now, that person was either Mr. Zuluaga or

25   Mr. Zuluaga's mother.  Right?  So this whole question of who
```

1   is the identity of the person at Marquillas, to me, is a

2   little bit -- first of all, it's not -- I don't really see

3   how it's relevant to the case at all, but, you know,

4   Mr. Zuluaga knows --

5           THE COURT:  There was no objection at the

6   deposition based on relevance, so that's obviously waived.

7           Go ahead.

8           MR. KADOSH:  Mr. Zuluaga knows the identity of that

9   individual.  But if, Your Honor, is the really the one issue

10  that Mr. Ingber needs, who the identity of the -- of the

11  individual at Marquillas, we could obtain that.  I don't

12  think we need to fly somebody from Colombia for a two-day

13  deposition and a day of preparation in order to obtain the

14  identity of one individual at Marquillas.

15          THE COURT:  All right.  I appreciate counsel's

16  arguments.

17          MR. KADOSH:  I'm just -- add one more point,

18  Your Honor.

19          THE COURT:  Go ahead.  Yeah, sure.

20          MR. KADOSH:  You know, there's been a lot of -- I

21  think broad talk about the inadequacy of Mr. Salazar's

22  deposition, and I think Your Honor noticed already that the

23  deposition was ended after two hours on the second day, even

24  though I --

25          THE COURT:  Yeah, I only noticed that -- I said

1    that in the context of that's what you folks had told me.

2              MR. KADOSH:  Yeah --

3              THE COURT:  Obviously, I wasn't there, don't have

4    the complete deposition transcript, so I don't know that for

5    sure, but I -- I didn't hear also any argument from the

6    defense.

7              Instead, he argued that it was because Salazar

8    wasn't ready.

9              MR. KADOSH:  And, Your Honor, if you look at

10   Exhibit 2 to the joint letter, that was the most recent

11   correspondence that we had with Mr. Ingber about the adequacy

12   of Mr. Salazar's deposition, and for every topic, right, for

13   each -- we list every topic that Mr. Ingber claimed was not

14   adequately covered, and we provided cites in Mr. Salazar's

15   testimony by doing -- Mr. Ingber never provided a substantive

16   response to this.  He just kept, again, with a broad -- the

17   broad -- --

18        (Simultaneous conversation)

19             THE COURT:  Yeah, except, look, and I say this in

20   the context of not having the entire deposition, but if, for

21   example -- if Number 27, plaintiff's electronic storage

22   practices, you say Mr. Salazar testified regarding this

23   topic, including but not limited to the testimony at 32:22 to

24   37:5, if, in fact, what Salazar testified was "I didn't deal

25   with IT, that would go to IT person John Doe," I can't find,

1   assuming that was a noticed topic, that he was prepared

2   testify as to, could I?

3            MR. KADOSH:  I believe what he testified there was

4   that, you know, he was aware that there were electronic

5   storage practices.

6            THE COURT:  You missed my point, Mr. Kadosh.  And I

7   appreciate it.  If I were you, I'd make the same argument.

8   And you remember the deposition transcript that well, all I

9   can say is kudos.

10           But all I'm saying that without the full deposition

11  transcript, I'm at a loss to evaluate whether the parties'

12  discovery dispute letter essentially ends the inquiry.

13  Right?

14           MR. KADOSH:  I mean, you don't have in the record,

15  Your Honor, a counterletter from Mr. Ingber saying, well,

16  actually, your citation to this was inadequate -- right? --

17  or the testimony's inadequate --

18           THE COURT:  Sure.

19           MR. KADOSH:  All you have are these general

20  statements.  And, again, I -- I started with this, and I'll

21  end with this, that he hasn't identified specific issues

22  that -- that he needs further discovery on.  And all we hear

23  is, well, we could start.  This is truly what's so concerning

24  is he says, well, we could start with this individual.  And

25  then, obviously, in that individual's testimony, some may --

1    or some nugget will come up, and I'll say we need further

2    depositions.  And each time that that happens, we have fly

3    somebody up from Colombia, you know, for a two-day

4    deposition, because they're all being translated, a day of

5    preparation, it's tremendously costly.  And that the federal

6    rules have -- haven enshrined now the principle of

7    proportionality.  Where is the proportionality?  If a name

8    comes up once, right, like the CEO, his name came up once in

9    a thousand documents that we produced, he was in one email

10   saying, meet with another guy.  And that's the basis that's

11   proportional enough to fly the CEO up here?  Even --

12        (Simultaneous conversation)

13        THE COURT:  Whoa, whoa, whoa.  The CEO's a whole

14   different issue because of the --

15        (Simultaneous conversation)

16        MR. KADOSH:  Yeah, I know, leaving aside the apex

17   rule --

18        (Simultaneous conversation)

19        THE COURT:  -- apex rule, which I haven't had to

20   rule on yet, but that's a whole different issue.

21        But, look, here's where I frankly -- your

22   proportionality argument, at least right now, falls flat.

23        You're the plaintiff.  You're seeking very

24   substantial relief against the defendant, relief that could,

25   at least conceivably, include injunctive relief.  It could

1   include hundreds of thousands, if not millions, of dollars in

2   disgorgement or lost economic benefits to the plaintiff.  So

3   the prospect of spending -- I don't know -- a few thousand

4   dollars to bring in a critical witness -- now, you can argue

5   he's not critical, but then that's not a undue burden or

6   proportionality.  That's a straight relevance issue.

7          The argument that a few thousand dollars to fly a

8   witness up here where you are the plaintiff seeking the

9   relief is, frankly, less than persuasive.

10          But here's where -- and is there anything else?

11   Because I'm -- I think you make a fair point, but I'm going

12   to incorporate it into my ruling rather than -- I'd rather

13   hear you first if there's something else you want to argue.

14          MR. KADOSH:  Well, just the additional point,

15   Your Honor, is that if you're going to argue any additional

16   depositions, there are a couple of limitations, I think, we

17   need to establish, the first being, we would like there to be

18   whatever your -- your order's going to be, it to be final;

19   like, this is, and this is -- you know, that's it.  This is

20   not the starting process of a new -- of another round of --

21          THE COURT:  Well, let me ask this.  He's -- that's

22   part -- I had actually had a similar or related concern.

23   That's why I asked Mr. Ingber if he gets this 30(b)(6)

24   witness and if that witness is a competent witness, whether

25   by agreement of the parties or if there's a dispute by my

1   ruling, he's not looking for anybody else, and he may -- very

2   clearly said -- and if I'm wrong, Mr. Ingber, please correct

3   me -- yes.  If it's a competent 30(b)(6) witness, he's not

4   going to be looking to depose Jiménez or anybody else.

5        Is that correct, Mr. Ingber?  I want to be

6   crystal-clear about that.

7        MR. INGBER:  Your Honor, again, I don't want to

8   make a flat-line denial.  You know, I have to consult with my

9   client, Your Honor.  I -- I am hoping that, Your Honor.  But,

10  again, based on what I've seen so far, Your Honor, in

11  connection with the pre- -- he still thinks that Salazar was

12  a great witness.  So presumably, he'll think that the next

13  guy is a great witness.  Everybody's a great witness.

14       Right.  We've only taken one deposition of each of

15  the corporate defendants here --

16       THE COURT:  Wait, wait.  No.

17       Earlier -- and this is why sometimes resolving

18  disputes in this case is so difficult, because every time I

19  think I understand an issue, I then wonder if I did at all.

20       I had understood -- and that's why when we took the

21  break, I said, what is it?  I want you to think about what it

22  is exactly defendants want.

23       You came back and said -- or when I came back,

24  rather, you said our first preference is a substitute

25  Rule 30(b)(6) deposition.

1            And then I essentially said, am I correct in

2    understanding if -- and to be clear, I don't know -- I think

3    it's at least 30 topics that have been noticed?  Is that

4    right?

5            MR. INGBER:  Yes.  Yes, Your Honor.

6            THE COURT:  Yeah.  Somewhere in the order of 30

7    topics.  So we're not talking about an insubstantial number

8    of topics for a Rule 30(b)(6).  We're talking about very

9    expansive number of topics.

10           But be that as it may, I said, and if that is -- if

11   the 30(b)(6) witness is competent as to those issues, the

12   defendant is not going to seek additional fact depositions.

13   Is that right?  Understanding that if there's a dispute

14   between the parties, if the defendant believes that that

15   30(b)(6) witness was not competent, that's what I'm here for.

16           I'm now hearing, for example, Mr. Ingber -- and

17   this concerns me -- perhaps that you're trying to leave some

18   wiggle room that you could conceivably have a 30(b)(6), a

19   competent 30(b)(6) witness and still want fact depositions.

20   And if so, fine, but let's at least address that today.

21           MR. INGBER:  Your Honor, again, we said all along

22   and it's been in all the papers, we want to start with a

23   competent 30(b)(6) witness.  After that, I will review it,

24   Your Honor, and determine if we got sufficient satisfactory

25   answers.

1           It's not my intent to go on and on with

2    depositions, Your Honor, I would like to get the information

3    so that we can move forward.  Given what I've seen in this

4    case, Your Honor, I suspect that we may need these two

5    additional witnesses.  Okay?  And I can't -- I can't give you

6    a broad statement, Your Honor.  We've got to have -- our

7    first preference, we have to start with the 30(b)(6) a

8    satisfactory one.

9           THE COURT:  But are you arguing that you may need

10   the additional witnesses you're talking about, Jiménez and

11   Moreno?

12          MR. INGBER:  I suspect that, Your Honor.

13          THE COURT:  Okay.

14          MR. INGBER:  A total of three, Your Honor.

15          THE COURT:  In addition to the 30(b)(6).

16          MR. INGBER:  No, that's total.  That's -- who's --

17   who's this substitute 30(b)(6) and these two individuals.

18          THE COURT:  Right.  I understand.  Right.  That's

19   why I said, in addition to the 30(b)(6).

20          MR. INGBER:  Your Honor, our client, as you

21   recognize, is facing serious charges here.

22          THE COURT:  I get it.  Hold on.

23          I have a follow-up question, though.

24          Are you arguing you need -- the defendants need

25   Moreno and Jiménez because you anticipate an inadequate

1   Rule 30(b)(6) witness or in addition to a competent 30(b)(6)

2   witness?  And, again, I am not trying to -- I'm simply trying

3   to understand the discovery issues in front of me, because

4   otherwise I can't help you folks with a ruling.

5           MR. INGBER:  Your Honor, they -- if they agree --

6   perhaps, Your Honor, they could put both of these witnesses

7   as their 30(b)(6) witnesses, Your Honor, and have them both

8   testify.  They're not limited to one 30(b)(6) witness.  They

9   could have both of these individuals testify on the topics

10  that they're familiar with, Your Honor.  And presumably one

11  of these people -- these are high executives, Your Honor.

12  They should -- if we -- perhaps if we could designate these

13  two individuals as 30(b)(6) witnesses, then he could be done.

14          THE COURT:  Look, I'm certainly not going to tell

15  the defendant who the relevant relative witnesses it needs to

16  depose are, and I am not going to -- I would give the parties

17  time to meet and confer on that, if that's what you're

18  looking to do.

19          So, then, in this iteration, what you're saying is

20  if the defendants will designate Moreno and Jiménez as the

21  30(b)(6) witnesses -- although we'll be satisfied -- is that

22  right?  Although that makes me want to -- why wouldn't you

23  just seek to waive the 30(b)(6) and depose Moreno and Jiménez

24  as 30(b)(1)s?

25          MR. INGBER:  Well, the 30(b)(6) witnesses,

1    testifies as to the corporation, Your Honor.

2              THE COURT:  Right.

3              MR. INGBER:  So that's the distinction.

4              THE COURT:  Right.  But it sure sounds like from

5    what you're arguing, you believe that Jiménez -- or maybe do

6    hybrid 30(b)(6) and 30(b)(1), it sounds like you're arguing

7    that Jiménez and Moreno also have personal knowledge.

8              MR. INGBER:  Exactly, Your Honor.  That's based on

9    my understanding.  Based on what we've seen from the Arango

10   testimony, I'm hoping that Moreno, if we bring him here,

11   Your Honor, he's going to be able to fill in the blanks about

12   all these meetings with Diego -- it wasn't just one meeting;

13   they had multiple meetings, Your Honor.  He's mentioned only

14   once in the correspondence, but --

15             THE COURT:  Arango.

16             MR. INGBER:  -- has testified that he had met with

17   him multiple times.

18             THE COURT:  Yeah, hold on.  I'm sorry.

19             Who 's mentioned only once?  You're talking about

20   Moreno or --

21             MR. INGBER:  Diego -- Diego Medina is mentioned --

22             THE COURT:  Right.  The CEO.

23             MR. INGBER:  -- in one of the documents that was

24   produced by plaintiffs.

25             THE COURT:  Yes.

|Hearing
|16-cv-06576, October 25, 2019                                              66

1           MR. INGBER:  But Mr. Arango, who is the Cordialsa

2    30(b)(6) witness, said that he had met with -- he had met

3    with Diego Medina on multiple occasions.

4           THE COURT:  Okay.  But what does that mean for the

5    individuals that you want to depose?

6           MR. INGBER:  So if -- did -- is he going -- if we

7    bring him, we would start with the Moreno.  If he's competent

8    to testify about everything that Diego Medina knows, then we

9    don't need -- then that would satisfy that.

10           THE COURT:  Okay.

11           MR. INGBER:  If he comes in and testifies, well, I

12    don't know anything, like, Diego met with him separately,

13    Diego never put anything in writing -- these people, by the

14    way, Your Honor, the plaintiff, they docket all their calls.

15    They have record of everything.

16           THE COURT:  Industria, you mean.

17           MR. INGBER:  Industria, yes.  But somehow, when

18    we're trying to get information on Marquillas, we have no

19    information.  There's no report.  There's no log-in call.

20    When they have these meetings, you know, we can't get any

21    further information.  It's just this constant -- again, they

22    want everything that they want, Your Honor, and they want to

23    hold our client accountable disgorgement on a 16-count

24    complaint, but we can't get basic information.

25           THE COURT:  Okay.

1             MR. RAYMOND:  Your Honor, could I just add a couple

2   of points here.  First of all, in terms of proportionality,

3   we haven't taken a single deposition yet, other than a

4   spoliation deposition a year and a half ago.  Mr. Ingber has

5   stomped our various attempts to take Mr. Zuluaga's

6   deposition, so we've had to have this fight just to get one

7   deposition of one 30(b)(6) and 30(b)(1) witness.

8             On his side, we gave him a negotiated two-day

9   deposition of Mr. Salazar, who is a very competent witness.

10  He is the head of sales and marketing for our Zenu, Ranchero

11  products in Colombia.  He came and prepared with us for two

12  days.  We went through everything, really.  We went through

13  the topics.  If you read through his whole deposition, they

14  gave a great deal of testimony.  This calling him the

15  incompetent witness because he deferred to the lawyers and

16  the IT people on a couple of issues is, frankly, absurd.  He

17  wasn't --

18            THE COURT:  Well, are there -- are there -- I

19  understand that.

20            Are there additional witnesses that you want to

21  depose?  I know you're obviously getting Zuluaga.

22            MR. RAYMOND:  Well, I don't know.  I mean, based on

23  what Mr. -- what Mr. Ingber does, is as soon as anyone

24  identifies somebody in a deposition, he says, now I've got to

25  depose that person too.  He still has not, all morning here,

 1   identified what issue does he need Medina on, what issue does

 2   he need Moreno on?  He said, because they were involved in

 3   some conversation.  Well, those -- they were identified in

 4   the Cordialsa deposition.  Cordialsa is only in this case,

 5   it's a third-party defendant --

 6            THE COURT:  Right.  I'm aware.

 7            MR. RAYMOND:  -- his counterclaim.  So this isn't

 8   about our multi-million-dollar claim against him.  This is

 9   all about his counterclaim.

10            And, by the way, he's taken four or five

11   depositions already on his counterclaim.  It involves one

12   conversation that took place in a Food Fair Supermarket,

13   wherever it was -- in Texas, 2015; he's deposed everyone in

14   that conversation.  He's deposed a couple of bystanders to

15   the conversation.  Every name that comes up, he then has to

16   depose them.  And the last deposition took place after this

17   letter was submitted, he served another deposition notice.

18   We objected, and he said I'm going to go ahead and do it, so

19   we went and had to send someone to attend the deposition a

20   month or so ago, which we thought was totally improper, but

21   he was going to do it anyway.

22            So my problem here is that this is just a fishing

23   expedition.  He said several times, I want to start with this

24   guy, and that's what he's doing here.  Every --

25            THE COURT:  Well, wait a minute.  Here is where --

1    here's where I have a problem with the fishing expedition.

2    All right.  Your own initial closures identified Jiménez is

3    Industria employee with a -- having knowledge, as

4    irrelevant -- having relevant knowledge under Rule 26 about

5    the history of the Zenu mark, the product portfolio, and a

6    number of other topics.

7           As to Moreno, he's pretty clearly a relevant

8    witness or potentially relevant witness because Medina has

9    unique and firsthand knowledge of the issues, at least

10   insofar as -- sorry.  I'm sorry.

11          Let me go back.

12          Arango himself testified that there was these

13   meetings, but that in -- essentially, it was handed off --

14   that Medina handed off responsibility about bringing Zenu's

15   products in the U.S. to be sold by Cordialsa to Moreno.

16          I have -- I understand your argument that there's

17   no deficiency in Arango's testimony, but that doesn't make

18   render Moreno an irrelevant witness.

19          So my point being, you have a number of these

20   witnesses that you yourselves have identified as relevant.

21   How do I then say basically, that none these individuals

22   other than -- within the broad scope of Rule 26, isn't

23   sufficiently relevant to allow the plaintiff to depose

24   them -- or defendants to depose them as a 30(b)(1) witness.

25   I can't control who the -- who the plaintiffs or any party

1   designates as their Rule 30(b)(6).  But I have a hard time

2   fathoming how they're not at least potentially relevant under

3   Rule 26 when you folks disclosed them.

4        MR. RAYMOND:  Well, Your Honor, in our -- in our

5   initial disclosures, as I always do, I try to name everybody

6   who has any knowledge about the issues in the case, and many

7   cases, it's very duplicative knowledge.  But you name them

8   all so that no one can argue later, wait a minute, you didn't

9   tell us about that guy.  That doesn't mean that anyone needs

10  to depose all of these witnesses, because the information is

11  largely duplicative.

12        And in this case, we presented as our 30(b)(6)

13  witnesses the two people who knew the most about the issues

14  we said.  When we said Mr. Jiménez knows here, he could have

15  asked Mr. Salazar.  He did ask Mr. Salazar some of that

16  stuff.  And he had another day to ask Mr. Salazar anything he

17  didn't get any answer on.  But he -- he left at noon on the

18  second day.  We flew all those people up here.  We were

19  sitting there expecting to go all day.  We negotiated hard

20  over this two days.  They initially wanted four days.  But at

21  noon on the second day, they said we're done.  We said, okay,

22  you know, we were ready go for the whole afternoon.  He could

23  have asked all these questions.

24        Instead, he's now saying, well, wait.  I want to

25  ask somebody else these questions.

1          So, look, I'm not trying to limit his right to

2    discovery.  I guess I just want to -- there needs to be an

3    end to this, because if he took -- if he took four or five

4    depositions over one conversation that took place in a store

5    in 2015, he's going to always be able to come up with another

6    reason, another meeting, another person who was identified.

7    Tell us what issues we didn't -- that Salazar was asked about

8    and didn't -- and didn't answer, and I'm happy to bring up

9    another witness to answer those questions.  But to leave it

10   open-ended, like, he was an incompetent witness, I need

11   another 30(b)(6) witness, he's basically telling me he's

12   going to back and ask it all over again for the second guy.

13          And Mr. Salazar -- I mean, we're happy give you the

14   whole transcript, if you want it read it, but he testified

15   for, you know, one full day and a couple of hours the second

16   day, and, you know, he answered a lot of questions.  No one

17   person knows everything that goes on in a

18   multiple-billion-dollar company.  But, you know, he's -- he

19   was the main guy who knew about what our sales of Zenu and

20   Ranchera were in Colombia, which is all that's really

21   relevant to this case.  I mean we have claims against them.

22   They have most of the knowledge of the facts that are

23   relevant to the claims.  As I say, he's taken tons of

24   depositions on his counterclaim.

25          So, again, I go back to what are the issues that he

1   needs more testimony on, and can we agree to one or maybe two

2   witnesses that -- and that's it.  And then we're done with

3   this.

4              THE COURT:  Well, what did you -- if -- if -- what

5   if the plaintiff's response to Mr. Ingber's proposal to have

6   Moreno and Jiménez testify as to -- as both 30(b)(6) and

7   30(b)(1) witnesses, and I understand correctly, Mr. Ingber --

8   and if I'm wrong on this, you've got it tell me -- and that

9   essentially would, barring some unforeseeable development,

10  that would constitute that sum total of the deposition.

11             Is that essentially what you are now offering?

12             MR. INGBER:  In -- under that scenario, if they're

13  competent, if they testify, if they've been properly educated

14  on things that they don't have necessarily personal

15  information, and if we're --

16             THE COURT:  That are noticed in the note- -- in the

17  deposition notice, yes.

18             MR. INGBER:  And if we're not obstructed and we can

19  just have a normal deposition where I can ask a question

20  without being interrupted and coached, that would be my

21  pleasure.

22             THE COURT:  That is not -- that last part does not

23  move me a bit.  Nobody sought court relief.  And, frankly, I

24  didn't -- I looked at the deposition enough -- that was both

25  sides.  Okay?

1            So, but, yes -- the answer to my question is yes?

2            MR. INGBER:  I feel it would be yes, Your Honor.

3            MR. RAYMOND:  Your Honor, can we ask one more

4   thing, which is that he tell us in writing what subjects?  I

5   mean, I can't -- bringing two people and prepare each of them

6   for 30 subjects that --

7            THE COURT:  I agree.

8            MR. RAYMOND:  -- they don't know about many of

9   those subjects.  They only know limited things.  We gave them

10  the best 30(b)(6) witness.  If there are certain subjects

11  that he didn't get an answer out of Mr. Salazar on -- and not

12  ones he didn't ask Mr. Salazar, because that's not fair, the

13  ones he didn't get an answer on, then, you know, we'll

14  find -- if it's those two witnesses or somebody else, that

15  someone can answer those questions.

16           But -- but it can't just be open-ended that he gets

17  just another two 30(b)(6) witnesses.  I mean, do we have to

18  prepare each of them --

19           THE COURT:  No.  I don't -- I think it would be

20  manifest -- here's -- I think it would be manifestly

21  unreasonable to expect of Moreno and Jiménez to be fully

22  prepared as to all 30 topics in addition to whatever they

23  might know in their personal capacity.

24           I do think that it's only fair -- and this would be

25  true of any deposition notice, Rule 30(b)(6) deposition

 1   notice -- that the topics to some extent be -- so that

 2   they're not -- des- -- they're not testifying overlapping --

 3   in an overlapping fashion.

 4            MR. INGBER:  Your Honor, Mark Ingber.

 5            Again, you don't have the whole deposition

 6   transcript.  It's --

 7            THE COURT:  And let me be clear.  I'm not deciding

 8   that, folks.  I have spent an enormous amount of time

 9   preparing for this hearing today.

10            What I am not doing -- and both sides had a full

11   opportunity to put that transcript in front of me and make

12   whatever arguments off of it.  You did not.  You gave me what

13   you gave me, and I've reviewed it thoroughly for today.

14            What I'm not going to do is now go all the way back

15   and start over by reviewing Salazar's full deposition

16   transcript to decide who's right.  It sounds to me like we

17   have at least a promising potential resolution of the issue.

18            MR. INGBER:  Your Honor, I agree.  But the devil's

19   in the details, as always, Your Honor.  We intend, if we

20   could get these two witnesses -- not -- I hear Mr. Raymond's

21   mentioned it might be other witnesses.  No, we want these two

22   particular people.  And we're going to -- we're going to --

23   we're going to set forth the topics.  We're not -- this is

24   not like -- again, we got so many answers that said "I don't

25   know."  If we got an "I don't know," Your Honor, we're

1  entitled to ask somebody else if they know.  Okay?  If he

2  answered and it just wasn't a great answer because, so be it.

3  But, again, it's replete with "I don't knows" -- "I don't

4  know," "ask my attorneys," "ask my attorneys."  So that's

5  the -- that was the extent of the whole deposition,

6  Your Honor.  And that's why I left early, because -- because

7  of that.

8            THE COURT:  I got it.  I got it.

9            Here's -- you know, this is a little bit

10 interesting in the sense that normally a party notices the

11 subjects and leaves it to the producing party to designate

12 who's going to testify.

13           It sounds like the plaintiff very much wants to --

14 sorry.  I get confused because normally the plaintiffs sit

15 next to the jury.

16           It sounds like the defendants very much want

17 Jiménez and Moreno to testify.  It also sounds, frankly, like

18 the plaintiffs are willing to contemplate producing Jiménez

19 and Moreno to testify.

20           The concern I have is the division of the topics

21 under Rule 30(b)(6).  And what -- because while I agree, it

22 is manifestly unfair to expect both Moreno and Jiménez are

23 going to testify or be prepared to testify as to -- both as

24 to the same 30.  That would defy the entire purpose of

25 Rule 30(b)(6).

1           How we ensure that Jiménez would testify as to

2     certain topics and Moreno would testify as to the other

3     topics that don't overlap with what Jiménez is testifying to

4     or the other one's testifying to, that is, it seems to me,

5     what -- for this to work needs to be sorted out.

6           MR. RAYMOND:  I would ask that Mr. Ingber give us a

7     list of those topics, and we will consult with these

8     witnesses, first, to see whether they know anything about the

9     topics.  They certainly don't know everything about all 30 of

10    those topics.  It sounds like, based on whatever Mr. Salazar

11    said, there's -- or Mr. Arango said, there's something

12    specific -- I just don't really know what it is, but there's

13    something specific they want from these two witnesses, I

14    would ask that Mr. Ingber put that in writing to us.  We can

15    talk to those witnesses, and if they know something about

16    those subjects, you know, then we will produce them.  I'm not

17    trying to stop from taking discovery.  But it's -- I don't

18    think it's fair to say that we've got to subject two more

19    30(b)(6) -- I mean, we get to determine who our 30(b)(6)

20    witnesses are.  He doesn't get to say who our 30(b)(6)

21    witness should be.  We gave him who we believed was the best

22    30(b)(6) witness that we had.  So if he wants these two guys

23    on specific subjects, I would ask that he be directed to tell

24    us what those subjects are, and I will respond in writing and

25    say which subjects they have knowledge of, and then we can

1    produce them to testify about those things.

2              MR. INGBER:  Your Honor, Mark Ingber.

3              We had sent on July 12th, we had sent a second

4    amended notice of deposition to Diego Medina with the

5    specific topics that we wanted to speak to him about.  But

6    they wouldn't even look at it.

7              THE COURT:  Well, because they were taking a

8    position that there was no basis to depose Medina.

9              MR. INGBER:  Exactly.  So we've already sent --

10             THE COURT:  And, frankly, you haven't articulated a

11   persuasive one for me.  But that's a whole separate issue

12   under the apex rule.

13             But my point being, what is the list of topics as

14   to Diego Medina have to do with this?  Are you arguing that

15   those are the topics now that would form the Rule 30(b)(6)

16   notice?  I am not sure what the relevance is.

17             MR. INGBER:  Your Honor, this is a -- this is a --

18   this is a tough nut to crack.  Okay?

19             THE COURT:  Yeah, but we're going to crack it,

20   because we have to -- this case is three years old, folks.

21   We have to get to the bottom of this.

22             MR. INGBER:  Your Honor --

23             THE COURT:  And, frankly, if the parties would have

24   more productive meet-and-confers, we probably could resolve

25   it.

1          MR. INGBER:  It's -- unfortunately, Your Honor --

2    Mark Ingber, again.  It's very difficult.  I'm able to make

3    decisions on the fly because of all the bureaucracy in

4    dealing with -- which they themselves acknowledge,

5    Your Honor, that they can't -- they can't get back to me

6    right away.  They have to go through people who don't speak

7    English --

8          THE COURT:  Look, I don't want to -- I'm not -- I'm

9    sorry I even brought it up, because I'm not looking to peel

10   back the onion on the meet-and-confer.  And -- it would

11   hardly be the first case where I have a large corporation

12   that -- or large transnational corporation, but I'm not

13   interested in dissecting the reasons why prior

14   meet-and-confers were less than, you know, completely

15   successful.

16         All I want to do is try and reach a resolution of

17   this today, because --

18         MR. INGBER:  Your Honor --

19         THE COURT:  -- you folks are going to -- my concern

20   is keep coming back and keep coming back, and we're not going

21   to get this -- we're going to find ourselves still as far

22   away from getting fact discovery done in this case as we are

23   now.

24         MR. INGBER:  Your Honor, as a suggestion, the

25   second amended notice of deposition to Diego Medina --

```
 1              THE COURT:  Okay.

 2              MR. INGBER:  -- we'll substitute Mr. Moreno's name

 3    for.  It's a 30(b)(1) deposition.

 4              THE COURT:  All right.  So you would --

 5              MR. INGBER:  A list of 12 topics, Your Honor.

 6              THE COURT:  But how do I know that Moreno is the

 7    competent witness to testify as to those 12 topics?

 8              MR. INGBER:  Well, this is the witness that the --

 9    that the plaintiffs' counsel has been offering.  They even

10    offered in their report here, Your Honor, that he would --

11    that he would be the witness.

12              MR. RAYMOND:  We offered as a compromise, we'd

13    produce one witness, Mr. Medina, if that would end this.

14              MALE SPEAKER:  Moreno.

15              MR. RAYMOND:  Mr. Moreno.  I'm sorry.

16              That's all that we offered to do as a compromise

17    to -- not as a starting point, but as a way to try to end

18    this so we don't end up with --

19              THE COURT:  But, wait.  Did you offer Moreno as a

20    witness to testify as to those topics?

21              MR. INGBER:  No, Your Honor.

22              MR. RAYMOND:  No, Your Honor.  I just -- we just

23    said that as a compromise in our letter, we could produce

24    this one person to testify, if that will end it.  But now

25    he's naming all sorts of other people, so ...
```

1         MR. INGBER:  End it.  I'm sorry, Your Honor.  End

2    it.  Again, we have discoverable witnesses.  They want to put

3    a protective blanket.  We want to --

4         THE COURT:  No, Mr. Ingber, I understand that.  But

5    trying to understand exactly what it is, though, that --

6    that, first, that you want and that the parties can agree to

7    has been a little bit like trying to grab smoke, because I

8    can't tell -- I can't -- you -- right -- I think you'll agree

9    with this.  I can't dictate who they put up to deal with the

10   30(b)(6) or testify as a 30(b)(6) witness.

11        Now, look, you could argue -- you could seek to

12   depose Moreno, Jiménez, whoever, as a Rule 30(b)(1).  And

13   then the issue would be, you know, relevance under all the

14   traditional considerations.

15        MR. INGBER:  Your Honor.

16        THE COURT:  Yeah.

17        MR. INGBER:  As another suggestion, again, we would

18   agree to depose these two 30(b)(1) witnesses, Moreno --

19        THE COURT:  And Jiménez.

20        MR. INGBER:  -- and Jiménez and put off, if we're

21   satisfied with these two people -- and we'd like to be

22   satisfied, then we don't need another 30(b)(6) substitute

23   witness.

24        THE COURT:  But what would the criteria for -- how

25   do -- how do I independently determine -- so let's say you --

1   you take, look, obviously, if you take their depositions and

2   you're satisfied, great.  Everybody's happy.

3         But let's assume you come back and say, we're not

4   satisfied.

5         Well, not satisfied with what?  They testified as

6   Rule 30(b)(1) witnesses based on what they know.

7         I don't know at that point invariably when you

8   folks come back to me on a dispute, we're basically then just

9   kicking the can down the road to having another fight as to

10  whether Salazar was a viable 30(b)(6) witness.

11        Now, look, thinking it through, that may not be a

12  terrible idea.  But the -- what would dictate whether you are

13  satisfied?

14        MR. INGBER:  We would have to articulate a reason

15  to Your Honor, why we were unsatisfied.  And you would have

16  to make the determination, and -- with all due respect.

17        MR. RAYMOND:  But don't we get to know in advance

18  so we have some idea what to prepare these people for.  I

19  mean, it's --

20        THE COURT:  Well, he's not going to --

21     (Simultaneous conversation)

22        MR. RAYMOND:  -- to come up with some subject --

23     (Simultaneous conversation)

24        THE COURT:  Well, wait, no.  He's not noticing as

25  30(b)(6) witnesses.  He's noticing as 30(b)(1) witnesses.

1          MR. INGBER:  Correct.

2          MR. RAYMOND:  Well, good, then.  They'll testify

3    about what they know.  And if they don't know something, then

4    that's not a reason to say, well, now I need more

5    depositions.  He's now saying those are the people he wants,

6    and they have the knowledge that he wants, then -- then that

7    we can live with.  But -- but then he can't come back and

8    say, well, wait they didn't testify to some subject on the

9    30(b)(6) list because I am not going to prepare them for all

10   those things, because they're not 30(b)(6) witnesses.

11         MR. INGBER:  Your Honor, Mark Ingber.

12         But if they testify as Arango said, hey, it's

13   Moreno is the one that knows.  I can't be precluded from

14   saying, well, you know, plaintiffs' counsel wants to be done

15   with this.  I don't want to go on, but if they gives me a

16   discoverable name, I mean, I'm entitled to pursue that.  I

17   mean, I'm sorry.  We can't just cave anywhere.

18         THE COURT:  Wait, wait, wait.  Tell me that again.

19   I'm sorry.

20         MR. INGBER:  Okay.  If the -- if we ask this

21   Jiménez guy, Santiago Jiménez, hey, tell me about the

22   Marquillas -- you know, the Marquillas conversations, Salazar

23   said you were in charge of all of that, well, I don't know,

24   but XYZ knows.

25         So do they -- is there a gotcha here, you know?  Do

```
 1   they say, oh, well, you said this was the last one.  I can't
 2   find out.  I can't pursue this.
 3              THE COURT:  Right.
 4              MR. INGBER:  So ...
 5              THE COURT:  I understand.
 6              MR. RAYMOND:  But his list of topics has -- for
 7   Mr. Medina has plaintiff's Zenu and Ranchera trademark
 8   applications.
 9              THE COURT:  No, as I -- as I regard it, those
10   topics would be off the table -- right? -- because --
11              MR. RAYMOND:  Okay.
12              THE COURT:  -- Medina's not testifying, at least as
13   of right now and, frankly, that would be a very big issue,
14   because defendant had his chance to argue for that and fell
15   well short of the apex rule.
16              But with the Medina topics would be off the table,
17   because he's deposing -- if I understand, correctly,
18   Mr. Ingber, what you're trying to do is you want to depose
19   Jiménez and Moreno as 30(b)(1) witnesses and then essentially
20   see if that gets you far enough to where you don't care about
21   the 30(b)(6).  Is that right?
22              MR. INGBER:  Hopefully, Your Honor.  We did send an
23   amended -- we sent a deposition notice to Hernando Moreno,
24   Your Honor.  We have topics.  We've given it to them already.
25              THE COURT:  I'm really confused.  Moreno is a
```

Case 2:16-cv-06576-KM-MAH   Document 167   Filed 11/01/19   Page 84 of 116 PageID: 1975

|Hearing
|16-cv-06576, October 25, 2019

84

```
 1   30(b)(1) or a 30(b)(6).

 2           MR. INGBER:  30(b)(1).

 3           THE COURT:  How did you send a list of topics to a

 4   30(b)(1) witness?  Moreno knows what he knows.  He has no

 5   independent duty, then, because he's not speaking for the

 6   corporation, to go out and do independent research in

 7   preparation for the deposition.  Right?

 8           MR. INGBER:  30(b)(1), Your Honor.

 9           THE COURT:  Right.

10           MR. INGBER:  As fact witness.

11           THE COURT:  Right.  A fact witness has no

12   independent duty to go out and do research in advance of --

13   he's not testifying for the corporation.

14           MR. INGBER:  No, we ask him questions, Your Honor,

15   about what -- what was discovered in the documents that the

16   plaintiff produced and what Arango said about, hey, Medina --

17   Medina designated Moreno, Hernando Moreno to be in charge of

18   this.  So we specifically focus on -- focus on questions

19   related to that, Your Honor.

20           THE COURT:  No, I understand that.

21           But if hypothetically, so hypothetically Moreno

22   said, I don't recall, he hasn't dis- -- he hasn't failed to

23   discharge his duty.  He didn't have an independent reason to

24   go out and do research.  He's not a 30(b)(6).  Right?

25           MR. INGBER:  Okay.
```

1          THE COURT:  Now, you would then come back and

2     say -- might come back and say, "well, Judge, he doesn't

3     remember anything," frankly, my response to that would be,

4     well, it sounds like you've got really good cross if

5     plaintiff tries to put him up at trial, but he didn't fail to

6     discharge some duty under Rule 30(b)(1).  Right?

7          MR. INGBER:  We believe, Your Honor, that there are

8     written records, because they keep lots of written records.

9     So it would be implausible, Your Honor, to think that the

10    president -- or the CEO of your company assigns you a topic,

11    and you don't have any recollection of it.

12         THE COURT:  Right.  Fair.  Totally different issue,

13    though.

14         All I'm saying is you send topics to the 30(b)(1)

15    witness, we expect you to be able to testify about X, Y, and

16    Z.  Right?

17         MR. INGBER:  As to these meetings --

18         THE COURT:  Okay.

19         MR. INGBER:  -- as to what happened.

20         THE COURT:  But he doesn't have -- unlike Rule --

21    first of all it's not even -- I mean, it's not even required

22    under Rule 30(b)(1), but unlike, in any event, Rule 30(b)(6),

23    where the subpoena's directed to the corporation and requires

24    the responding party to designate the appropriate person to

25    deal with the topics you've noticed, if Moreno -- you could

1    give the plaintiff -- a party could -- I could issue a

2    Rule 30(b)(1) deposition notice and not list any particular

3    topics or list a bunch of topics.  But in responding to the

4    deposition, you would come in and testify, and you can

5    argue -- you could answer, obviously, you have an obligation

6    to tell the truth -- I don't know.  I don't remember.  You

7    say, well, did you do anything to prepare for today?  And you

8    say no.  You haven't failed to discharge any duty under

9    Rule 30(b)(1), unlike Rule 30(b)(6).  Right?

10             MR. INGBER:  Well, Your Honor, we're going to

11   include a document request that will force him to look and

12   see if he has anything.

13             THE COURT:  A document request?  What?

14             MR. INGBER:  Attach -- that he should come and

15   produce any documents, Your Honor, as part of the 30(b)(1).

16   That he should bring with him any documents relating to any

17   of these meetings.

18             THE COURT:  No, no, no.  We're --

19             MR. RAYMOND:  We've already produced all the

20   documents, Your Honor.  He can't --

21             THE COURT:  That's the entire point of written

22   discovery.  We don't -- otherwise you're doing -- you're

23   doing written discovery in perpetuity.

24             MR. INGBER:  Your Honor, they have an obligation to

25   supplement -- to 26(e).

1          THE COURT:  That is such -- if they become aware of

2    other information that is responsive, yes, they do.

3          But that does give you the right to keep going back

4    to them using deposition notices as a surrogate for the

5    discovery requests you should have served in this case three

6    years ago.  Right?

7          MR. INGBER:  We -- we have served discovery

8    requests.  We were told -- we were told that there was a

9    Marquillas report, Your Honor.  For years, we were told.  And

10   then all of a sudden we found out recently, sorry, there is

11   no Marquillas report.  So maybe there -- maybe there'll be

12   a -- if they don't -- if there is nothing, then there is

13   nothing.  I don't see the burden of making him look in his

14   files to see if there's anything further.  Because we --

15   maybe it was too broad the last time.  Maybe I need to --

16   based on what I've found out during the Arango deposition,

17   I've narrowed the scope.

18          THE COURT:  I'll leave that to you, but I want to

19   be clear:  One -- because we have gotten very far afield from

20   the original issue.  -- there is no expectation, if you issue

21   these deposition notices to Moreno and Jiménez, I don't

22   want -- I don't want to hear another dispute that they

23   weren't prepared to deal with those subjects, because the

24   fact is all that is required of Rule 30(b)(1) witness is that

25   they truthfully answer questions within their knowledge.

1   There's no independent -- for at least as I understand it --

2   and if you're aware of contrary authority, please tell me --

3   there's no independent duty, because you're not testifying as

4   a designated corporate represent, to go out and prep.

5           Now, they may -- or educate themselves about those

6   subjects.  Right?

7           MR. INGBER:  They should.

8           MR. RAYMOND:  No, they shouldn't.  That's why I'm

9   so confused about --

10      (Simultaneous conversation)

11          THE COURT:  Well, should or shouldn't isn't --

12  rather beside the point.

13          MR. RAYMOND:  Right.

14          THE COURT:  Do they have an obligation, Plaintiffs'

15  Counsel, in your view, under Rule 30(b)(1) to go and educate

16  themselves about the subjects?

17          MR. RAYMOND:  Not the subjects.  I would prepare

18  them about -- and -- about what they know about and help them

19  refresh their recollection and what they know about.  I'm not

20  going to give them a list of subjects that Mr. Ingber came up

21  with.  They're not 30(b)(6) witnesses, and they're not

22  speaking on behalf of the corporation.

23          So I mean, I think he should either give us a new

24  30(b)(6) notice limited to the topics that he has -- has a

25  good-faith, you know, presentation for that Mr. Salazar

 1    didn't answer him, and we'll produce a second 30(b)(6)

 2    notice, and/or he can tell us he wants, you know, one or two

 3    30(b)(1), you know, witnesses, and we'll produce those

 4    witnesses -- it's got to be one or the other, and then that

 5    should be the end of this.  It can't be that Mr. Ingber walks

 6    back in here and says, well, he didn't -- Medina or Jiménez

 7    didn't know something I want -- I asked him about.  So now I

 8    need another witness.  And I mean, it will go on forever.  It

 9    will go on forever.  That's what we're hearing here is he

10    wants to start every -- these guys are only there because

11    they got mentioned in someone else's deposition.  So

12    obviously --

13              THE COURT:  Well, to be fair, Moreno and Jiménez

14    are -- again are identified in your own disclosures.

15              Mr. Ingber, what -- where are we going?

16              MR. INGBER:  Your Honor, based on what he's saying,

17    it appears -- again, we need to have these two individuals as

18    30(b)(6) witnesses on the topic -- on certain topics.

19              THE COURT:  Wait.

20              MR. RAYMOND:  He can't determine what --

21              THE COURT:  Right.  If the -- look.  The only way

22    that happens, though, Mr. Ingber, right, is if the parties

23    stipulate.

24              I can't order them to des- -- to produce a

25    particular witness as a 30(b)(6).  That's simply not how

 1   30(b)(6) is written.  Right?  Or how courts have construed

 2   it.

 3            It's very simple.  You provide list of topics.  The

 4   witnesses -- or the corporation designates the -- a

 5   representative to come in and testify.  And the deposition

 6   occurs.

 7            So I can't order them to produce Jiménez and Moreno

 8   as 30(b)(6) witnesses.  I have no idea, as I sit here,

 9   whether they're competent to testify as to whatever

10   subjects -- which I also don't know -- that you notice.

11   Right?

12            MR. INGBER:  Your Honor, I think you -- I think

13   there's material, there's cases in the report, I think you

14   had already said that they can testify both as a 30(b)(6) and

15   as a 30(b)(1) at the same time consecutively.

16            THE COURT:  If the parties agree.  Certainly a

17   party can.  In other words, they could designate or parties

18   agree, they could designate them as 30(b)(6) witnesses to

19   testify in addition to testifying as Rule 30(b)(1)s.

20            But I don't have any authority and certainly no

21   record in front of me, even if I could, to tell them they

22   have -- that's who they have to designate as a 30(b)(6).

23            MR. INGBER:  Well, we're ready to -- because we're

24   trying to get a resolution here, we're willing to do that,

25   Your Honor.

1           THE COURT:  Okay.

2           MR. INGBER:  Because he wants to -- he wants -- the

3   plaintiffs' counsel wants to do -- do the other thing and

4   say, hey, if we give you this, then you're done.  So we're

5   trying to figure out a resolution here, Your Honor.  These

6   are complicated issues.

7           THE COURT:  Okay.  I appreciate that.

8           MR. RAYMOND:  And we gave a 30(b)(6) witness.

9           THE COURT:  Hold on.  Let me do -- be clear.  Let

10  me be clear.

11          So what you're offering as a compromise is if the

12  plaintiffs will put forth Moreno and Jiménez as -- or,

13  frankly, Moreno and/or Jiménez, you could have a situation,

14  at least conceivably -- and I don't know the subjects -- to

15  be true or necessarily the case, but where one or the other

16  is the entire 30(b)(6) witness, but if, as between those, if

17  your 30(b)(6) topics are addressed and they each testify in

18  their Rule 30(b)(1) capacity, you agree, barring some

19  completely unforeseeable issue or the 30(b)(6) is not a

20  competent 30(b)(6) witness, to not seek any additional fact

21  depositions.  Is that right?

22          MR. INGBER:  I'm hoping, Your Honor.

23          THE COURT:  I need a more definitive answer,

24  Mr. Ingber.

25          MR. INGBER:  Your Honor, okay --

 1          THE COURT:  Because I've already left open --

 2   right? -- I've left open either, one, incompetent

 3   Rule 30(b)(6) witness or completely unforeseeable

 4   development.

 5          I don't know what --

 6          MR. INGBER:  I think -- I think that's a fair

 7   compromise, Your Honor.

 8          MR. RAYMOND:  I cannot agree to produce them as

 9   30(b)(6) witnesses, Your Honor.  They have very limited

10   knowledge about certain things.  Mr. Ingber, notwithstanding

11   being asked again and again and again, refuses to even give a

12   list of the issues that he claims that Mr. Salazar didn't

13   testify about.  So I can't say that these guys have knowledge

14   about those issues, because I don't know what they are.

15          We produced a 30(b)(6) witness for two full days.

16   They didn't use the two full days, but they could have.

17          They want 30(b)(1) depositions, then certainly

18   Your Honor can order those to go forward.  But they -- I

19   can't agree to make them 30(b)(6) witnesses because they have

20   limited knowledge about certain aspects that would men- --

21   they just happened to be mentioned in Arango's deposition.

22   Arango is a third-party defendant on their counterclaim.

23   So --

24          MR. INGBER:  Your Honor.  Mark Ingber.

25          Well, they can certainly be educated a lot better

1    than Mr. Salazar was, where --

2              THE COURT:  I don't know that.  I understand you

3    feel -- you argue that.

4              MR. INGBER:  It can't be any worse.

5              THE COURT:  But I don't know that.

6              All right.  I'm going to draw what I regard as a

7    reasonable compromise in this.  I think the -- the -- it

8    is -- the Court is satisfied that Moreno and Jiménez qualify

9    as relevant witnesses from whom the defendant should be

10   afforded opportunity under Rule 26 to take discovery as

11   Rule 30(b)(1) witnesses.  That is borne out by -- that --

12   that conclusion is borne out by -- or from several factor.

13   One, as I have said previously today, the plaintiff --

14   plaintiff has identified Mr. -- yes, Mr. Jiménez as -- in its

15   initial disclosures as having knowledge of the history of

16   plaintiffs' Zenu mark, the plaintiffs' product portfolio, the

17   plaintiffs' research and development of products sold under

18   the Zenu mark, the production of Zenu products, and

19   plaintiffs' relationships with suppliers worldwide, which are

20   certainly relevant subjects for the Lanham Act and unfair

21   competition and other claims in this case.

22             Moreover, as to Mr. Jiménez, at least, when

23   Mr. Salazar as Rule 30(b)(6) witness was asked about whether

24   Marquillas was a supplier of Industria, he said, I do not

25   work with the supplier -- this is page 54, Docket

1    Entry 157-2 -- he said he did not work with the suppliers and

2    that Mr. Jiménez did and did not know -- Mr. Salazar did not

3    know whether Mr. Jiménez was alerted to Marquillas's

4    complaint.

5         So the Court is satisfied that as a Rule 30(b)(1)

6    witness, Santiago Jiménez is relevant.

7         I'm also satisfied that Mr. Moreno is a relevant

8    witness because of the fact that Mr. Arango testified as a

9    Rule 30(b)(6) witness for Cordialsa -- Cordialsa SA or --

10   that essentially there were some communications with

11   Industria's CEO Diego Medina about Zenu's -- plaintiffs'

12   Zenu-branded products, and there were meetings in Colombia in

13   March 2014 concerning efforts between Industria and

14   Cordialsa, a joint effort to sell plaintiffs' Zenu-branded

15   products in the U.S., and essentially, though, Mr. Medina

16   handed that responsibility off to Mr. Moreno.

17        So I find that he too is -- may possess

18   discoverable information under Rule 26 in his personal

19   capacity such as to warrant affording the defendant the

20   opportunity to take a Rule 30(b)(1) deposition of him.

21        I certainly understand the plaintiffs' argument

22   that the defendants did not identify a deficiency in Arango's

23   testimony, but I don't think that -- frankly, that the

24   defendants need to.  Mr. Arango was the managing director of

25   Cordialsa; certainly would not be privy to discussions within

1   Industria concerning the effort to sell plaintiffs'

2   Zenu-branded products in the United States.

3          So I think that Mr. Moreno is a valid -- or may

4   possess discover- -- likely enough to possess discoverable

5   information, that his deposition should go forward.

6          Finally, I think the plaintiffs' argument that the

7   defendant's showing as to the inadequacy of Mr. Salazar is,

8   to some degree, a fair one.  The defendant certainly was

9   afforded the opportunity to show the Court all of the

10  different ways that as a Rule 30(b)(6) witness Mr. Salazar

11  fell short of the subjects.  And, frankly, that showing has

12  been lacking other than that part of Mr. Salazar's deposition

13  testimony dealing with Marquillas on page 54 that I

14  referenced earlier.

15         Nonetheless, the Court regards a Rule 30(b)(6)

16  witness as sufficiently important in a case of this

17  complexity that it will permit the defendant one day, one

18  additional day to complete a Rule 30(b)(6) deposition on the

19  same subjects that were noticed for the prior deposition.  I

20  do think in the interests of -- and I'm going to require the

21  defendant not less than a week in advance of that deposition

22  to send to the plaintiff the specific -- or plaintiffs'

23  counsel the specific issues that the defendant expects to

24  cover.

25         I believe that this draws a reasonable compromise

1   between recognizing the potential significance of a

2   Rule 30(b)(6) witness in a case concerning potential

3   international sales and Lanham Act claims with the fact that

4   the defendant has already had approximately eight hours to

5   depose the Rule 30(b)(6) witness and left open, according to

6   the plaintiffs, at least, a number of subjects for which was

7   there no actual inquiry.

8           But in any event this affords the defendant a fair

9   opportunity to complete Rule 30(b)(6) deposition questioning

10  without imposing such an undue burden or completely reopening

11  the Rule 30(b)(6) deposition on an open-ended basis.

12          MR. RAYMOND:  Your Honor, could I just ask for one

13  modification.  Could we list of topics two week before the

14  deposition --

15          THE COURT:  Yeah.

16          MR. KADOSH:  -- because our client's in Colombia.

17          THE COURT:  I think that's fair.

18          MR. RAYMOND:  -- and one week gives us no time,

19  really, to --

20          THE COURT:  I think that's more than fair.

21          MR. RAYMOND:  -- so -- that assume that list won't

22  be duplicative of things that Mr. Salazar did testify to.

23          THE COURT:  I'm not going to so rule, because that

24  would require me to make a determination as to what Salazar

25  competently testified to versus potentially did not.  But

```
 1  that's also why I'm limiting it to one day.

 2          And I want to be clear:  If there's any -- two

 3  things about that.  If there's any dispute at the deposition,

 4  you have to call me as soon as the dispute arises.  In fact,

 5  I'll leave open, not that you folks would necessarily want to

 6  do this, if you think it would help, you can do the

 7  deposition here.  But since defendant is noticing, the

 8  plaintiff is producing, that would have to be a joint

 9  agreement by the parties.  I am not going to force it.

10  Otherwise, the deposition will proceed at Reed Smith.  I

11  assume?

12          MR. RAYMOND:  That's where they've --

13          THE COURT:  All right.

14          Two --

15          MR. INGBER:  Your Honor, I think that is a great

16  suggestion.

17          Just as to the 30(b)(6) witness --

18          THE COURT:  Yeah, that's what I meant.

19          MR. INGBER:  -- that we have it here, Your Honor.

20          THE COURT:  You folks have it -- I'm not ordering

21  it.  You folks are going to -- if you folks agree, great.  If

22  not, you're still going to have it -- and you can't agree,

23  you'll still have access to me by phone.

24          But understand, Mr. Ingber, it's one day.  That's

25  what you get.
```

```
 1              MR. INGBER:  One day.  But we're --

 2              THE COURT:  One day.

 3              MR. INGBER:  But I believe you had just said we're

 4     not limited.  It should be recovering topics that were

 5     previously --

 6              THE COURT:  What you're limited to, at least as far

 7     as my ruling goes, is you're limited in three respects:  One,

 8     you have one day.  Two, you have to give notice to the

 9     plaintiffs not less than two weeks ahead of time.  Three, it

10     can't be new topics that were outside of the original

11     30(b)(6) notice.  It must either that or quite hopefully some

12     subset of that.

13              Do you understand?

14              MR. INGBER:  Yes.

15              THE COURT:  What can't happen is you give them new

16     topics that were not part of the 30(b)(6) that culminated in

17     Salazar testifying.

18              MR. INGBER:  Right.  But I have to go over the

19     topics, Your Honor, but I presume that we're going to be able

20     to ask questions to follow up about what happened with Arango

21     when he went to Colombia and bind the -- a 30(b)(6)

22     witness --

23              THE COURT:  I don't have the 30 topics or

24     whatever -- how many topics there were in front of me.

25     You're limited to those topics.  I can't give any more
```

1    guidance --

2            MR. INGBER:  Okay.

3            THE COURT:  -- than that.

4            MR. INGBER:  Thank you, Your Honor.

5            MR. RAYMOND:  And, Your Honor it's one of the

6    things, since -- you know, we designate 30(b)(6) witness.

7            THE COURT:  Yeah.

8            MR. RAYMOND:  I don't know that there will be a --

9    any witness who -- who can't respond.  I mean, we gave our

10   30(b)(6) witness, so if he gives a list of topics again, I

11   can't promise that there is a witness who can testify to all

12   those topics.  I mean, I can raise that with the Court when

13   we get the list.  But I would again ask that the list be

14   extremely limited to things Mr. Salazar didn't testify about,

15   because -- trying to find another witness who could testify

16   about what Salazar already test- -- I mean, he testified at

17   length about many of these subjects, so to say we --

18           THE COURT:  Look, folks, we can do this the hard

19   way or the easy way.  Okay?  If you folks can work together

20   and -- meaning Mr. Ingber can produce a narrowed list of

21   topics to provide to the plaintiffs and the plaintiffs

22   produce a witness who is reasonably competent to testify

23   about those noticed subjects, that's going to be the easy

24   way.  All right?

25           The hard way is we have another dispute and I

1   have -- am faced with the situation of either telling me,

2   defendant, you got everything you got, too bad, so sad, or

3   tell the plaintiff, too bad, so sad, you've got to produce

4   another witness.

5           I don't want to be in that situation.  You don't

6   either.

7           So you folks are going to have to find a way to

8   work with each other.  I'm not going to -- again, I am not

9   going to presage now what that 30(b)(6) witness, whether it's

10  Salazar or somebody else, will testify to beyond the topics

11  noticed in the defendant's original 30(b)(6).  But at the

12  same time, plaintiffs have to produce a witness who's

13  reasonably prepared.  And if that witness is not reasonably

14  prepared, then you're going to -- probably produce another

15  witness.  I don't know what else I can tell you guys.

16          MR. RAYMOND:  Understood, Your Honor.  Thank you.

17          MR. INGBER:  Thank you, Your Honor.

18          THE COURT:  All right.  Okay.

19          Last issue.  The identities of individuals on the

20  call with Marquillas SA.

21          Let's cut to the chase on this.  What is it that

22  the defendants are looking for on this and why?

23          MR. INGBER:  Your Honor, this Marquillas person,

24  think we've already established is a key -- witness of

25  knowledge, Your Honor.  Okay?

```
 1              THE COURT:  Well, what's the call with Marquillas?

 2              MR. INGBER:  This call?

 3              THE COURT:  Yeah, it says -- it says on the call

 4   with Marquillas.

 5              Remember, you guys are in the weeds on this.  I'm

 6   way out of the loop.

 7              So what is this call?  And why wouldn't -- frankly,

 8   why wouldn't Jiménez be a position to testify -- I'm sorry.

 9   Is it Jiménez or Moreno?

10              MR. RAYMOND:  Your Honor, can I explain what the

11   issue is here --

12         (Simultaneous conversation)

13              THE COURT:  Why wouldn't Jiménez be a position to

14   testify about this?

15              MR. RAYMOND:  I can explain the issue easily.

16              This is a company that was mentioned by Mr. Kadosh

17   earlier that told us back in 2013 that he was -- they were

18   asked to produce 400,000 labels for someone else that copied

19   our trademark.  And the person at the company told our person

20   at our company in confidence about that conversation.

21              Now, the conversation that --

22              THE COURT:  Wait.  I'm sorry.  Make sure I

23   understand.

24              So who's -- who's having this conversation?  This

25   is a representative of Marquillas.
```

1           MR. RAYMOND:  Somebody else at Marquillas, called

2    up aliment- -- my client, Industria.

3           THE COURT:  Right.

4           MR. RAYMOND:  And said we now found out or we were

5    told that it was -- it was Mr. -- Mr. Zuluaga's mother, who

6    lives in Colombia, contacted them and said, I want to order

7    400,000 Zenu labels that look just like that, you know, that

8    other company's labels.

9           THE COURT:  Wait.  So if I understand -- I'm just

10   trying to follow along.

11          So the Marquillas rep called the plaintiff's rep

12   and said that Wilson Zuluaga's mother placed an order for

13   400,000 --

14          MR. RAYMOND:  We didn't know Wilson Zuluaga at the

15   time.

16          THE COURT:  Right.

17          MR. RAYMOND:  Just the woman that we now know is --

18   who I understand is Zuluaga's mother, made this order.  And

19   they -- since they were our label manufacturer, they thought

20   that was strange, that some third party was asking --

21          THE COURT:  That's who Marquillas is.

22          MR. RAYMOND:  What?

23          THE COURT:  They're the label-maker.

24          MR. RAYMOND:  They're a label-maker.

25          THE COURT:  Okay.

1           MR. RAYMOND:  That's all they are.

2               So when that conversation took place, the person at

3     Marquillas who told the person at our client, asked that we

4     not reveal his -- his or her name.

5           THE COURT:  The Marquillas rep asked that.

6           MR. RAYMOND:  And that's all it is.  That's the

7     only reason that my clients have -- have -- we disclosed that

8     the conversation took place.  They certainly know --

9     Mr. Zuluaga knows who his mother spoke to.  But they want to

10    force us to tell them who she spoke to.  Our guys -- so my

11    client feels like they're breaching a confidence in doing.

12          THE COURT:  Okay.

13          MR. RAYMOND:  If Your Honor orders us to do it, we

14    will do it.

15          THE COURT:  I understand.

16          MR. RAYMOND:  But that's -- there's -- Marquillas

17    has nothing else to do with this case.  It just establishes a

18    date in 2013 when we got some notice that somebody was -- we

19    didn't know about Wilson Zuluaga.  We don't know about

20    Latinfood at that point.  We just learned that somebody

21    wanted copies of our labels.  And that's --

22          THE COURT:  In 2013.

23          MR. RAYMOND:  And that's pled in our complaint, and

24    that's literally as deep as this goes.  So you can take 15

25    depositions about it, but that's all -- we're not doing that.

 1            MR. KADOSH:  -- that we know about it.

 2            MR. INGBER:  Your Honor?

 3            THE COURT:  Yes.

 4            MR. INGBER:  Mark Ingber.

 5            Respectfully, it is so much more than that.  We

 6   have October 2013th [*sic*], Your Honor.  We have statute of

 7   limitations deadlines relating to that in the case.

 8   Regarding to the --

 9            THE COURT:  Relating to what?  I'm sorry --

10       (Simultaneous conversation)

11            MR. INGBER:  -- amended complaint --

12       (Simultaneous conversation)

13            THE COURT:  What claim does this give rise to?

14            MR. INGBER:  It gives rise to the claims of

15   copyright infringement that was filed in 2017, Your Honor.

16            THE COURT:  Okay.

17            MR. INGBER:  We have a three-year statute of

18   limitation.  I'm not going to get into all the vagaries of

19   that, Your Honor.  But this is -- this is essentially a case

20   of whether or not, as far as we're concerned, whether or not

21   the plaintiff has -- whether this case is going to continue

22   beyond summary judgment.  Okay?

23            THE COURT:  I'm sorry.  How does this phone call

24   and the identity of the individual on the phone call dictates

25   whether the plaintiffs are within the statute of limitations

1    on the Lanham Act claim or not?

2              MR. INGBER:  It's not just to Lanham -- it's not

3    the Lanham Act.

4              THE COURT:  Okay.  With whatever claim.

5              MR. INGBER:  It's the copyright claim where there's

6    a three-year statute of that limitations.

7              THE COURT:  I'm sorry.

8              MR. INGBER:  So we want to find out -- they make

9    all these allegations we've heard here to -- Your Honor

10   about.  It was the -- my client that called.  It was -- it

11   was my client's mother that called.  There's all these

12   unsubstantiated claim here.

13             We want to know who's making these claims.

14   Where -- this is a discoverable witness, Your Honor.

15   There's -- are they representing this Marquillas person?  Is

16   it -- we have -- we have a confidentiality agreement,

17   Your Honor.  They're trying to use this witness as a sword

18   and a shield.  Hey, we make all those allegations.  This

19   person reported this, but somehow, Your Honor --

20             THE COURT:  Is this in the complaint?

21             MR. INGBER:  Pardon?

22             THE COURT:  Is this in the complaint?

23             MR. INGBER:  Yes.

24             MR. RAYMOND:  Yes, it is.

25             THE COURT:  Okay.

1          MR. INGBER:  So this is -- this is a very key fact

2    for us, Your Honor.  It's just absurd -- again, all these

3    other things are -- extraneous.  We don't care about that.

4          THE COURT:  Okay.

5          MR. INGBER:  We want to find out what happened

6    then, Your Honor.  What happened on October 2013?  Okay?  We

7    know that the -- that the plaintiffs docket all their calls,

8    Your Honor, that make reports for everything.  So -- and we

9    can't get the name -- we're being challenged by this

10   allegation of -- we ordered -- my client ordered 400,000

11   labels?  They get to say this in open court, and we can't --

12   we can't test the veracity of the witness?  And we now know

13   the Marquillas witness, we want to know the who the

14   Marquillas witness spoke to at -- at the plaintiff.

15         THE COURT:  Want to know who the Marquillas....

16         MR. INGBER:  Marquillas contacted plaintiff.

17   What -- was there a report issued by plaintiff -- who is the

18   person that was contacted?  What do they know about it?  What

19   was said?  These are just basic facts.

20         Your Honor, again, that -- as -- in Exhibit F,

21   Your Honor, we said that do we know that -- we asked -- we

22   test- -- we -- there was testimony of Mr. Salazar, page --

23   Your Honor.  Do we know the name of the person at Marquillas

24   that communicated this to Industria?

25         Salazar:  "I don't know.

1              "Who would know?

2              "I don't know."

3              I asked:  "Can you find out?

4              "I don't know."

5              Mr. Raymond:  "We'll provide you with a name, if we

6    have it.  Thank you."

7              But notwithstanding this, we're just back at square

8    one.

9              THE COURT:  Wait.  All right.  So -- okay.  I got

10   it.

11             I do find, now -- that I had reviewed the amended

12   complaint filed in 2017, Docket Entry 31, the plaintiffs, as

13   part of their allegations, do allege that the defendants had

14   attempted to acquire 400,000 of plaintiffs' labels from, I

15   guess, it would be Marquillas, Zenu's label provider in

16   Medellín, who had then alerted the plaintiff to the order and

17   brought the defendant's scheme, that being, of course, to try

18   to harness the plaintiffs' marks in goodwill.  This is the

19   allegations in the complaint, of course.  For the defendant's

20   economic benefit.

21             Therefore, I'm more than satisfied that the

22   discovery that the defendant seeks is relevant under the

23   broad standard of Rule 26 and will require the plaintiff to

24   produce it, subject to a confidential designation in the

25   parties' discovery confidentiality order.

1              Okay.  That's the last issue.

2              MR. INGBER:  Thank Your Honor.

3              MR. RAYMOND:  Thank you.

4              THE COURT:  So -- okay.  My next one is 1 o'clock?

5              THE COURT OFFICER:  Mm-hmm.

6              THE COURT:  Okay.  Here's what I'm going to let you

7    guys do.

8              I would like a -- I would like you to schedule

9    out -- prepare the order, please, for today.  Schedule out

10   the depositions.  And then, say, within -- a meet-and-confer

11   within two weeks, give me a jointly proposed amended schedule

12   to complete these remaining discovery items.  Propose any

13   deadlines for experts.  I assume each side is anticipating

14   using experts, given the Lanham Act and copyright claims?  Or

15   am I wrong?

16             MR. INGBER:  Your Honor, Mark Ingber.

17             We've -- the plaintiff has mentioned that they were

18   going to be seeking using expert deposition testimony.

19   They've never designated one individual.  We have no idea

20   about --

21             THE COURT:  Right.

22             MR. INGBER:  -- we don't know how to prepare for

23   this, even.

24             THE COURT:  I understand.  That's why I'm trying to

25   work through -- I'm at least anticipating -- plaintiff going

1    to use experts?

2              MR. RAYMOND:  I don't know yet, Your Honor.  We

3    haven't decided that.  But we would just remind Your Honor

4    that in your order of March 21, you ordered that plaintiff,

5    us, at the close of fact discovery could make a renewed

6    application to stay all expert discovery pending District

7    Court's decision on the spoliation motion and any other

8    dispositive motion, to which defendant shall respond within

9    seven days.

10             So we would ask to have that right at the end of

11   this fact discovery period to renew our application to make

12   those motions prior to taking on the expense of expert --

13             THE COURT:  You can -- you can make the motion,

14   obviously.  Yeah, the point, if I recall correctly, the point

15   of that was -- I'm almost certain I said let's see what other

16   discovery there is, because the scope of what other discovery

17   you were able to get, notwithstanding the corrupted file

18   servers at Latinfoods may very well have a significant impact

19   on the -- on the scope of the relief you get, if any.

20             So ultimately in any event, this is going to be a

21   decision by Judge McNulty, I suspect.

22             Look, let's start here.  I would like a schedule

23   from you folks that includes the close of all -- of getting

24   all of this getting all of this done, which, as I regard as

25   the close of fact discovery.

1           A proposal, at least, for experts.  And then in the

2    alternative, the plaintiff can pitch, again, the idea of the

3    spoliation and staying expert discovery.  So at least I have

4    all options in front of me.

5           All right?

6           MR. RAYMOND:  The spoliation at this point and

7    summary judgment as well.  Because we don't think we need

8    expert testimony --

9           THE COURT:  Well, here's the thing, though.  I'm

10   not -- putting the spoliation issue aside.  In this

11   three-plus-year-old case, it's not like, well, we're going to

12   hold off on whether we're even going to announce if we're

13   using experts, take a run at summary judgment, and then

14   decide experts.  We're probably not doing that, because this

15   case is already old enough.

16          So I also want to know if the parties intend to use

17   experts.  Then we'll deal with scheduling.

18          All right?

19          Why don't you folks get that to me by November 6th.

20          MR. INGBER:  Your Honor, I believe that you had set

21   forth in the March 21st hearing that if the defense wants to

22   renew an application to stay discovery pending the spoliation

23   motion, a dispositive motion, again, they would send out a

24   letter that lays out the basis and base -- on even though --

25   and you were very dubious about it, Your Honor.

```
1              THE COURT:  I was dubious?

2              MR. INGBER:  Yes.

3              THE COURT:  Dubious means doubtful or sketchy.

4              MR. INGBER:  Well, that's what you said,

5    Your Honor.

6              THE COURT:  Oh, you mean not that I was dubious.  I

7    was skeptical of their argument.

8              MR. INGBER:  Yes, Your Honor.

9              THE COURT:  Okay.

10             MR. INGBER:  And you didn't want to stay any

11   discovery.

12             THE COURT:  Look, as much as we've accomplished

13   today, let's end on a positive note.

14             I'm not taking a position at all on the spoliation

15   or the stay.

16             MR. INGBER:  Thank you.

17             THE COURT:  I think the -- I'm pretty sure, first

18   of all I'm pretty sure the March order issued as a result of

19   an on-the-record conference call.

20             MR. RAYMOND:  Your Honor, I guess in a previous

21   transcript, you had given us permission to make that motion,

22   but you then in the subsequent conference said that since it

23   hadn't been put into an order, it was not binding.  And then

24   you issued this order saying we could renew an application

25   for that.  I believe that's --
```

1          THE COURT:  Nobody is saying that the plaintiffs

2    cannot make a spoliation motion.  It's a question of when and

3    whether we stay discovery pending that spoliation motion.

4          MR. RAYMOND:  Your Honor, we're not asking to stay

5    any fact discovery.  It's only a question whether we would

6    designate experts and all expert discovery.  I don't know

7    that we're going to have any experts.  No one's designated

8    any yet at this point.  But if we did do an expert, one might

9    be consumer perception survey, which would be an expensive

10   enterprise for both sides.  So the idea was that we could get

11   summary judgment decided before I even take on that expense,

12   but we can -- we can hold off until later to make that

13   application.

14         MR. INGBER:  Your Honor, you had indicated that --

15   during that hearing that the -- that the spoliation motion

16   would be included in dispositive motion.  That was your

17   thinking.  But that you would give -- even though you were

18   not -- you were dubious about it, Your Honor.  You said if

19   the plaintiff wants to meet that burden, they could do so.

20         THE COURT:  Here's what I said.  I don't mean to

21   interrupt, but to move this along, because I already have

22   counsel in for my next conference, what I said on the

23   transcript, Docket Entry 142, page 24, talking about the

24   prior order, I said what the order held was that plaintiff's

25   application to stay remaining discovery pending adjudication

1    of the sanctions motion is denied plaintiffs could file any

2    such motion at the close of discovery in conjunction with

3    dispositive motions.

4          The Court never held -- this is why it struck me as

5    unlikely when I first heard it -- the Court never held that

6    expert discovery was going to be stayed.  That's not in

7    either the May 8th order nor the ... Hold on.  There's a

8    whole long -- see what the word is.  I essentially said the

9    Court never took a position on what was going to -- if any

10   there was going to be stayed pending the spoliation motion.

11         So --

12         MR. RAYMOND:  Your Honor, this came just put the

13   whole thing on the record, in the December 4, 2018.

14         THE COURT:  Oh, no, no.  We're -- we're not going

15   to appeal that that --

16         MR. RAYMOND:  Okay.

17         THE COURT:  -- that's a layer far back.  You

18   referenced my March 26th -- which -- order, which of course

19   the Court is free, particularly in an evolving discovery

20   situation, to modify scheduling at any time as it deems

21   appropriate pursuant to its Rule 16 case management.

22         So long story short, certainly the plaintiff will

23   be allowed to proceed with a spoliation motion at the

24   appropriate time.  The question is timing.  You can pitch me

25   in the submission that you guys are going to get me by

1    November 6th as to when the spoliation motion in conjunction

2    with the summary judgment motion is to be made.  And -- I

3    mean, we're all agreed, it won't be before the close of fact

4    discovery.  Right?

5            MR. RAYMOND:  No, that's correct, Your Honor.

6    Just --

7            THE COURT:  Right.

8            MR. RAYMOND:  -- before -- just talking about

9    before --

10           THE COURT:  So the issue is ripe.  Where the

11   experts and expert discovery fall within that.

12           You folks can pitch me your respective ideas on

13   that in the submission you get my by November 6th.  Okay?

14           MR. RAYMOND:  Your Honor, could I ask, can we make

15   that pitch after fact discovery is over, because I --

16           THE COURT:  Sure.

17           MR. RAYMOND:  -- things may change by then.  We

18   may --

19           THE COURT:  Fair enough.

20           MR. RAYMOND:  -- want to make an ...

21           THE COURT:  That seems like a very reasonable

22   suggestion.

23           MR. RAYMOND:  Thank you.

24           THE COURT:  I want to be clear, lest there's any

25   confusion, all I'm saying at this point is at the close of

 1   fact discovery, you can argue sort of where -- it's sort of

 2   where we go from there.  Right?  I gather the parties are

 3   going to want to make -- one or both parties are going to

 4   want to make a summary judgment motion.  I anticipate that

 5   the plaintiff's going to want to make the spoliation motion.

 6   And then the only issue remaining on the table is what do we

 7   do with expert discovery while that's pending?

 8             I have an open mind.  Understand, by the way, Judge

 9   McNulty may have His Honor's own opinion about this.  All

10   right?

11             So we'll take it in steps.  But I think that makes

12   a lot of sense.

13             So what I would like is by November 6th, then --

14   we'll leave it at this.  You guys are going to get me a

15   jointly proposed, I hope, deadline to complete the remaining

16   fact discovery.  Then off of that, we'll set up a telephone

17   conference at the end of the fact discovery, to talk about

18   what comes next.  All right?

19             MR. RAYMOND:  Thank you, Your Honor.

20             MR. INGBER:  Thank you, Your Honor.

21             THE COURT:  All right.  We're adjourned.  Thank

22   you, folks.

23                (Conclusion of proceedings at 12:49 P.M.)

24

25

|Hearing
|16-cv-06576, October 25, 2019
|Certification

116

1                              Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3   that the 116 pages contained herein constitute a full, true,

4   and accurate transcript from the official electronic

5   recording of the proceedings had in the above-entitled

6   matter; that research was performed on the spelling of proper

7   names and utilizing the information provided, but that in

8   many cases the spellings were educated guesses; that the

9   transcript was prepared by me or under my direction and was

10  done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12  the parties hereto nor am I in any way interested in the

13  outcome hereof.

14

15

16

17

18  s/ *Sara L. Kern*                    28th of October, 2019

19  _____     _____
    Signature of Approved Transcriber              Date

20

21
    Sara L. Kern, CET**D-338
22  King Transcription Services
    3 South Corporate Drive, Suite 203
23  Riverdale, NJ  07457
    (973) 237-6080

24

25