# Exhibit 41

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF NEW JERSEY
 3   CIVIL ACTION NO. 2:16-CV-06576
     ----------------------------------------x
 4
     INDUSTRIA DE ALIMENTOS ZENU S.A.S.,
 5
               Plaintiff,
 6
         - against -
 7
     LATINFOOD U.S. CORP. d/b/a ZENU PRODUCTS
 8   CO. and WILSON ZULUAGA,
 9           Defendants/Counter Plaintiff.
     ----------------------------------------x
10   LATINFOOD U.S. CORP. d/b/a ZENU PRODUCTS
     CO.,
11
               Defendant/Counter Plaintiff.
12
         and
13
     INDUSTRIA DE ALIMENTOS ZENU S.A.S
14   and CORDIALSA USA, INC.
15   ------------------------------------------------x
                         599 Lexington Avenue
16                       New York, New York
17                       July 11, 2019
                         10:12 a.m.
18
19           30(B)(6) Deposition of LUIS ARANGO, a
     representative of the Plaintiff/Counter
20   Defendant held at the above-entitled time and
     place, taken before Carolyn Crescio, a
21   Professional Shorthand Reporter and Notary
     Public of the State of New York.
22
23                  *      *      *
24
25
```

1                   L. ARANGO

2        A.    It's a show with retailers.

3        Q.    Do you come to New York City for any

4   of these trade shows?

5        A.    No.

6        Q.    There's no -- you're not aware of

7   any candy or --

8        A.    No, there are several shows here,

9   but normally the territory manager is the one

10   who goes.

11        Q.    Have you ever gone to a trade show

12   in this area?

13        A.    Some time ago I went to one of the

14   CNS show.

15        Q.    CNS, when was that?

16        A.    I don't remember.

17        Q.    Was it in the last five years?

18        A.    Yes.

19        Q.    Last two years?

20        A.    No.

21        Q.    Are you familiar with the defendant,

22   Latinfood?

23        A.    Yes.

24        Q.    Have you ever seen any Latinfood

25   Zenu-branded products at any of these trade

```
                                            Page 41
  1                  L. ARANGO
  2   shows?
  3        A.    No.
  4        Q.    How about Latinfood Ranchera-branded
  5   products at any of these trade shows?
  6        A.    No.
  7        Q.    What type of company is Cordialsa
  8   USA?
  9        A.    Cordialsa is a distribution company
 10   and marketing.
 11        Q.    Who are you the distribution and
 12   marketing arm for?
 13        A.    You mean consumers or brands?
 14        Q.    Are you marketing and distributing
 15   on behalf of somebody else?
 16        A.    On behalf, no.  We distribute our
 17   own brands from Nutresa.
 18        Q.    So correct me if I'm wrong:  Are you
 19   the marketing and distribution arm for Grupo
 20   Nutresa?
 21        A.    I'm one of many distribution
 22   companies.  Nutresa has multiple distribution
 23   companies.  We are in the US.
 24        Q.    Are you the exclusive marketing and
 25   distribution arm for Grupo Nutresa in the US?
```

Page 42

1                        L. ARANGO

2        A.    No.

3        Q.    Who else do you know of is marketing

4    and distributing for Grupo Nutresa in the US?

5        A.    They export to several other

6    companies in the US.

7        Q.    Are you the only company working for

8    Grupo Nutresa that's in the U S?

9        A.    No.

10               MR. RAYMOND:  Objection to the

11               form of the question.  He just

12               answered.

13       Q.    Are you operating exclusively for

14   Grupo Nutresa in the US?

15               MR. RAYMOND:  Objection to the

16               form of the question.

17       A.    Can you elaborate more on the

18   question "exclusively"?

19       Q.    Are you the representative of Grupo

20   Nutresa in the US?

21               MR. RAYMOND:  Object to the

22               question.  Asked and answered.  He's

23               not going to answer it again.

24       A.    No.

25       Q.    These other distribution companies

1                    L. ARANGO

2        Q.    Does Cordialsa handle US marketing

3    and distribution for Grupo Nutresa in the US?

4        A.    We handle Grupo Nutresa products in

5    the US.

6        Q.    Thank you.  Does Cordialsa work for

7    any other companies besides its parent company,

8    Nutresa?

9                    MR. RAYMOND:  Objection to form.

10       A.    What you mean?  "Work" is what?

11       Q.    Does Cordialsa handle marketing and

12   distribution for companies other than Grupo

13   Nutresa in the US?

14       A.    Yes.  We have one brand that is not

15   Grupo Nutresa brand.

16       Q.    What is that brand?

17       A.    It's called Mexico Lindo.  Mexico,

18   L-I-N-D-O.

19       Q.    What did you sell for them?

20       A.    Hot sauce.

21       Q.    Is Mexico Lindo a Mexican company?

22       A.    Yes.

23       Q.    How many people does Cordialsa

24   employ?

25       A.    We have around 100.  One hundred

```
1                       L. ARANGO

2    people.

3        Q.    Do you have any non-US employees?

4        A.    Non-US employees, yes.

5        Q.    How many?

6        A.    I don't know.

7        Q.    What type of products does Cordialsa

8    distribute in the US for Nutresa?

9        A.    Cookies and crackers, coffee, candy,

10   chocolate, pasta, powder drinks and hot sauce.

11       Q.    Any meats?

12       A.    No.

13       Q.    How about vegetables?

14       A.    Vegetables, no.

15       Q.    How about beans?

16       A.    No.

17       Q.    Are the products that you're selling

18   on behalf of Nutresa, are they sold exclusively

19   in the US?  Only in the US?

20               MR. RAYMOND:  I'm going to

21               object.  Once again, you're far

22               beyond the agreed subjects of this

23               deposition.  Clearly the subjects of

24               this deposition were to limit

25               questions about sales of Zenu,
```

1                    L. ARANGO

2         Ranchera-branded products in the

3         United States.

4             There's nothing in here about

5         asking questions about other

6         activities of Cordialsa that have

7         absolutely nothing to do with this

8         lawsuit.  You have a very limited

9         counterclaim against Cordialsa

10        involving one incident, and you

11        certainly can ask him about that.

12            We produced documents about Zenu

13        and Ranchera activities by this

14        company, and we agreed that you

15        could ask questions about those

16        subjects, as well.  But all of the

17        other activities that Cordialsa may

18        be engaged in are beyond the scope

19        of any of these agreed subjects.

20        The whole purpose of negotiating

21        this was to limit the subjects of

22        this deposition.

23            So you are clearly violating the

24        agreement that you made as set forth

25        in these topics for examination.

```
 1                    L. ARANGO
 2            MR. INGBER:  Well, I certainly --
 3            MR. RAYMOND:  I suggest you limit
 4        your questions to what you agreed to
 5        testify about, because we are not
 6        going to bring the witness back, and
 7        you have a limited amount of time.
 8        But in any event, we are not going
 9        to let him talk about subjects
10        beyond the agreed scope.
11            MR. INGBER:  Well, I disagree
12        with your characterization, but I'm
13        going to move on to my next
14        question.
15    Q.    Does Cordialsa sell or distribute
16  any Zenu or Ranchera products in the US?
17            MR. RAYMOND:  Today?
18    A.    Today, no.
19            MR. INGBER:  You are
20        interjecting.  If he -- that is not
21        an objection, today.  That is not a
22        proper legal objection.
23            MR. RAYMOND:  Objection to form.
24        What is the time frame in which
25        you're asking him?  Is that better?
```

```
 1                    L. ARANGO
 2          Now you can ask the next question.
 3          I do get to object to the form.
 4              MR. INGBER:  You get to object to
 5          the form, but you don't get to
 6          interject with anything other than
 7          that.  And you're making a habit out
 8          of doing that.
 9              MR. RAYMOND:  You know perfectly
10          well that the time frame that things
11          happen or didn't happen is very
12          important in this case.  So you need
13          to explain in your question what
14          time frame you're asking about.
15      Q.   Has Cordialsa ever sold or
16   distributed any Zenu or Ranchera-branded
17   products in the US?
18      A.   Yes.
19      Q.   When did you do that?
20      A.   2014.  It was a couple of cases in
21   Texas.
22      Q.   Were they sold in the US?
23      A.   Yes.
24      Q.   To who?
25      A.   One bakery in Texas.
```

1                    L. ARANGO

2        Q.    What bakery?

3        A.    It's called Paneria Central.

4        Q.    Was this a one-shot occurrence?

5        A.    Yes.

6        Q.    What did you sell to them?

7        A.    Beans.

8        Q.    How much was the value of the sale?

9   Do you recall?

10       A.    Very minimum.  Less than $50.

11  Twenty, 30, whatever.

12       Q.    Twenty to $30?  Is that the only

13  time?

14       A.    Yes.

15       Q.    How did the sale come about, if I

16  may ask?

17       A.    It was sold.  Everything was sold.

18       Q.    Did this company contact you?

19       A.    Can you explain more?

20       Q.    Did they contact Cordialsa about

21  purchasing products from you?

22       A.    It was a regular customer.

23       Q.    Do you have a copy of the sales

24  document for the product?

25       A.    Yes.

```
 1                    L. ARANGO
 2              MR. INGBER:  We ask that that
 3              document be produced and any and all
 4              communications in regard to that
 5              sale be produced.
 6                  We will put that in a subsequent
 7              request after the deposition.
 8      Q.    Do you recall if there are any
 9  emails relating to that sale?
10      A.    What you mean emails about the sale?
11      Q.    Were there any communications in
12  written form, either via email or letter between
13  Cordialsa and Paneria Central regarding the sale
14  and/or purchase of these Zenu-branded beans?
15      A.    Emails, no.  The invoice.
16      Q.    Invoice, okay.  You think that might
17  be the only --
18      A.    A picture of the sale.
19      Q.    Do you know if you were allowed
20  to -- do you know if you obtained permission
21  from US Customs about selling Zenu-branded
22  products in the US to Paneria?
23      A.    What you mean that you're allowed?
24      Q.    Where were these products made?
25      A.    They were made in Colombia.
```

```
 1                       L. ARANGO
 2   Ranchera-branded products in the US?
 3           A.    I don't know.
 4           Q.    If you need to take a break for any
 5   reason, let us know.  It's not a marathon.
 6           Can you tell me about what the corporate
 7   structure of Cordialsa is in the US?
 8           A.    We belong to Grupo Nutresa, so we
 9   are a subsidiary.
10           Q.    Who are the current officers and
11   directors of Cordialsa?
12           A.    Alberto Hoyos, Jaime Correa and
13   Alejandra Sarazty.
14           Q.    Is Mr. Hoyos your boss or superior?
15           A.    Yeah, my superior.
16           Q.    Do you know how long Mr. Hoyos has
17   been the president of Cordialsa?
18           A.    Since the beginning.
19           Q.    I think you mentioned previously
20   that you had developed a sales strategy for Zenu
21   products in the US; is that correct?
22           A.    In 2014, yes.
23           Q.    Is that a written document?
24           A.    Yeah.  We have all of the steps to
25   do the sales in the US, like the pricing and all
```

```
 1                    L. ARANGO
 2   these things.  Everything related.
 3        Q.    Has that plan been implemented, to
 4   your knowledge?
 5        A.    No.  It was put on hold in 2014.
 6        Q.    How come?
 7        A.    Again, I was just waiting, and
 8   Industria told me to put it on hold because
 9   there was a issue with their trademark.
10        Q.    Do you know if it had anything to do
11   with sanitary or labeling issues?
12        A.    I don't know.
13        Q.    Has this sales strategy been
14   produced to us, to your knowledge?
15              MR. RAYMOND:  Object to the form
16              of the question.  The implication is
17              there is some single document, and
18              that's not been the testimony.
19        Q.    Is there a document with the sales
20   strategy that you're referring to?
21        A.    I have documents on the pricing
22   analysis, the importing process, the compliance
23   with the FDA regulation, and the manufacturing
24   plant registration.  That's part of the business
25   plan.
```

1                    L. ARANGO

2      Q.    This business plan, do you know if

3   this business plan has been produced in this

4   case to us?

5      A.    I don't know.

6              MR. RAYMOND:  We produced all of

7              the documents that we have been able

8              to locate that relate to the

9              activities taking place from 2011 to

10             2014 regarding the possibility of

11             selling Zenu and Ranchera products

12             in the United States.

13             MR. INGBER:  Well, I'm not aware

14             of this business plan.  If it's been

15             produced, then I ask that you

16             identify it.  If it has not, then I

17             ask that you produce it.

18             MR. RAYMOND:  As I said before,

19             and I think the witness made clear,

20             I don't think you're understanding.

21             He's talking about a business plan

22             as a plan, not as a single document.

23               There's no single business plan

24             document, as I understand it.  There

25             are a number of documents --

```
 1                    L. ARANGO
 2   Zenu, and he direct me to Hernando.  And I talk
 3   with Hernando about the possibility of bringing
 4   the product to the US.
 5          Q.    When you say "the president," was
 6   that Diego Medina?
 7          A.    Yes.
 8          Q.    Do you know if there were any
 9   issues or any discussions about validating the
10   use of the Zenu brand in the US?
11          A.    No.  The validation is a normal
12   process for us for everything that we do.  It's
13   not a specific issue, but it's a concern.  We
14   normally do it for every single product.
15          Q.    When you say "validation," are you
16   referring to getting a trademark for it in the
17   US?  Do you know?
18          A.    If it's active, if we need to ask
19   for the use, if we need to register, any option
20   has to be worked with Servicios Nutresa.
21          Q.    When you say you have to register,
22   do you mean with the US Trademark Office?
23          A.    Yeah.
24          Q.    At that time, were you aware of
25   any -- were you aware of Latinfood selling
```

Page 85

1                          L. ARANGO

2    Zenu-branded products in the US?

3          A.    No.

4          Q.    Do you know if there were any

5    discussions in Colombia at that time about

6    somebody else using the name "Zenu" in the US?

7                    MR. RAYMOND:  Object to the form

8                of the question.

9          A.    To my knowledge, no.

10         Q.    What happened as a result of these

11   meetings and discussions?

12         A.    We started working on the

13   requirements, like labeling, reviewing the

14   pricing analysis, everything.  Yeah.  We work a

15   lot on it, on the product, until we got the

16   notification they have to review the trademark.

17         Q.    Did you understand there to be some

18   issues with registering the trademark in the US?

19         A.    No.  When I started the product, not

20   at all.  After, when we were kind of ready.

21         Q.    When you were what?

22         A.    Ready with the product.

23         Q.    When was that, if you know?

24         A.    June, July, August.  Later on.

25                    MR. INGBER:  Off the record.

```
 1                      L. ARANGO
 2              (A lunch break was taken.)
 3    FURTHER EXAMINATION
 4    BY MR. INGBER:
 5        Q.   When did you first become aware of
 6    this lawsuit?
 7        A.   When I received the letter from
 8    Latinfood.
 9        Q.   When was that?
10        A.   I don't remember exactly the date.
11        Q.   Do you know if it was in 2017?  You
12    don't know?
13        A.   No.
14        Q.   Did there come a point in time where
15    Cordialsa was issued a counterclaim in
16    this matter from Latinfood?
17        A.   I don't know.
18        Q.   Do you know if Latinfood ever sued
19    Cordialsa in this case?
20        A.   I received a communication from
21    Latinfood.  I pass it over to the -- our
22    lawyers.
23        Q.   Okay.  I want to show you --
24              MR. INGBER:  Mark that Arango 4.
25              (Defendant's Fourth Answer to
```

1                     L. ARANGO

2          Q.    Was that that marketing plan you

3     were talking about, the business plan?

4          A.    No.  It was just an overview at the

5     supermarkets, and I saw the potential of the

6     category.

7          Q.    Was this a written survey?

8          A.    No.

9          Q.    Was it verbal?

10         A.    It's not a survey.  It was potential

11    that I saw.

12         Q.    Oh, potential that you saw.

13         A.    Uh-huh.

14         Q.    And did you share that with

15    Industria?

16         A.    Yes.  That's why I asked them to

17    start the process of bringing the product to the

18    US.

19         Q.    And what year was that?

20         A.    It was in 2011.

21         Q.    Back in 2011, did you create a

22    marketing strategy for Zenu-branded products in

23    the US?

24         A.    Marketing strategy, no, not really.

25    Not really a marketing strategy.  I started the

Page 94

1                          L. ARANGO

2    process of analyzing the possibility of bringing

3    the product to the US.

4          Q.    Can you describe Cordialsa's sales

5    strategy for bringing in Zenu-branded products

6    into the US back in 2011?

7          A.    2011, we normally target the

8    demographics.  We saw a potential of Colombians

9    in Florida, New Jersey, New York and Washington.

10   So our proposal or our offer is to offer

11   products with name brand recognition for

12   Colombians that want -- to have the product that

13   they have in origin, here in the US.  That's

14   what we do.

15         Q.    Did you as -- on behalf of Cordialsa

16   do any kind of investigation to determine

17   whether Industria Zenu products could be

18   imported into the US?

19         A.    I did the research with Pro Export.

20   It's a Colombian government entity who promote

21   the export from Colombia to any country.

22         Q.    Was this back in 2011?

23         A.    Yes.

24         Q.    Were there any written

25   communications with Pro Export about this?

```
 1                    L. ARANGO

 2        A.    Yes.

 3        Q.    And that was back in 2011?

 4        A.    Yes.

 5        Q.    What do you recall them saying?

 6        A.    That we are allowed to bring the

 7   products in.  It's included in the free trade

 8   agreement, but they recommended to send to

 9   Customs the product to get the approval of the

10   label on the cans and everything.

11                    (Email is received and marked as

12                    Arango Exhibit 6 for identification,

13                    as of this date.)

14        A.    Just to clarify, it's 2014.  That's

15   what I see in the --

16        Q.    Right now you have in front of

17   Arango 6, which is some email communication

18   dating back to 2014?

19        A.    Uh-huh.

20        Q.    After looking at this document,

21   you're correcting yourself to mean that your

22   communications with Pro Export were in 2014,

23   correct?

24        A.    2014, yes.

25        Q.    Thank you.
```

Page 96

```
 1                      L. ARANGO
 2               MR. INGBER:  These documents,
 3          just for the record, are numbered
 4          IAZDNJ0002505 through 2507.
 5     Q.   Now, on 2506, which is the second
 6  page, there's an email from you dated May 30th,
 7  2014 to Elena Bustamante Crump.
 8     A.   Correct.
 9     Q.   Who is she?
10     A.   She's the representative from the
11  Pro Export in Texas.
12     Q.   Now, according to this email, you
13  say:  I would like to see if Pro Export can
14  advise us of some products they have always
15  wanted to bring, but they say there that they
16  can't be brought to the US for some restrictions
17  from the US government.  In particular, they are
18  some Zenu products.
19          Do you know what the restrictions that you're
20  talking about here refer to?
21     A.   Yeah.  The cans.  The cans have some
22  limitations about bringing the product to the
23  US, and the TLC agreement with Colombia has some
24  restrictions.  As I am not a person with legal
25  knowledge about that, I proceed to go to Pro
```

Page 97

```
 1                    L. ARANGO
 2   Export because they have knowledge about the
 3   free trade agreement.
 4        Q.    Actually, it looks like the first
 5   page is the response to that; is that correct?
 6   2505.
 7        A.    Yeah.  He said we can meet in
 8   person.  Some time, I can send her product specs
 9   and information.
10        Q.    Did you respond to this?
11        A.    Yeah.  We talk about it over the
12   phone, and he explained we can do it when she
13   advise me to go to Customs.
14        Q.    They asked you on 2505, Ms. Enela
15   said, Can you make a list of the products, their
16   specifications and the most important is what
17   percentage of meat are contained in the
18   preparation?
19        So did you do that?
20        A.    Yeah, but not to her.  I call her to
21   say, the best way you can make it -- she said
22   you can make it.  We reviewed the agreement.
23   But there are some limitations on the meat
24   content, so proceed to send to Customs, real
25   samples, and they can give you feedback.
```

Page 98

L. ARANGO

1

2      Q.     Did you do any surveys or take any

3   tests to determine if Zenu had any brand

4   recognition in the US?

5      A.     No.

6      Q.     Are you aware of any -- again,

7   you're aware now of Latinfood selling

8   Zenu-branded products; is that correct?

9      A.     Yes.

10      Q.     Are you aware of any consumers being

11   confused about who is making Zenu-branded

12   products in the US?

13      A.     That I'm aware of, no.

14      Q.     Are you aware of any incident or

15   person or company in the US who has been

16   confused as to whether the goods sold under the

17   Zenu mark are Industria's and not Latinfood?

18      A.     No.

19      Q.     Has anyone ever contacted you or

20   Industria to see if you're affiliated with

21   Latinfood in the US?

22             MR. RAYMOND:  Objection to the

23             form of the question.  Again, he's

24             not here to testify for Industria.

25             He can testify as to Cordialsa.

```
 1                    L. ARANGO
 2   better the content of origin.
 3        Q.    Where would you mark that?  On the
 4   label?
 5        A.    The label.
 6        Q.    So --
 7        A.    We send the samples, and they gave
 8   back to us with recommendations.
 9        Q.    So I summarized this as saying that
10   that there's a labeling issue.
11        A.    No.
12        Q.    If it's not -- if the label is not
13   properly marked, then I guess --
14        A.    The objective was to -- the tariff
15   classification of the can beans, as you see on
16   the title.  They review it.  They gave feedback,
17   and they send a recommendation to properly mark
18   the country of origin.
19        Q.    Would that be -- to properly mark it
20   on the label; is that correct?
21        A.    Yes.
22        Q.    So the label would need to be
23   changed?
24        A.    That's the recommendation.
25        Q.    Did you do that?
```

```
 1                    L. ARANGO
 2        A.    We didn't bring the product up to
 3   that, because as I mentioned before, in 2014 we
 4   were working a lot on the product, but it has to
 5   be stopped in 2014.
 6        Q.    And this is 2011?
 7        A.    Yes.
 8        Q.    But just mentioned 2014.  That's
 9   over three years later.
10        A.    The pro --
11             MR. RAYMOND:  Wait for him to ask
12             you a question.
13        Q.    So why are you talking about 2014
14   when this letter is dated January 12th, 2011?
15        A.    Maybe I misunderstood the years.
16   But the whole process in 2011, there were two
17   steps.  2011 and 2014.  2011, when we sent the
18   samples, the objective was to get the tariff
19   classification, and they requested samples.  We
20   sent them over.  They gave us the
21   recommendations.
22        From 2011 to 2014, there are some years.  At
23   that time we were increasing a lot our
24   distribution.  We need more volume, we need more
25   sales.  So we were focusing our effort and
```

```
                                         Page 108
 1                   L. ARANGO
 2    increasing distribution.  That -- it's not that we
 3    didn't want the product.  We were doing a lot,
 4    increasing distribution.
 5         2014, because we had a success with other
 6    lines, I add, Please send me over -- because when
 7    we get the project again, I say, Please -- in
 8    March, in the meeting that I have in March, I need
 9    the product -- project back again, because I need
10    the product for my distribution.
11         Q.    Were there any issues with the
12    trademarking in 2011, to your knowledge?
13         A.    No.
14         Q.    Did this have anything to do, to
15    your knowledge, this letter, with Latinfood?
16         A.    No.
17         Q.    So in connection with this document
18    in 2011, you got a notice from US Customs
19    telling you what to do to change the labeling;
20    is that correct?
21                MR. RAYMOND:  It's been asked and
22                answered about 100 times, but you
23                want him to say it again?  He took
24                it as a recommendation.  He said it
25                over and over again.
```

```
                                          Page 109

 1                    L. ARANGO
 2        A.    The objective was to get the tariff,
 3    the classification, and how it goes with the
 4    free trade agreement.  They send back a
 5    recommendation, that we received.
 6        Q.    So nothing happened -- or did
 7    anything happen from 2011 through 2014 in
 8    connection with bringing in Zenu-branded product
 9    into the US?
10        A.    No.
11        Q.    Do you know if there was ever a
12    response made by Cordialsa to this letter?
13        A.    No.  We didn't have to.
14        Q.    Back in 2011, did Cordialsa work
15    with a US Customs broker to try and get
16    Zenu-branded products into the US?
17        A.    No, I think the way you're saying it
18    is not correct.
19        Q.    What is the correct way?
20        A.    We worked with our Customs broker,
21    and his recommendation was to send samples to
22    Customs to get the ruling.
23        Q.    Was that Mr. Fleischer?
24        A.    Yes.
25        Q.    What was the result of that testing?
```

```
                                                    Page 110

  1                       L. ARANGO

  2          A.     The letter.

  3          Q.     Was there any follow-up testing

  4     done?

  5          A.     No.   The ruling is just a document

  6     they send, that was the tariff classification.

  7     That was the whole purpose.

  8          Q.     Did Cordialsa attempt to bring

  9     Zenu-branded products into the US for sale in

 10     2014?

 11          A.     As I mentioned before, I work on

 12     different things to bring the product in 2014.

 13          Q.     Was Cordialsa successful in 2014?

 14               MR. RAYMOND:   Object to the form.

 15               Successful at what?

 16          Q.     In bringing Industria Zenu-branded

 17     products to the US for sale in 2014 -- was

 18     Cordialsa successful?

 19               MR. RAYMOND:   I object to the

 20               form.   But if you understand, you

 21               can answer.

 22          A.     I don't really understand what

 23     successful mean, but we did a lot.   But at the

 24     end, we didn't bring the product because of the

 25     trademark.
```

Page 111

1              L. ARANGO

2        Q.    Now, are you aware if Zenu-branded

3   products owned by Industria were canceled in the

4   US -- trademarks?  Excuse me.

5        A.    Can you repeat that?

6        Q.    Are you aware if Industria's US

7   trademarks for Zenu-branded products were

8   canceled in the US?

9        A.    I don't know about Zenu product.  I

10  can only speak about Cordialsa.

11       Q.    Do you have any knowledge of an

12  individual named Jairo?

13       A.    Who?

14       Q.    Jairo, J-A-I-R-O.

15       A.    Do you have the last name?

16       Q.    That is the last name, J-A-I-R-O.

17  First name is John.  Second name is Jairo.

18       A.    Jairo is a second name in Colombia,

19  so maybe not a last name.  There are many John

20  Jairos.

21       Q.    Do you know any?

22       A.    No.

23       Q.    Okay.  Thank you.  I'm going to talk

24  to you a little bit about Alejandro Yepes.  Do

25  you know who he is?

Page 117

```
 1                    L. ARANGO
 2   products made under the Zenu brand.
 3        Is that what you see?
 4        A.    Yes.
 5        Q.    Were these photos -- we don't have
 6   the photos in front of us, I'm not sure if this
 7   is something that came Tuesday or something --
 8              MR. RAYMOND:  No.  This was
 9              produced months ago.
10              MR. INGBER:  Do you know if
11              photos were attached to this?
12              (Whereupon, an off-the-record
13              discussion was held.)
14        Q.    Were these the Latinfood Zenu photos
15   that --
16        A.    Yes.
17        Q.    Yes?
18              MR. RAYMOND:  When you say "the
19              Latinfood," which Latinfood Zenu?
20        A.    Red bean cans.
21        Q.    Red bean cans.  I remember that.
22   Was that the first time you had seen any
23   Latinfood Zenu products?
24        A.    No.  This was an email they send
25   me --
```

Page 118

```
 1                        L. ARANGO
 2        Q.    You're sending the email.
 3              MR. RAYMOND:  Let him finish the
 4        answer.
 5        A.    2014, some of the Alejandro and
 6   Alexander, he's the guy in the email, he used to
 7   be our marketing guy.  They sold products in the
 8   supermarket.  One of the events you see, the
 9   email was sent from Alex Yepes to me, with those
10   two pictures.  I forward them to the corporate.
11        Q.    You think that might have been
12   December 1st, 2014, looking at 2475?
13        A.    It was December.
14        Q.    December.
15        A.    Uh-huh.
16        Q.    And that's the email you're
17   referring to that Mr. Yepes sent you the photos?
18        A.    This particular evidence was email
19   he sent me, but I personally saw in the store,
20   too.
21        Q.    How did you see?
22        A.    I saw the store.
23        Q.    You went to the store?
24        A.    Not this event.  It was
25   another event.
```

Page 119

1                          L. ARANGO

2        Q.    When did you see it?

3        A.    In 2014.

4        Q.    When in 2014?

5        A.    I don't remember.

6        Q.    Would it have been before December?

7        A.    Yes -- not sure, exactly.  But I saw

8    the product in one of the supermarkets.

9        Q.    Do you have any records that could

10   confirm when you first saw it?

11       A.    Yeah.

12             MR. INGBER:  Can I have this

13             marked as Exhibit 9?

14             (Email dated 12/3/14 is received

15             and marked as Arango Exhibit 9 for

16             identification, as of this date.)

17       Q.    Have you seen this document before?

18       A.    Yes.

19       Q.    This is documents 2480 through 2482.

20   And on 2481, the last email on the page, there's

21   a -- I believe it's 9/10 or 9/11.  I believe

22   it's September 10, 2014 at 7:36 p.m.  You're

23   emailing Hernando; is that correct?

24       A.    Correct.

25       Q.    Now, you say here, the last

Page 124

```
 1                    L. ARANGO
 2   With all of the merchandising, appropriate as
 3   the brand requires; this is one.  The second is
 4   to create ideas for generating more sales at the
 5   store.
 6        Q.    But Cordialsa -- was Cordialsa ever
 7   marketing or distributing Zenu-branded products
 8   in the New York metropolitan area?
 9        A.    No.
10        Q.    How about Ranchera?
11        A.    No.
12        Q.    Do you know or have you heard of
13   Elvis Rodriguez?
14        A.    I've heard about him.
15        Q.    Have you ever met him?
16        A.    No.
17        Q.    Now, Mr. Rodriguez testified that
18   Mr. Yepes visited him on or about July 15, 2015,
19   and said that he was directed by you, Luis
20   Arango, of Cordialsa, to tell stores that all
21   Zenu product -- all Zenu-branded products sold
22   by companies who are not Industria
23   are unauthorized.
24        Are you aware of that?
25        A.    No.  He said that, but that's not
```

```
 1                       L. ARANGO
 2    true.
 3         Q.    He said that?  Mr. Rodriquez is not
 4    saying the truth?
 5         A.    I don't know.  I didn't do any
 6    indication to Alex Yepes, as you mentioned,
 7    other -- they were not Zenu products.
 8         Q.    "Authorized" you mean?
 9         A.    Authorized.
10         Q.    Were you aware of this incident?
11         A.    Yeah.  He called me.
12         Q.    What did he tell you?
13         A.    He called me and said he has an
14    incident, that he saw some products at the store
15    under Zenu.  And the owner of the Latinfood was
16    present.  And he said the owner of the Latinfood
17    was saying he said they were fake, and he told
18    me that the only thing he mentioned was, they
19    were not the real product that are in Colombia.
20    And I say that's okay, that's not a product in
21    Colombia.
22         Q.    Did you give him any instructions
23    about visiting stores in this area regarding if
24    he found any Zenu-branded products?
25         A.    No.
```

1                    L. ARANGO

2        Q.   We know for sure that you are aware

3   of Latinfood selling Zenu products in September

4   of 2014, I believe; is that correct?

5        A.   I don't remember exactly, but I was

6   aware the product was there before.

7        Q.   And what did you do in response to

8   that?

9        A.   It's my responsibility to forward

10  the pictures to the corporate, and they have to

11  take care of the situation.

12       Q.   Did they tell you to do anything in

13  response?

14       A.   No.

15       Q.   Did you tell -- you said it was

16  okay, I believe, if Mr. Yepes told these -- any

17  locations that were selling Zenu-branded

18  products that they were unauthorized; is that

19  correct?

20            MR. RAYMOND:  Objection to the

21            form of the question.  He did not

22            say that.  It was with respect to

23            one conversation.

24       Q.   What did you say?

25            MR. RAYMOND:  He's already said

Page 127

1                        L. ARANGO

2            it.  Let's read it back.

3        A.    On the event that you mentioned on

4   July 15th, he told me what happened.  I said,

5   Don't worry.  That's not a product we sell in

6   Colombia.  That's okay.

7        Q.    What were those products?  Do you

8   know, the ones sold in Food Fair?

9        A.    He didn't mention specific.  He said

10  some items.

11       Q.    I think you just said they were not

12  the same products as were sold under the Zenu

13  mark in Latinfood?

14       A.    Yeah, because I knew the products

15  because -- they, in Maryland, and some areas

16  have informed me there were Zenu products at the

17  store.  But I did -- my only job was to refer

18  them to the corporate.  Nothing else.

19       Q.    When you say that the products were

20  different, do you mean that here they only sell

21  beans in the US, while -- or here they only sell

22  beans, but in, say, Colombia they sell meat

23  products, something to do with that?

24       A.    I don't understand the question.

25       Q.    You said there were different

```
 1                      L. ARANGO
 2   products.  Were they different food categories
 3   or just different looks, different --
 4        A.    No.  The item was similar to the
 5   Columbian product, but it's not the product that
 6   we made in Industria in Colombia, but it was
 7   identical.
 8        Q.    Did Mr. Yepes ever tell you that he
 9   called the Latinfood Zenu products fake?
10        A.    No.
11        Q.    Did Mr. Yepes call you right after
12   this incident?
13        A.    Yes.
14        Q.    What did he tell you -- did he tell
15   you he met Mr. Wilson Zuluaga of Latinfood?
16        A.    Yeah.  He just called me and told me
17   what happened and say, Don't worry.  That's good
18   to hear you told me what happened, but those are
19   not our products and don't worry.
20        Q.    Did he tell you that Mr. Zuluaga was
21   upset?
22        A.    He mentioned that, yeah.
23        Q.    Did you tell him he could keep doing
24   whatever he was doing as long as he said that
25   they were unauthorized?
```

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.